## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>　　　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 18-10512 (KBO)<br><br>Jointly Administered |
| LYNN TILTON; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC; OCTALUNA, LLC; OCTALUNA II, LLC; AND OCTALUNA III, LLC,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>MBIA INC., MBIA INSURANCE CORPORATION, U.S. BANK, N.A., ALVAREZ & MARSAL ZOHAR MANAGEMENT, CREDIT VALUE PARTNERS, LP, BARDIN HILL INVESTMENT PARTNERS F/K/A HALCYON CAPITAL MANAGEMENT LP, COÖPERATIEVE RABOBANK U.A., VÄRDE PARTNERS, INC., ASCENSION ALPHA FUND LLC, ASCENSION HEALTH MASTER PENSION TRUST, CAZ HALCYON OFFSHORE STRATEGIC OPPORTUNITIES FUND, L.P., CAZ HALCYON STRATEGIC OPPORTUNITIES FUND, L.P., BROWN UNIVERSITY, HCN LP, HALCYON EVERSOURCE CREDIT LLC, HLF LP, HLDR FUND I NUS LP, HLDR FUND I TE LP, HLDR FUND I UST LP, HALCYON VALLÉE BLANCHE MASTER FUND LP, BARDIN HILL EVENT- | Adversary No. 19-50390 (KBO) |

---

[1]  The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

DRIVEN MASTER FUND LP, PRAETOR
FUND I, A SUB FUND OF PRAETORIUM
FUND I ICAV; HIRTLE CALLAGHAN
TOTAL RETURN OFFSHORE FUND
LIMITED; HIRTLE CALLAGHAN TOTAL
RETURN OFFSHORE FUND II LIMITED;
HIRTLE CALLAGHAN TRADING
PARTNERS, L.P.; AND THIRD SERIES OF
HDML FUND I LLC.,

Defendants.

**COMPLAINT OF LYNN TILTON AND THE PATRIARCH & OCTALUNA ENTITIES
FOR EQUITABLE SUBORDINATION**

Plaintiffs (a) Lynn Tilton ("Ms. Tilton"), (b) Patriarch Partners VIII, LLC, Patriarch

Partners XIV, LLC, and Patriarch Partners XV, LLC (collectively, the "Patriarch Entities"); and

(c) Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC (collectively, the "Octaluna Entities,"

and together with Ms. Tilton and the Patriarch Entities, the "Plaintiffs"), by and through their

undersigned counsel, bring this action for equitable subordination against Defendants MBIA Inc.

and MBIA Insurance Corporation ("MBIA Insurance," and collectively with MBIA Inc.,

"MBIA"), U.S. Bank, N.A. ("U.S. Bank"), Alvarez & Marsal Zohar Management ("AMZM"),

Credit Value Partners, LP ("CVP"), Bardin Hill Investment Partners f/k/a Halcyon Capital

Management LP ("Halcyon"),[2] Coöperatieve Rabobank U.A. ("Rabobank"), and Värde Partners,

Inc. ("Värde," and the latter four entities collectively referred to as the "Original Zohar III

Controlling Class"), Ascension Alpha Fund LLC, Ascension Health Master Pension Trust, CAZ

Halcyon Offshore Strategic Opportunities Fund, L.P., CAZ Halcyon Strategic Opportunities Fund,

---

[2] On October 10, 2018, Halcyon Capital Management sold minority stakes to TPG Sixth Street Partners and Dyal Capital Partners. Concurrent with the transaction, the firm changed its name to Bardin Hill Investment Partners ("Bardin Hill"). Because the relevant documents in this matter referred to the entity as Halcyon Capital Management, this Complaint will continue to refer to it as Halcyon.

L.P., Brown University, HCN LP, Halcyon Eversource Credit LLC, HLF LP, HLDR Fund I NUS LP, HLDR Fund I TE LP, HLDR Fund I UST LP, Halcyon Vallée Blanche Master Fund LP, Bardin Hill Event-Driven Master Fund LP, Praetor Fund I, Praetorium Fund I ICAV, Hirtle Callaghan Total Return Offshore Fund Limited, Hirtle Callaghan Total Return Offshore Fund II Limited, Hirtle Callaghan Trading Partners, L.P., and Third Series of HDML Fund I LLC (the latter nineteen entities, together with CVP, Halcyon and Varde, collectively referred to as the "Current Zohar III Controlling Class," and together with the Original Zohar III Controlling Class, the "Zohar III Controlling Class").[3]  MBIA, U.S. Bank, AMZM, and the Zohar III Controlling Class are collectively referred to as the "Defendants."

## I.  PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for equitable subordination of Defendants' claims to those of Plaintiffs to thwart and seek redress from MBIA's long-running scheme—perpetrated with the assistance and support of U.S. Bank, AMZM, and the Zohar III Controlling Class—to rescue itself from the brink of financial ruin by wrongfully attempting to wrest from Ms. Tilton and the other Plaintiffs assets worth over a billion dollars.  Defendants' scheme—which was perpetrated in part while they controlled the Zohar Funds, and which has uniquely harmed

---

[3]   The members of the Original Zohar III Controlling Class entered into a "Common Interest Agreement" to work together as the "Controlling Party" of Zohar III, as that term is defined and used in the Zohar III Indenture.  The composition of the Zohar III Controlling Class changed in or around December 2018 when Rabobank transferred its Zohar III A-1R Notes to the following entities: Ascension Alpha Fund LLC, Ascension Health Master Pension Trust, CAZ Halcyon Offshore Strategic Opportunities Fund, L.P., CAZ Halcyon Strategic Opportunities Fund, L.P., Brown University, HCN LP, Halcyon Eversource Credit LLC, HLF LP, HLDR Fund I NUS LP, HLDR Fund I TE LP, HLDR Fund I UST LP, Halcyon Vallée Blanche Master Fund LP, Bardin Hill Event-Driven Master Fund LP, Praetor Fund I, Praetorium Fund I ICAV, Hirtle Callaghan Total Return Offshore Fund Limited, Hirtle Callaghan Total Return Offshore Fund II Limited, Hirtle Callaghan Trading Partners, L.P., and Third Series of HDML Fund I LLC.  On information and belief, the latter nineteen entities are currently managed by Halcyon, or an affiliate of Halcyon.  On information and belief, the Current Zohar III Controlling Class is the successor to the Original Zohar III Controlling Class in all material respects, and all members of the Original Zohar III Controlling Class except Rabobank continue to be members of the Current Zohar III Controlling Class.  This Complaint therefore refers collectively to the "Zohar III Controlling Class."

57772/0001-17905092v2

Plaintiffs—stretches over a period of years and has continued through MBIA's and the other Defendants' conduct in Debtors' bankruptcy cases (the "Chapter 11 Cases"), in conjunction with the administration of the Debtors' estate.[4]

2.     MBIA insured certain Class A notes for Zohar I and Zohar II—two investment funds that Ms. Tilton created in 2003 and 2005—which, together with the later-created Zohar III, used money from Ms. Tilton and investors to buy a portfolio of loans to distressed companies (the "Portfolio Companies"). Since the formation of the Zohar Funds, and consistent with their original design and strategy described in greater detail below, Ms. Tilton has managed and controlled the Portfolio Companies through her various roles as their Manager or Director, beneficial owner, and in some cases CEO. As part of that design and strategy, Ms. Tilton (through her Patriarch Entities) also controlled the terms of the Debtors' loans to the Portfolio Companies, by serving as the Zohar Funds' collateral manager (until MBIA and the other Defendants wrongfully wrested that control from Ms. Tilton pre-petition by inducing her to resign from her collateral manager role under false pretenses). This dual control—which was Ms. Tilton's central innovation in forming the Zohar Funds—enabled her to implement flexible and innovative turnaround solutions to create value for the Portfolio Companies and noteholders. MBIA intended, approved, and recognized Ms. Tilton's ownership and control of the Portfolio Companies for more than a decade until it became advantageous to MBIA and the other Defendants to reverse course and run from those prior

---

[4]   The debtors in this case are Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), Zohar III, Limited ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), Zohar CDO 2003-1, Corp. ("Zohar I Corp."), Zohar II 2005-1, Corp. ("Zohar II Corp.") and Zohar III, Corp. ("Zohar III, Corp.," and together with Zohar I Corp. and Zohar II Corp., the "Zohar Corps."). The Zohar Funds and the Zohar Corps (the "Debtors") are collectively the debtors and debtors-in-possession in the above-captioned Chapter 11 Cases. The Zohar Funds are owned through entities owned by Lynn Tilton, either directly or indirectly—Octaluna, LLC ("Octaluna I"), Octaluna II, LLC ("Octaluna II"), and Octaluna III, LLC ("Octaluna III", and, as noted, together with Octaluna I and Octaluna I, the "Octaluna Entities"). Each of the Octaluna Entities holds all of the preference shares of its respective Zohar Fund (Octaluna I holds Zohar I's preference shares, etc.). Through Ms. Tilton's ownership of the Zohar Funds, she is also the indirect owner of the Zohar Corps.

representations in a desperate attempt to seize assets from Ms. Tilton and sell them quickly for cash.

3.    Through discovery in the now-dismissed prepetition case brought by the Securities and Exchange Commission ("SEC") against Ms. Tilton and her Patriarch Entities, and in the prepetition action brought by the Zohar Funds at the direction and control of MBIA (through its agent AMZM) against Ms. Tilton, among other defendants, in Delaware seeking to take control of three Portfolio Companies (the "Delaware 225 Action")—discovery that MBIA fought vigorously to deny—Ms. Tilton was able to uncover the truth: That for years MBIA and the other Defendants, or their respective predecessors, have engaged in a surreptitious, inequitable scheme—with Plaintiffs as their target—seeking to capture the significant value in the underlying Portfolio Companies for themselves and to unfairly advantage themselves at the expense of Plaintiffs. Among other actions in furtherance of its scheme, MBIA wrongfully induced Ms. Tilton to purchase personally, for nearly $104 million, the A-3 Notes of Zohar I, which remained on par with the A-1 and A-2 notes only as long as Zohar I did not default, with the false promise that MBIA would extend Zohar I's maturity date with respect to the A-1 and A-2 notes if she did. MBIA then sought to (and did) bring about the default of Zohar I by refusing to agree to an extension of the maturity date, despite its prior representations to the contrary.  As a result, the A-3 Notes purportedly became subordinated to payments of principal and interest for the A-1 and A-2 Notes held by MBIA.

4.    MBIA also wrongfully induced Ms. Tilton to resign as collateral manager of all three Zohar Funds under false pretenses—including that MBIA agreed Ms. Tilton would "remain in her positions with," and "retain" "all ownership . . . positions in," the "underlying portfolio companies."  And after falsely assuring Ms. Tilton that she would have a role in the selection of

the replacement collateral manager, MBIA and the Zohar III Controlling Class unilaterally hand-picked the successor collateral manager, AMZM, to act at their behest.  With the Zohar III Controlling Class, AMZM, and U.S. Bank as its co-conspirators, MBIA sought to snatch ownership and control of Zohar I and the Portfolio Companies from Ms. Tilton: MBIA instructed U.S. Bank to conduct an auction of Zohar I collateral, through which MBIA purported to obtain equity interests in Portfolio Companies actually beneficially owned by Ms. Tilton and the other Plaintiffs.  Then MBIA and the Zohar III Controlling Class instructed AMZM to execute written consents to oust Ms. Tilton from her board positions with certain Portfolio Companies, even though MBIA and the Zohar III Controlling Class knew that the structure and purpose of the Zohar Funds, from inception, depended upon Ms. Tilton owning and controlling the Portfolio Companies.

5.      In furtherance of its scheme, MBIA entered into a secret deal with the SEC to obtain confidential information about the Portfolio Companies to use in a campaign of sham litigation against Ms. Tilton.  At the same time, MBIA sought to encourage and provoke the SEC to investigate Ms. Tilton and Patriarch on meritless fraud charges—a gambit that cost Ms. Tilton tens of millions of dollars in defense costs and nearly ruined her business and reputation—until an Administrative Law Judge (after a multi-week trial) ultimately fully exonerated Ms. Tilton in a 57-page decision that finally exposed this MBIA-instigated campaign for what it is: a relentless crusade to obtain Ms. Tilton's assets, based on accusations entirely unsupported by the facts.  All of the actions by MBIA and the other Defendants described herein constitute atypical behavior of lenders designed to give them an improper advantage over Plaintiffs.

6.      But this SEC decision served as only a temporary hurdle in this wrongful crusade of the Defendants, each working at MBIA's direction or in coordination with MBIA—to obtain

6

Plaintiffs' assets. With the SEC proceedings concluded, Defendants—through AMZM as collateral manager—opened new litigation fronts of their own, bringing wave after wave of suits against Ms. Tilton and the other Plaintiffs, including a now-dismissed civil RICO claim filed in the Southern District of New York that falsely accused Ms. Tilton and the other Plaintiffs of all manner of outrageous wrongdoing (much of which overlapped with the SEC's meritless allegations) and sought over a billion dollars from Ms. Tilton and the other Plaintiffs. Defendants well know that the fog of litigation they created with their myriad meritless actions has directly harmed Plaintiffs' investments in the Zohar Funds and the Portfolio Companies and cost Plaintiffs tens of millions of dollars in legal fees and expenses alone, in addition to myriad other fees and expenses.

7.      Defendants' scheme—orchestrated by MBIA—has continued throughout the pendency of these Chapter 11 Cases, which were initiated to lift the cloud created by Defendants' scorched earth litigation campaign and allow Ms. Tilton to successfully monetize the Zohar Funds' assets for the benefit of all stakeholders. At the outset, MBIA and the Zohar III Controlling Class's bad faith, inequitable conduct continued with the filing of a meritless motion to dismiss the bankruptcy proceedings that sought to replicate the scare tactics they employed in the RICO action—a strategy built on groundless accusations of wrongdoing. Indeed, the motion to dismiss repeated many of the same baseless canards advanced in the SEC proceeding and in the RICO complaint, even though both of those actions had resulted in full exoneration for Ms. Tilton. Only after Plaintiffs filed their opposition to the motion to dismiss did Defendants agree to mediation. After nearly five long days of mediation, the parties reached an agreement on a process to fully and finally resolve their dispute over the propriety of the bankruptcy cases, embark on a process to realize the maximum value of the underlying Portfolio Companies, and stay all further actions.

57772/0001-17905092v2

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. The Court eventually

approved the settlement agreement reached by the parties (the "Settlement Agreement"),[5] ███████

████████████████████████████████████████████████████████████████

████████████████████.

8.    Following approval of the Settlement Agreement, Ms. Tilton, working with the

Zohar Funds' Independent Director and Chief Restructuring Officer, invested her full energy into

the monetization process. ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████. Working for the benefit of all

stakeholders, she delivered multiple proposals that would have mitigated Defendants' damages

and ended the threat of value destructive litigation. Nevertheless, the proposals did not result in a

settlement. ███████████████████████████████████████████████████

█████████████████████████████████████████.

9.    Despite this history of inequitable conduct, each of the Defendants assert that it

holds a claim against the Zohar Funds senior to the claims of Plaintiffs. In reality, Defendants'

conduct should result in this Court entering an order subordinating those claims to the claims

asserted by each of the Plaintiffs.

---

[5]  A public version of the Settlement Agreement is attached to the *Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* [D.I. 266].

10. MBIA's and the other Defendants' serial pattern of inequitable conduct has resulted in an unfair advantage conferred to Defendants relative to Ms. Tilton and the other Plaintiffs in the Chapter 11 Cases, who are the primary other creditors holding claims against each of the Debtors. Each Defendant, moreover, was a "person in control of the debtor" and thus a statutory insider pursuant to 11 U.S.C. § 101(31)(B). Alternatively, Defendants are each a non-statutory insider, as each is "in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's-length" or were at their direction. Specifically, for the bulk of the Debtors' existence, MBIA (as the credit enhancer) and the Zohar III Controlling Class were the so-called "Controlling Party" and "Controlling Class," respectively, under the Zohar Funds' Indentures, entitling them to exercise significant control and rights over each of the Debtors (which they exercised to obtain an unfair advantage over Plaintiffs). From 2016 to the filing of the Chapter 11 Cases, AMZM was the Collateral Manager of each of the Zohar Funds, and U.S. Bank was their Trustee.

11. Defendants' actions, moreover, have specifically and uniquely targeted and harmed each of the Plaintiffs, including because Defendants' actions were taken to enable themselves to recoup the full value of their Zohar Fund investments (in addition to amounts not due to them at all) while, among other things, damaging the $896 million of secured Zohar Fund notes held by Plaintiffs; attempting to render worthless Ms. Tilton's sole ownership, through her ultimate ownership of the Plaintiff Octaluna Entities, of the Zohar Funds' preference shares; forcing Plaintiffs to incur tens of millions of dollars in legal fees; and causing significant reputational damage to Ms. Tilton and the other Plaintiffs. This pattern of inequitable conduct by the Defendants entitles Plaintiffs in this action to equitable subordination of Defendants' claims.

57772/0001-17905092v2

12.     In sum, MBIA and the other Defendants have unfairly advantaged themselves vis-à-vis the Plaintiffs.  The principles of equity, which are embedded in a claim for equitable subordination, require the Court to address Defendants' years of inequitable conduct and harm to Ms. Tilton and the other Plaintiffs.  Defendants should not be permitted to benefit from their "insider" status, which they used to inappropriately further their own interests, and improperly to position their own claims over those of Plaintiffs.  Defendants' claims should be subordinated to those of Ms. Tilton and the other Plaintiffs.  Subordination is the only result consistent with the provisions of the Bankruptcy Code, equity, and other applicable law.

## II. PARTIES AND OTHER RELEVANT ENTITIES

13.     Plaintiff Ms. Tilton is a natural person and a citizen and resident of Florida.  Ms. Tilton, through her various affiliated entities (a number of which are described below), acquires, manages, and invigorates undervalued, often distressed, iconic American brands and companies.  Ms. Tilton's business enterprise is one of the largest woman-owned businesses in the United States.  She is the owner and Chief Executive Officer of Patriarch Partners, LLC and is the principal owner of several affiliated entities, including each of the Patriarch Entities.  Ms. Tilton and Patriarch Partners, LLC ran the day-to-day operations of the Patriarch Entities.  Ms. Tilton also wholly owns, through affiliated entities, the Octaluna Entities, which at all relevant times have been the equity owners of the Debtors through each Octaluna Entity's ownership of all of the respective Zohar Fund's preference shares.  The Octaluna Entities also hold the class B notes of the Zohar Funds.  Ms. Tilton's claims against the Debtors are described in more detail below (*see infra* ¶ 68).

14.     Plaintiff Patriarch Partners VIII, LLC ("Patriarch VIII") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York.  Patriarch VIII is the managing member of

Octaluna I.  Patriarch VIII is wholly owned, through affiliated entities, by Ms. Tilton, and it was the collateral manager of Zohar I until it was induced to resign from that position under false pretenses in February 2016, effective March 3, 2016.  Patriarch VIII has a secured claim against Zohar I in an amount no less than $21,238,505.74.

15.    Plaintiff Patriarch Partners XIV, LLC ("Patriarch XIV") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York.   Patriarch XIV is the managing member of Octaluna II.  Patriarch XIV is wholly owned, through affiliated entities, by Ms. Tilton, and it was the collateral manager of Zohar II until it was induced to resign from that position under false pretenses in February 2016, effective March 3, 2016.  Patriarch XIV has a secured claim against Zohar II in an amount no less than $4,574,540.86.

16.    Plaintiff Patriarch Partners XV, LLC ("Patriarch XV") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York.   Patriarch XV is the managing member of Octaluna III.  Patriarch XV is wholly owned, through affiliated entities, by Ms. Tilton, and it was the collateral manager of Zohar III until it was induced to resign from that position under false pretenses in February 2016, effective March 3, 2016.  Patriarch XV has a secured claim against Zohar III in an amount no less than $2,281,497.95.   Patriarch XV also holds no less than $286,445,355 in principal amount owing under the Class A-3 Notes issued by Zohar I.

17.    Plaintiff Octaluna I is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York. It is a creditor of, and holds the class B notes and preference shares of, Zohar I.  Specifically,

Octaluna I holds no less than $150,000,000 in principal amount owing under the class B notes issued by Zohar I.  Octaluna I holds $5.1 million in preference shares of Zohar I.

18.      Plaintiff Octaluna II is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York. It is a creditor of, and holds the class B notes and preference shares of, Zohar II.  Specifically, Octaluna II holds no less than $200,000,000 in principal amount owing under the class B notes issued by Zohar II.  Octaluna II also holds $49.9 million in preference shares of Zohar II.

19.      Plaintiff Octaluna III is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York.   It is a creditor of, and holds the class B notes and preference shares of, Zohar III. Specifically, Octaluna III holds no less than $196,000,000 in principal amount owing under the class B notes issued by Zohar III.  Octaluna III holds $60 million in preference shares for Zohar III.

20.      Defendant MBIA, Inc. is a monoline insurer.  It is a publicly traded holding company.  Together with its subsidiaries, MBIA Inc. operates one of the largest financial guaranty insurers in the United States and is a provider of asset management advisory services.  Shares of MBIA Inc. common stock are traded on the New York Stock Exchange.  It has insured hundreds of billions of dollars in structured financial products, and paid approximately $149 million in claims as insurer under certain of the Zohar I notes and approximately $770 million in claims as insurer under the Zohar II notes.  MBIA is a disputed creditor of Zohar I, and it is a creditor of Zohar II.

21.      Defendant MBIA Insurance Corporation is a wholly owned subsidiary of MBIA, Inc., and primarily operates MBIA Inc.'s structured finance and international insurance business. MBIA Insurance Corporation is incorporated in New York and has its executive offices and

12

principal place of business in Purchase, Westchester County, New York. MBIA Insurance Corporation underwrote financial guaranty insurance on the Class A-1 and A-2 notes of Zohar I and Zohar II, and paid out insurance claims following the Zohar I and Zohar II defaults. MBIA is a disputed creditor of Zohar I, and it is a creditor of Zohar II.

22.     Defendant U.S. Bank is a national banking association with offices in New York County, New York. U.S. Bank is the Trustee under the Zohar I, Zohar II, and Zohar III Indentures. U.S. Bank is a creditor of Zohar II and Zohar III.

23.     Defendant Credit Value Partners, LP ("CVP") is a Delaware partnership with offices in New York, New York. CVP is a noteholder and creditor of Zohar III.

24.     Defendant Halcyon Capital Management LP ("Halcyon") is a New York partnership headquartered in New York, New York. Halcyon is a noteholder and creditor of Zohar III. On October 10, 2018, Halcyon Capital Management sold minority stakes to TPG Sixth Street Partners and Dyal Capital Partners. Concurrent with the transaction, the firm changed its name to Bardin Hill Investment Partners ("Bardin Hill"). Because the relevant documents in this matter referred to the entity as Halcyon Capital Management, this Complaint will continue to refer to it as Halcyon.

25.     Defendant Coöperatieve Rabobank U.A. ("Rabobank") is a Dutch multinational banking and financial services company with offices in New York, New York. Rabobank was a noteholder and creditor of Zohar III. This position was subsequently purchased by Defendant Bardin Hill.

26.     Defendant Värde Partners, Inc. ("Värde") is a Delaware company headquartered in Minnesota with offices in New York, New York. Värde is a noteholder and creditor of Zohar III.

27.     Defendant Ascension Alpha Fund LLC is a Delaware company headquartered in Missouri.  Ascension Alpha Fund LLC is a noteholder and creditor of Zohar III.

28.     Defendant Ascension Health Master Pension Trust is headquartered in Missouri. Ascension Health Master Pension Trust is a noteholder and creditor of Zohar III.

29.     Defendant CAZ Halcyon Offshore Strategic Opportunities Fund, L.P. is a Cayman Islands company headquartered in the Cayman Islands.  CAZ Halcyon Offshore Strategic Opportunities Fund, L.P. is a noteholder and creditor of Zohar III.

30.     Defendant CAZ Halcyon Strategic Opportunities Fund, L.P. is a Delaware company headquartered in Texas.  CAZ Halcyon Strategic Opportunities Fund, L.P. is a noteholder and creditor of Zohar III.

31.     Defendant Brown University is a Rhode Island company headquartered in Rhode Island.  Brown University is a noteholder and creditor of Zohar III.

32.     Defendant Halcyon Eversource Credit LLC is a Delaware company headquartered in New York.  Halcyon Eversource Credit LLC is a noteholder and creditor of Zohar III.

33.     Defendant HCN LP is a Delaware company headquartered in New York.  HCN LP is a noteholder and creditor of Zohar III.

34.     Defendant HLF LP is a Delaware company headquartered in New York.  HLF LP is a noteholder and creditor of Zohar III.

35.     Defendant HLDR Fund I NUS LP is a Cayman Islands company headquartered in New York.  HLDR Fund I NUS LP is a noteholder and creditor of Zohar III.

36.     Defendant HLDR Fund I TE LP is a Cayman Islands company headquartered in New York.  HLDR Fund I TE LP is a noteholder and creditor of Zohar III.

14

37.    Defendant HLDR Fund I UST LP is a Cayman Islands company headquartered in New York.  HLDR Fund I UST LP is a noteholder and creditor of Zohar III.

38.    Defendant Halcyon Vallée Blanche Master Fund LP is a Canadian company headquartered in Canada.  Halcyon Vallée Blanche Master Fund LP is a noteholder and creditor of Zohar III.

39.    Defendant Bardin Hill Event-Driven Master Fund LP is a Cayman Islands company headquartered in New York.  Bardin Hill Event-Driven Master Fund LP is a noteholder and creditor of Zohar III.

40.    Defendant Praetorium Fund I ICAV is an Ireland company headquartered in Ireland.  Praetor Fund I is a sub-fund of Praetorium Fund I ICAV.  Praetorium Fund I ICAV and Praetor Fund I are noteholders and creditors of Zohar III.

41.    Defendant Hirtle Callaghan Total Return Offshore Fund Limited is a Cayman Islands company headquartered in Pennsylvania.  Hirtle Callaghan Total Return Offshore Fund Limited is a noteholder and creditor of Zohar III.

42.    Defendant Hirtle Callaghan Total Return Offshore Fund II Limited is a Cayman Islands company headquartered in Pennsylvania.  Hirtle Callaghan Total Return Offshore Fund II Limited is a noteholder and creditor of Zohar III.

43.    Defendant Hirtle Callaghan Trading Partners, L.P. is a Pennsylvania Company headquartered in Pennsylvania.  Hirtle Callaghan Trading Partners, L.P. is a noteholder and creditor of Zohar III.

44.    Defendant Third Series of HDML Fund I LLC is a Delaware company headquartered in New York.  Third Series of HDML Fund I LLC is a noteholder and creditor of Zohar III.

57772/0001-17905092v2

45.    Defendant Alvarez & Marsal Zohar Management ("AMZM") is a Delaware limited liability company with a principal place of business at 600 Madison Avenue 8th Floor, New York, NY 10022.  On February 3, 2016, Ms. Tilton tendered the voluntary resignations of Patriarch as collateral manager for the Zohar Funds, premised on the misrepresentations described herein that Ms. Tilton would remain in her positions with the Portfolio Companies, and retain ownership and control of them.  On March 3, 2016, AMZM was appointed by MBIA, as Controlling Party under the Zohar I and II Indentures, as the successor collateral manager of Zohar I and II.  That same day, AMZM also was appointed by the Zohar III Controlling Class as the successor collateral manager of Zohar III.  AMZM was terminated as collateral manager under the Settlement Agreement.  AMZM purports to be a creditor of the Zohar Funds.

46.    Debtors Zohar I, Zohar II, and Zohar III are companies organized under the laws of the Cayman Islands.  They are investment funds that Ms. Tilton, together with her affiliated entities, conceived, structured, owns, and for many years managed.  Zohar I is owned by Octaluna I, Zohar II is owned by Octaluna II, and Zohar III is owned by Octaluna III.  Ms. Tilton is and at all relevant times has been the ultimate owner of the Zohar Funds, through her ownership (through affiliated entities) of the Octaluna Entities.  Ms. Tilton was previously the sole director of each of the Zohar Funds; under the Settlement Agreement, she was replaced with a new independent director (the "Independent Director") and chief restructuring officer (the "Chief Restructuring Officer"), with Ms. Tilton remaining as tax director.

### III. JURISDICTION AND VENUE

47.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

48.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A), (B), (K), and (O).

49.     Plaintiffs do not consent to entry of a final order by this Court.

50.     Venue is proper in the Court pursuant to 28 U.S.C. § 1408 and 1409(a).

### IV. FACTUAL ALLEGATIONS

**A.     Ms. Tilton, with MBIA, Structures and Runs the Zohar Funds Pursuant to Her Innovative Control Strategy.**

**1.     Ms. Tilton Creates the Zohar Funds as Distressed Loan CLOs.**

51.     In 2000, after 19 years of experience on Wall Street, Ms. Tilton founded Patriarch Partners to develop innovative solutions for financial institutions holding large portfolios of nonperforming and distressed loans that were causing accounting and regulatory problems for those institutions.  Ms. Tilton created a groundbreaking model for investing in a portfolio of distressed loans through a collateralized loan obligation ("CLO").[6]

52.     In Ms. Tilton's model, the CLO would use funds borrowed from investors to purchase a portfolio of distressed loans at a discount and, through active management and restructuring, repay noteholder investors their principal plus interest, with residual value flowing to the equity owner of the CLO (here Ms. Tilton, as indirect owner of all the Zohar Funds' preference shares).  The noteholders are entitled to only repayment of their notes plus interest; should the CLO generate enough money to repay the notes in full plus interest, all other money flows to the owner of the CLO and is not shared with the noteholders.  In this model, a "collateral manager" is tasked with, among other things, determining what loans to purchase or originate on behalf of the CLO fund.  This asset class—distressed senior secured loans—had never before been used in a CLO structure.

---

[6]  A typical CLO is an investment vehicle created to buy a collateral pool of debt instruments, primarily commercial loans.  CLOs borrow money to buy the collateral pool by issuing securities or instruments to investors typically in the form of notes and preference shares.  The collateral pool secures the notes and preference shares and generates the cash flow the CLO will use to make payments due on them over time.

53.    Ms. Tilton developed a method for evaluating distressed loans and, in November 2003, was granted a business method patent—Patent No. US 6,654,727 B2. This method involved analyzing potential cash flows and other factors, and determining whether to purchase the loans and an appropriate price. Each loan Ms. Tilton considered was evaluated as part of a portfolio that would generate sufficient cash flow to pay expenses and investors. Although some of the loans in the pool had a high likelihood of paying interest at high rates on a consistent basis, other loans involved transactions with more default risk but with the potential for greater profits.

54.    Ms. Tilton initially created two CLOs in 2000 and 2001—Ark I CLO 2000-1, Ltd. and Ark II (collectively, the "Arks")—based on her innovative investment strategy. MBIA insured Ark II. The Arks were widely recognized as extremely successful, and were considered the best-performing CLOs ever structured. The ratings for each note tranche in both Ark I and Ark II were upgraded during the life of the transactions, and the Arks repaid noteholders well ahead of the notes' maturity dates.

55.    Due to the success of the Arks, MBIA asked Ms. Tilton to give it priority on any similar transaction she created in the future. Later, in the early 2000s, facing a potential insurance liability shortfall of $200 to $300 million on a set of seven failing collateralized debt obligations ("CDOs"), MBIA sought Ms. Tilton's help. Ms. Tilton responded by creating a new CLO called Zohar I, which was modeled after the Ark investment strategy and structure. As part of the Zohar I deal, which closed in 2003, Patriarch took over as replacement collateral manager for MBIA's seven failing CDOs. MBIA, in turn, insured the Class A notes for Zohar I.

56.    After Zohar I closed, prices for distressed loans increased, and the Zohar I investment strategy evolved. While Zohar I continued to purchase distressed senior secured loans, the primary strategy shifted to include Zohar I originating loans to distressed companies side-by-

18

side with Ms. Tilton's personal investment vehicles.  Ms. Tilton would obtain controlling equity positions in the Portfolio Companies and then use her experience and expertise to manage the Portfolio Companies and implement a long-term turnaround strategy to create value.

57.     MBIA agreed to proceed with the revised investment strategy, and the governing documents for Zohar I were amended accordingly.

58.     Zohar II and Zohar III were created in 2005 and 2007, respectively, to loan side-by-side with Zohar I, and with the same investment strategy.

59.     Each Zohar transaction was governed by an Indenture, a Collateral Management Agreement, and a Collateral Administration Agreement, each of which was heavily negotiated by multiple sophisticated parties, including MBIA.  The Zohar Funds Indentures notified noteholders that the collateral manager (initially the Patriarch Entities) would have considerable flexibility in managing the Portfolio Companies' loans.  They also disclosed a potential conflict of interest in that Ms. Tilton would also own equity, stock, or membership interests in the Portfolio Companies.  And they made clear that the noteholders were entitled to only the repayment of the notes plus interest, with any excess monies flowing to the preference shareholder.

60.     As "credit enhancer" under the Zohar I and II Indentures, MBIA provided an insurance guaranty for the Class A notes of Zohar I and II.  This guaranty provided that, if the Zohar Funds could not meet their repayment obligations under the notes, MBIA would do so.  Accordingly, MBIA took on the role of a senior investor in the negotiations of the Zohar I and II Indentures, commenting extensively on all terms of the transaction.

61.     MBIA did not insure notes for Zohar III.  As such, the Indenture for that Fund vests controlling-party status on the Zohar III Controlling Class.

19

> **2.    Ms. Tilton's Unique Turnaround Strategy Depends on Her Active Management and Control of Distressed Portfolio Companies.**

62.    Like typical CLOs, the Zohar Funds raised capital by issuing notes, which entitled the noteholders to interest payments over time and return of their principal at the maturity date.

63.    The Zohar Funds noteholders were paid according to a "waterfall."  Under the Zohar Funds' waterfall, as set forth in governing documents discussed more fully below, available funds were generally distributed first for the payment of certain fees and expenses; second, for interest and principal payments to noteholders; and third, limited distributions were made to preference shareholders subject to a cap.  Once all noteholders were repaid, the preference shareholders received any remaining funds.  The waterfall for Zohar I and II also included payments to MBIA for insurance premiums.

64.    The fundamental investment strategy and value proposition of the Zohar Funds differed markedly from traditional CLOs.  Most CLOs involved highly rated performing bank loans, where the expectation was that there would be few defaults and interest and principal would be paid when due, according to the terms of the original loan agreement.  The Zohar Funds, on the other hand, held distressed loans purchased from the secondary market, and loans originated at high interest rates by the Zohar Funds, themselves, to distressed Portfolio Companies whose capital financing needs were not likely to be fulfilled through standard lending practices.

65.    The unique investment strategy of the Zohar Funds was heavily dependent on Ms. Tilton's ability to control the terms of repayment on the loans, as well as her control of, and active participation in, the rehabilitation of the Portfolio Companies from the inside—typically as the CEO or director or manager of the Portfolio Companies.  That Ms. Tilton exercised control of not only the Zohar CLOs (the lenders) through her role as collateral manager of the Zohar Funds, but also of the underlying Portfolio Companies (the borrowers), was very different from typical

CLOs.  An investment in the Zohar Funds was thus an investment in Ms. Tilton's financial and managerial expertise, as all Fund noteholders understood.

66.     The structure of the Zohar Funds was built on the understanding by all stakeholders, including MBIA, that Ms. Tilton would wear many hats with respect to the Zohar Funds and the Portfolio Companies.  These roles included Manager of the collateral manager, active leadership at the Portfolio Company level, Director and/or Manager of the Portfolio Companies, owner and Manager of Patriarch Partners Management Group, LLC ("PPMG") (provider of operational, advisory, and other services to the Portfolio Companies), owner and Manager of Patriarch Partners Agency Services, LLC ("PPAS") (PPAS was the administrative agent for the secured lenders, including the Zohar Funds, under the credit agreement with the Portfolio Companies, in which capacity PPAS, among other things, invoiced the Portfolio Companies for principal and interest. In spring 2019, PPAS transferred administrative agent responsibilities solely insofar as they related to the Zohar Funds to a new administrative agent in accordance with the terms of the Settlement Agreement.  PPAS continues to serve as administrative agent for the non-Zohar secured lenders under the relevant credit agreements.), and ultimate owner of the Zohar Funds.

67.     Because it was highly unusual for a CLO to have an investment strategy that required the collateral manager to engage in such varied responsibilities, the transaction documents disclosed, and the Zohar Funds and their stakeholders acknowledged and "waive[d]," "various potential and actual conflicts of interest . . . with respect to the Collateral Manager and its Related Parties" arising from "the overall advisory, investment and other activities of the Collateral Manager and its Affiliates."  *E.g.*, Zohar II CMA § 6.2(a)-(b).

68.     Moreover, Ms. Tilton's interests were carefully calibrated to align with the other interested parties, including MBIA, from the inception of the transaction.  *See* 2010 MBIA

Memorandum (describing the "strong alignment of interest" between Ms. Tilton and other stakeholders).  In addition to her other roles, Ms. Tilton is the sole equity owner of the Zohar Funds through the preference shares held by her Octalunas.  She has invested hundreds of millions of dollars of her personal money into the Zohar Funds in exchange for those preference shares and other rights.  Ms. Tilton has personally invested in the preference shares of the Zohar Funds: approximately $5.1 million in Zohar I through Octaluna I, $50 million in Zohar II through Octaluna II, and $60 million in Zohar III through Octaluna III, respectively.  She also (a) invested more than $103 million for the Zohar I A-3 notes through Patriarch Partners XV, LLC, and (b) is the holder of class B notes (i) issued by Zohar I in the amount of $150 million through Octaluna I, (ii) issued by Zohar II in the amount of $200 million through Octaluna II, and (iii) issued by Zohar III in the amount of $196 million through Octaluna III.  In addition, Ms. Tilton, through other entities not party to this Complaint, has a direct financial stake in the Portfolio Companies, with more than $575 million of her personal funds invested in loans and equity of the Portfolio Companies.

69.     As preference shareholder and sole equity owner of the Zohar Funds, Ms. Tilton is to receive the residual value in the Zohar Funds after the notes are repaid; until then, she is entitled to only a capped amount of dividends.  Those caps were reached in November 2005, April 2007, and September 2010 for Zohar I, Zohar II, and Zohar III, respectively.  This structure, which was insisted upon by the stakeholders at formation of the Zohar Funds, ensures that Ms. Tilton's interests are aligned with the Zohar Funds, their noteholders, and the Portfolio Companies because the value of Ms. Tilton's preference shares is tied directly to, and dependent on, the value of the Portfolio Companies and the success of the Zohar Funds.

70.    In the course of structuring the Zohar Funds transactions, the ratings agencies insisted that the Zohar Funds could not purchase common equity and, generally, not own equity, because equity ownership could result in significant tax and other liabilities.  As a result, Ms. Tilton (through her Octaluna Entities), rather than the Zohar Funds, agreed to own, hold, and control the Portfolio Companies' equity, as well as the Zohar Funds' equity, and bear the tax consequences of ownership so long as she retains her ownership and control positions with the Portfolio Companies.  This structure would enable Ms. Tilton to control the Portfolio Companies in order to turn them around and build value, without violating the Zohar Funds' indentures by acquiring assets that could cause tax liability.  The structure was agreed to by the controlling class, rating agencies, Ms. Tilton, and the noteholders who signed on to the deal at closing.

71.    The Indentures and other governing documents reflected this understanding and expressly prohibited the Zohar Funds from owning equity, subject to narrow exceptions. Specifically, the Indentures state that to be "eligible for inclusion of the Collateral," a security cannot be an "Equity Security," which is defined broadly to include "any . . . security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal."  The Indentures similarly prohibit the Zohar Funds from "purchas[ing]" any "Equity Security."  In addition, the Indentures include negative covenants that prevent the acquisition of any collateral that could subject the Zohar Funds to an "encumbrance."

72.    Ms. Tilton negotiated for narrow exceptions to these prohibitions so that she would have flexibility to restructure debt and generate extra cash flows for noteholders.  The exceptions, however, could never permit a controlling share of equity because that would expose the Zohar Funds to tax and other liabilities, barred by the Indentures and the rating agencies.

73.     Finally, as a last component of the Zohar Funds' strategy, Ms. Tilton put certain Portfolio Company equity in the Zohar Funds' name as "record holder" only, to memorialize the Zohar Funds' limited right to receive the net proceeds from any sale of Portfolio Company equity. Net proceeds from a sale of the Portfolio Company equity owned by the Octaluna Entities would flow through the Zohar Funds' waterfall, satisfying any outstanding obligations to the Zohar Funds' noteholders (namely, principal and interest due), and paying expenses, before the residual proceeds flowed to Ms. Tilton, as the ultimate owner of all of the Zohar Funds' preference shares and the Portfolio Companies.

74.     This structure, which was insisted upon by the stakeholders, ensures that Ms. Tilton's interests are aligned with those of the Zohar Funds and their noteholders, as well as the Portfolio Companies, because the value of Ms. Tilton's preference shares is tied directly to, and dependent on, the value of the Portfolio Companies and the success of the Zohar Funds.  And this structure, in which Ms. Tilton (through the Octaluna Entities) owns and controls significant portions of the Portfolio Company equity, while granting the Zohar Funds the limited right to receive the net proceeds from the sales of Portfolio Companies, was the fundamental compromise permitting Ms. Tilton to implement her innovative "control strategy" while satisfying the concerns of the rating agencies over potential liabilities.

> **3.      Ms. Tilton Actively Manages and Revitalizes the Portfolio Companies While Bearing the Burdens of Ownership.**

75.     From the formation of the Zohar Funds, Ms. Tilton managed and controlled every aspect of the Portfolio Companies' turnarounds through her various roles, consistent with the Zohar Funds' design.  The Zohar Funds purchased and/or extended loans to Portfolio Companies, while Ms. Tilton owned (and owns) the equity, bore all attendant burdens, and arranged for the net

proceeds of any Portfolio Company sales to flow through the Zohar Funds' waterfall for the benefit of noteholders.

76.     Ms. Tilton has demonstrated consistent devotion to the best interests of the dozens of Portfolio Companies she owns and manages.  As one Portfolio Company executive, Keith O'Leary, wrote in 2012, Ms. Tilton's "mantra has always (and I mean ALWAYS) been 'do what's right for the company.'"  John Harrington, CEO of Hussey Copper, another Portfolio Company, similarly credited Ms. Tilton with "dedicat[ing] her life" to do "what's best for her portfolio companies," including by "work[ing] to try to build value in all of these companies."  Indeed, MBIA executive Anthony McKiernan could not "identify a single thing that Ms. Tilton has done wrong or inappropriate" in managing the Portfolio Companies.

77.     As the parties intended at the Zohar Funds' inception, Ms. Tilton has taken on the burdens of ownership, including personally reporting and paying income and other taxes associated with owning both the Zohar Funds and the Portfolio Companies.  These substantial tax consequences are being borne out primarily in years 2016 and beyond, totaling hundreds of millions of dollars.  In sum, Ms. Tilton has always protected the Zohar Funds from any liabilities, tax or otherwise, by paying taxes so long as she is the owner.

78.     At the same time, when Portfolio Companies were sold, Ms. Tilton followed through on her commitment and arranged for the net proceeds to flow through the Zohar Funds' waterfall.  For example, in 2014, Ms. Tilton sold XPIENT Solutions, LLC—a Portfolio Company for which she had named Zohar I and II as record owners.  The net proceeds from that sale were distributed to the Zohar Funds' Trustee, U.S. Bank, to be paid through the waterfall.

**B.      MBIA and AMZM Repeatedly Acknowledge That the Portfolio Company Equity Is Owned and Controlled by Ms. Tilton.**

79.      Throughout the business dealings between Ms. Tilton and MBIA, Ms. Tilton disclosed that she owns the Portfolio Companies and controls their day-to-day operations as Director and Manager.  Until recently, MBIA never disputed Ms. Tilton's ownership and control.

80.      For example, MBIA repeatedly acknowledged in internal communications that Ms. Tilton "holds ownership positions in approximately 60 [portfolio] companies." 2004 MBIA Memorandum; *see also* 2010 MBIA Memorandum ("[T]oday Lynn maintains equity positions in over 60 companies of which she has a controlling interests in over 40."); Trial Tr. 1443:18-1444:11 (McKiernan) (Delaware 225 Action) (acknowledging MBIA's contemporaneous internal memoranda reflecting Patriarch's controlling equity interests).  MBIA's course of conduct with Ms. Tilton has confirmed this understanding.  In negotiations between Ms. Tilton and MBIA in 2015 regarding the potential restructuring of the Zohar Funds, MBIA's lawyers returned agreement markups that acknowledged Ms. Tilton's retention of her "rights" "as equity holder of the [Zohar] [F]unds and underlying portfolio companies."  And in negotiations over Ms. Tilton's resignation as collateral manager in 2016, MBIA again acknowledged that Ms. Tilton would "retain" "all ownership . . . positions in the underlying portfolio companies."  MBIA Markup of Resignation Agreement dated Feb. 3, 2016.

81.      Even MBIA's CFO admitted in a deposition in the Delaware 225 Action that "Ms. Tilton had equity interest in the companies."  This testimony is consistent with testimony that MBIA's Mr. McKiernan gave to the SEC in 2014, where he acknowledged Ms. Tilton's "equity ownership in and out of the structures of this many companies."  Contemporaneous notes taken by SEC investigators speaking with Mr. McKiernan similarly confirm that he acknowledged

Ms. Tilton "has equity" in the Portfolio Companies, and that she is the "CEO, lender, equity [owner], and manager."

82.    MBIA also confirmed in prior litigation its understanding that Ms. Tilton owns the equity in the Portfolio Companies held by the Zohar Funds.  For example, MBIA stated that "Patriarch and its affiliates . . . hold equity or debt issued by the Zohar II obligors, [and] effectively control[s] most of the Zohar II obligors."  Answer ¶ 46, *Patriarch Partners XIV LLC v. MBIA Ins. Corp.*, No. 62813/2011 (N.Y. Sup Ct. N.Y. Cty. Aug. 15, 2011).  In the bankruptcy proceeding for Zohar I, MBIA's attorney similarly asserted that "the companies that are the borrowers to Zohar I are companies owned and controlled by Lynn Tilton and her family of companies generally referred to as Patriarch."  Jan. 6, 2016 Opening Statement of R. Antonoff in *In re Zohar CDO 2003-1, Ltd.*, No. 15-23680, 15-23681, 15-23682 (Bankr. S.D.N.Y. Nov. 22, 2015) at 5:17-19.

83.    The SEC, too, acknowledged that Ms. Tilton has "significant equity in the portfolio companies" based on the investment of "her own money," and that the Zohar investors "weren't investing in the equity, because the equity isn't collateral to the [Zohar] [F]unds."  Representatives of the Zohar Funds' noteholders who testified at the SEC administrative hearing likewise recognized that Ms. Tilton invested in the equity of the Portfolio Companies.

84.    The management at the Portfolio Companies has always considered Ms. Tilton to be the owner of the companies.  For example, "based on more than a decade of experience and observation working at [FSAR] and with the board," Christopher Richards, FSAR's CEO, considers Ms. Tilton to be FSAR's owner.  Executives of Portfolio Companies MD Helicopters and Libertas Copper have also confirmed this understanding.

85.    Further, Ms. Tilton obtained certification of her Portfolio Companies as woman-owned businesses by an independent organization called the Women's Business Enterprise

National Council ("WBENC")—a certification that opened up incredible opportunities for the Portfolio Companies, including specified contracts for women-owned businesses with a reduced amount of competition. The WBENC certification process was rigorous, involving a detailed review of corporate documents and interviews with Ms. Tilton's tax preparer, Portfolio Company representatives, and others. After completing this demanding process, WBENC issued certifications to Ms. Tilton recognizing her ownership of the Portfolio Companies.

86.     Even AMZM appears to understand that Ms. Tilton owns the equity. In October of 2016, for example, AMZM admitted that the Zohar Funds possessed only limited "equity upsides interests" in the Portfolio Companies granted to the Zohar Funds by Ms. Tilton as the owner.

### C.     MBIA Engages in a Clandestine Campaign to Wrest Ownership and Control of the Portfolio Companies from Ms. Tilton.

#### 1.     After Becoming Financially Distressed, MBIA Sets Its Sights on Ms. Tilton's Assets to Mitigate Its Losses.

87.     MBIA has struggled financially since at least 2008, and has incurred substantial insurance losses since that time. MBIA had issued financial guaranties on certain structured financial products that were tied to the commercial and residential real-estate markets, including asset-backed and mortgage-backed securities. In the summer of 2007, the housing bubble burst and, as a result, capital markets, including the market for structured products, froze. The financial crises negatively impacted MBIA's insurance exposure, as borrowers were unable to pay the loans underlying the asset-backed and mortgage-backed securities that MBIA insured. The financial markets continued to deteriorate in 2008, in part because of concerns about financial institutions' and insurers' exposure to structured-finance obligations.

88.     In 2008 and 2009, Moody's and S&P downgraded MBIA Insurance's credit rating in a series of reports, noting that MBIA Insurance would "face diminished public finance and structured finance new business flow and declining financial flexibility," that continuing

deterioration in the structured-finance markets would place pressure on MBIA Insurance's capital adequacy, and that there was an "expectation of greater losses on [MBIA Insurance's] mortgage related exposure."  The market for CDOs shut down and MBIA Insurance stopped issuing insurance on structured products altogether.

89.    Needing cash, and recognizing the potential value in Zohar I, MBIA set its sights on owning the Zohar I class B notes, which Ms. Tilton's Octaluna I owned.  In April 2009, MBIA brought a lawsuit against Plaintiff Patriarch VIII (as well as another Tilton-affiliated entity that is not a party here) for at least $180 million, alleging that the defendants there violated agreements entered into with MBIA to turn over the Zohar I class B notes held by Octaluna I.  *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 1:09-cv-3255 (RWS) (S.D.N.Y. 2009).  MBIA asserted that under these agreements, Patriarch VIII was obligated to seek a rating for the class B notes, and to subsequently contribute the notes to seven CLOs whose own notes were in turn insured by MBIA.  Patriarch VIII argued in response that its agreements with MBIA only required it to obtain a rating for the notes under certain conditions, and that those conditions were never met.

90.    The case went to trial, and MBIA's claims were rejected in full.  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d. 568, 618-19 (S.D.N.Y. 2013).  In June 2013, Judge Robert Sweet rendered a complete verdict for Patriarch VIII, finding that it did not breach its agreements with MBIA, and was under no obligation to turn over the class B notes.  *Id.*

91.    MBIA's declining financial health prompted state regulators to question the company's ability to meet its financial obligations.  In 2011, the New York Department of Financial Services ("DFS") conducted an examination of MBIA's financial condition and the prospective risks facing the company.  In its report, DFS noted that two credit-rating agencies, Moody's and Standard and Poor's Financial Services, LLC ("S&P"), downgraded the financial

strength of MBIA due to the "significant deterioration in [MBIA's] commercial mortgage-backed securities portfolio." Because of that downgrade, MBIA was unable to write meaningful amounts of new insurance business from 2008 until at least the end of 2011. DFS concluded that, despite MBIA's assertions that its liquidity resources were adequate to provide for anticipated cash outflows, the company may not have sufficient resources or assets to meet its obligations in the event of unexpected liquidity needs.

92.    Confronted with mounting insurance losses, MBIA was on the brink of being placed into rehabilitation by DFS. It needed to access a significant amount of capital that would provide it with the necessary funds to recoup its insurance obligations, improve its credit ratings, and ward off scrutiny by DFS. MBIA also faced huge exposure in Puerto Rico, including billions of dollars of exposure for insurance obligations to Puerto Rico debt.

> **2.     MBIA Induces Ms. Tilton to Purchase More Than $100 Million in Notes While Falsely Promising That It Will Agree to Restructure the Zohar Funds If She Does.**

>> **a.     MBIA Falsely Promises to Agree to a Global Restructuring of the Zohar Funds.**

93.    The country-wide financial crisis that began in 2008 and 2009 hit the Portfolio Companies hard. Some of the Portfolio Companies could not pay full interest on the loans they had obtained from the Zohar Funds and, as a result, turnarounds could not happen as quickly as anticipated. Bank lending for small- and mid-sized companies could not be accessed, making refinancing unlikely. Moreover many banks were enforcing any rights they had to call in loans that were out of compliance with loan covenants. The merger and acquisition market all but dried up, making exiting sales at appropriate prices impossible to achieve. As a result, amortization on the Zohar I notes and Zohar I's ability to repay the notes upon maturing was jeopardized.

94.     The Zohar I notes were scheduled to mature on November 20, 2015.  On this date, noteholders—the A-1 Noteholder, the A-2 Noteholder (MBIA, Inc.), and the A-3 Noteholder— were due all principal and accrued but unpaid interest from Zohar I, and MBIA Insurance would be obligated to pay the outstanding principal and interests to the insured noteholders to the extent that Zohar I was unable to do so.[7]  The Zohar II notes, meanwhile, were scheduled to mature in January 2017, and the Zohar III notes were scheduled to mature in April 2019.

95.     In July 2012, recognizing the impact of the financial crisis on the Portfolio Companies, Ms. Tilton raised with the Zohar I noteholders the possibility of extending that fund's November 2015 maturity date to align with the January 2017 maturity date of Zohar II.  The extension would allow more time for the Portfolio Companies to improve their performance and avoid default, while also giving the noteholders of all three Funds time to negotiate and consummate a global restructuring.

96.     As the A-1 Noteholder held notes in both Zohar I and II, it had an interest in extending the Zohar I maturity to match the Zohar II maturity of January 2017.  During the 2012 to 2015 time period, there was substantial concern among the Zohar I and II noteholders regarding the value of MBIA Insurance's insurance policies (known as a "wrap"), as it was unclear whether MBIA would have the ability to make full payment in the event of default.  The A-1 Noteholder advised Ms. Tilton that preserving the value of the underlying assets of the Zohar Funds and successful monetization of those assets was important to it.

97.     On October 5, 2012, Ms. Tilton called a meeting with all Zohar I noteholders, including MBIA as the A-2 Noteholder.  At the meeting, she explained that amortization would be slow and value would take time to rebuild.  Patriarch proposed extending the maturity date of the

---

[7]  The identities of the A-1 Noteholder and the A-3 Noteholder are not public.

Zohar I notes.  For an extension, all noteholders would have to consent.  In response to the proposal, Mr. McKiernan, an executive of both MBIA Inc. and MBIA Insurance, expressed MBIA's significant interest in extending the maturity of Zohar I to January 2017, to match the maturity date of Zohar II.

98.     An extension of the Zohar I maturity date had several strategic benefits that Patriarch shared with MBIA.  Among other things, the collateral loans held by Zohar I and Zohar II could be managed more effectively for the benefit of all the Zohar Funds if the maturity of Zohar I were extended.  Aligning the maturities of Zohar I and Zohar II would avoid a situation in which the Portfolio Companies might be subject to disparate treatment by the different Zohar Funds. Many of the Portfolio Companies could be sold, but to unlock their full value, the Portfolio Companies had to be sold in the normal course of business in a competitive sales process.  This takes time and must be effectuated without the shadow of defaults or "firesale" conditions.

99.     In contrast, if Zohar I were in a prolonged state of default, the businesses of the Portfolio Companies might be adversely affected and the prices paid for the Portfolio Companies substantially reduced.  The rating agency Moody's opined in March and October 2015 that if Zohar I defaulted at its original maturity, the likelihood of a Zohar II default in 2017 would increase.  During the ongoing discussions, MBIA made it clear that it understood the need to maximize value in the Portfolio Companies and to sell them under the best possible conditions. Indeed, such an approach would be in the best interests of all of the Zohar Funds' constituents, including MBIA.

100.     Based on Mr. McKiernan's statements at the October 5, 2012 meeting, and in subsequent meetings and calls, it appeared that MBIA's stated interest in extending the Zohar I maturity was to take the necessary first step to facilitate a global restructuring of the Zohar Funds.

MBIA was not seeking to avoid its payment obligations on the Class A-1 Notes. Indeed, because MBIA had "unconditionally and irrevocably" guaranteed payment of the Class A-1 Notes and the Class A-2 Notes, while it could conceivably have avoided paying itself on the Class A-2 Notes it owned, it could not avoid its obligations to the A-1 Noteholder. Thus, Mr. McKiernan repeatedly stated that MBIA Insurance would "take care of" the A-1 Noteholder in order to facilitate the extension, leaving the A-3 Noteholder as the only impediment to an extension.

101.   On March 8, 2013, MBIA (represented by Mr. McKiernan) and Patriarch (represented by Ms. Tilton) arranged a conference call to discuss the possible terms of an extension. Mr. McKiernan provided Ms. Tilton with the terms under which MBIA would consent to an extension of the Zohar I maturity. It was agreed that Patriarch would draft a term sheet based on MBIA's terms to present to the Zohar I noteholders, including the A-3 Noteholder. During this conversation, Mr. McKiernan told Ms. Tilton that MBIA viewed the A-3 Noteholder as an "impediment" to getting the extension done, because the A-3 Noteholder had not invested in Zohar II or Zohar III and thus had a different time horizon and different interests. MBIA, on the other hand, had $770 million in exposure to Zohar II (*i.e.*, more than five times its exposure to Zohar I), and therefore purportedly wanted an extension. Mr. McKiernan made clear to Ms. Tilton that MBIA would consent to an extension of Zohar I if Patriarch was somehow able to remove what MBIA viewed as the "impediment" that the A-3 Noteholder presented. If the A-3 Noteholder "impediment" were removed, MBIA had the ability to obtain all necessary consents to an extension and a restructuring.

102.   Also on March 8, 2013, Ms. Tilton reached out to the A-1 Noteholder to discuss progress on a potential extension and restructuring.

33

103.    On March 15, 2013, Ms. Tilton presented to Mr. McKiernan and the A-3 Noteholder a term sheet proposing the terms for an extension of Zohar I's maturity from November 2015 to January 2017.  This proposal was the result of the negotiations between Patriarch and many of the terms on the term sheet were included at MBIA's insistence.

104.    Between March 2013 and October 2013 (and even beyond) Mr. McKiernan repeatedly told Ms. Tilton that it was the A-3 Noteholder that was the impediment (and the only impediment) to an extension of the Zohar I maturity and that if that impediment were removed, MBIA would consent to an extension.  For example, on May 30, 2013, Mr. McKiernan emailed a revised version of the March 15, 2013 term sheet to Ms. Tilton.  While that term sheet changed many terms, it left in place the maturity date extension that Ms. Tilton originally proposed.  And in an August 9, 2013 email, Mr. McKiernan assured Ms. Tilton that he was going to meet with the A-3 Noteholder directly about an extension, but no agreement from the A-3 Noteholder was obtained.

105.    By October 2013, although Mr. McKiernan had communicated MBIA's interest in extending the Zohar I maturity date, it was clear that MBIA would not agree to the term sheet Ms. Tilton had proposed.  Searching for an alternative solution that would address both parties' interest in extending the Zohar I maturity date, Ms. Tilton then retained Moelis & Company ("Moelis") to assist with a new proposal that involved a global restructuring of all three Zohar Funds in order to increase the value and performance of the Zohar Funds.  Patriarch and MBIA recognized that a Zohar I maturity extension could both provide additional time for Zohar I to avoid a default and simultaneously facilitate a future restructuring of the Zohar Funds.  As such, the necessary first step in effectuating this new restructuring proposal, as understood by Ms. Tilton

34

and MBIA, was to extend the maturity date of Zohar I so as to make the Zohar I and II maturities coterminous.

106.    From the end of 2013 through 2015, Patriarch, MBIA and Moelis continued to discuss an overall restructuring of the Zohar Funds and engaged in unsuccessful efforts to win the support of the A-3 Noteholder with respect to a Zohar I maturity extension.  During this period, Mr. McKiernan also met monthly and had near weekly telephone calls with Ms. Tilton.  Mr. McKiernan consistently expressed that MBIA's interests were aligned with Patriarch's and that it shared a common goal first extending Zohar I's maturity date, and then of achieving a global restructuring of the Zohar Funds.  It is now apparent that this was a ruse and just a part of Mr. McKiernan's overall strategy to gain Ms. Tilton's trust and to convince her that MBIA was committed to achieving shared goals.

107.    Patriarch also expended substantial time and extensive resources to satisfy numerous requests from MBIA and its advisors for information, including confidential information, MBIA claimed necessary to evaluate a global restructure.  This included setting up a data room for MBIA's advisors and responding as best Patriarch could, consistent with its obligations, to countless information requests from MBIA.

108.    During this time, Mr. McKiernan repeatedly urged Ms. Tilton to communicate with him in person or by telephone, rather than through email, whenever possible.  While Mr. McKiernan indicated that he was concerned about preserving the confidentiality of their communications, Ms. Tilton now believes this request was made not out of some concern for confidentiality but rather to avoid leaving a paper trail of Mr. McKiernan's misrepresentations.

109.    During the first half of 2014, Ms. Tilton and Moelis developed a proposal by which Patriarch would use the top fifteen Portfolio Companies as security to raise capital from an outside

lender, and then use that capital to buy out the existing Zohar noteholders in all three funds. It also contemplated cash contributions from Ms. Tilton and MBIA.

110.    Around June 2014, Deutsche Bank expressed interest in lending funds to finance this restructuring proposal. Representatives from Deutsche Bank, Patriarch, and Moelis met multiple times to discuss terms and conduct diligence, and eventually negotiated a term sheet that Ms. Tilton then presented to MBIA for its consideration.

111.    Patriarch had regular and continued discussions with Mr. McKiernan throughout this period regarding the Zohar Funds' restructuring. By September 8, 2014, Moelis had engaged with MBIA directly to negotiate the terms of the overall restructuring, in addition to the Zohar I extension. Among other things, during this period in late 2014, the parties discussed the need for MBIA to contribute, along with Patriarch, to any repurchase of the Class A-3 Notes.

112.    By December 2014, Patriarch and Moelis had provided MBIA and its advisors requested diligence materials, including sensitive financial information concerning the Portfolio Companies, which projected improved performance for the fifteen Portfolio Companies involved in the restructuring proposal and revealed that their equity was worth far more than MBIA would owe on any insurance claims if Zohar I and Zohar II defaulted. MBIA never agreed to the restructuring proposal, despite its nearly $1 billion of combined exposure under Zohar I and Zohar II.

113.    On or about February 11, 2015, Ms. Tilton and Moelis scheduled a meeting with MBIA and its advisors to discuss the upcoming maturity date of Zohar I and the then-current state of negotiations, regarding both an extension of the Zohar I maturity date and a restructuring of the Zohar Funds. Despite Patriarch's efforts, no real progress had been made towards MBIA's financial participation in the repurchase of the Class A-3 Notes or a Zohar I extension.

57772/0001-17905092v2

114.    In email correspondence between Ms. Tilton and Mr. McKiernan on February 11, 2015, Ms. Tilton stressed the significance of the upcoming meeting, noting that "[n]othing is more important to me than to move forward on what is best for the [Zohar] [F]unds."

115.    The meeting was held on February 17, 2015 at Patriarch's offices in lower Manhattan.  Among others, the participants at the meeting included Ms. Tilton, representatives from Moelis, Mr. McKiernan, and representatives from MBIA's advisors.

116.    During the February 17 meeting, Mr. McKiernan reiterated that MBIA favored a global restructuring.  He also agreed that a Zohar I extension would be the necessary first step in a full restructuring of Zohar I and Zohar II because the extension would avoid a default and align the maturity dates of Zohar I and Zohar II, thereby allowing more time for the parties to work out complex details of the restructuring.  This outcome was in both Patriarch's and MBIA's best interests because it would avoid a situation where Portfolio Companies were faced with disparate treatment between Zohar I and Zohar II.  Mr. McKiernan also reiterated that MBIA would "take care" of the A-1 Noteholder.

117.    On March 3, 2015, the pressure on MBIA to reach a global restructuring of the Zohar Funds intensified when Moody's announced that it had put MBIA Insurance's financial strength rating on "negative" outlook.  Moody's stated that its actions "reflect the heightened risk in the Zohar I and II CLO notes that MBIA Corp. insures" and that "absent a successful remediation, these exposures could result in meaningful strain on [MBIA Insurance's] capital and liquidity profiles."

118.    Moody's further commented that "MBIA [Insurance's] exposure to the first Zohar CLO, maturing in November 2015, is manageable, however failure to reach a global settlement on all Zohar deals would expose MBIA Corp to meaningful claim payments and losses on the much

37

larger Zohar II CLO, that matures in 2017." Moody's warned of the "[i]ncreased potential for significant liquidity and capital strain in the event of a failure to restructure the Zohar CLOs on terms that significantly reduce MBIA [Insurance's] potential for loss, ahead of the November 2015 maturity of the Zohar I CLO."

> **b.** **As a Result of MBIA's Misrepresentations, Patriarch Spends More Than $100 Million to Purchase A-3 Notes.**

119.    On March 19, 2015, the A-3 Noteholder emailed Patriarch's restructuring advisor Moelis to notify them that the A-3 Noteholder intended to sell all of its Zohar I notes in an auction the following week. Ms. Tilton was interested in buying the notes, through one of her affiliates if necessary, to remove what MBIA had long identified as the impediment to a Zohar I extension.

120.    On March 21, 2015, Ms. Tilton emailed Mr. McKiernan notifying him that the A-3 Noteholder was going to sell at auction and that she was "considering a bid." On March 23, 2015, Ms. Tilton again emailed Mr. McKiernan, this time to follow-up on the extension and restructuring initiatives discussed at the February 17 meeting (which included MBIA's agreement that if the A-3 Noteholder impediment were removed, MBIA would agree to an extension of the Zohar I note maturity).

121.    On March 25, 2015, Mr. McKiernan responded to Ms. Tilton by email that "MBIA remains intent on continuing the process established on February 17 working with our respective advisors to resolve the Zohar issues." That process necessarily included MBIA's commitment to an extension of the maturity date of Zohar I if the "impediment" was removed, and Ms. Tilton reasonably understood Mr. McKiernan's response that way.

122.    In reliance on Mr. McKiernan's and MBIA's prior repeated representations over the course of more than three years, Ms. Tilton, through her affiliate Patriarch XV, submitted a bid to purchase the Class A-3 Notes on March 26, 2015. The A-3 Noteholder rejected the initial bid

at 11:44 A.M. and replied at 2:47 P.M. with a counteroffer for $103,919,863.34 that required Ms. Tilton to analyze and respond to within hours.  Ms. Tilton accepted the counteroffer at 4:57 P.M.

123.    Ms. Tilton personally funded Patriarch XV's purchase of the Class A-3 Notes.  The amount paid for the notes reflected her expectation that MBIA would live up to its prior representations and extend the maturity date and implement a restructuring.  In fact, the A-3 Noteholder received bids from only two other bidders—neither of whom knew about MBIA's promised extension of the maturity date—with bids that were much lower than Ms. Tilton's purchase price.  This was because, without MBIA's promise of an extension, the notes had minimal value, as Zohar I was set to default only eight months later.  Ms. Tilton therefore never would have bought the uninsured A-3 Notes only eight months before default unless MBIA had induced her to do so with its false assurances.

c.    MBIA Reneges and Refuses to Agree to a Restructuring.

124.    Within days of Ms. Tilton's purchase of the A-3 Notes, MBIA reneged on its prior years of representations.

125.    As it turns out, MBIA's representations regarding the A-3 Noteholder were false. MBIA never intended to consent to an extension unless it could extract onerous and substantial concessions from Ms. Tilton and Patriarch in an overall restructuring of the Zohar Funds.  MBIA induced Plaintiffs into purchasing the notes by misrepresenting that MBIA would consent to an extension if the impediment presented by the A-3 Noteholder was removed.

126.    On April 13, 2015, MBIA's counsel informed Ms. Tilton's attorneys, for the first time, that MBIA would not consent to an extension without additional concessions from Ms. Tilton.  That same day, Ms. Tilton sent a letter to MBIA's counsel expressing her "surprise to learn . . . that MBIA is not interested in extending Zohar I without a concurrent restructure of

39

Zohar II" given that "McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I." By letter dated April 19, 2015 to Jay Brown, MBIA's then-CEO, Ms. Tilton again reminded MBIA of its commitment, stating that "Anthony McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I."

127.    In a letter on MBIA Inc. letterhead dated April 21, 2015, Mr. Brown wrote to Ms. Tilton, admitting that he and MBIA Inc. were "indeed aware of your transaction with [the A-3 Noteholder]" and that "Anthony [McKiernan] keeps me and the entire senior team well informed on all aspects of our exposure to Zohar I and II." Brown continued that "[Mr. McKiernan] will provide a more substantive response to your letter later today."

128.    In a letter later that same day, Mr. McKiernan effectively re-confirmed that MBIA had reneged on the commitment it had affirmed at the February 17 meeting. Mr. McKiernan wrote to Ms. Tilton that, "[r]egarding Zohar I, we have no basis to determine whether an extension is in MBIA's best interest. To make that assessment, we need, among other things, full and unfettered access to information regarding the collateral and the borrowers."

129.    This information demand was a pretext. Following the April 2015 letter exchange, MBIA's advisors refused even to discuss a potentially acceptable transaction structure, instead demanding more sensitive financial information about the Portfolio Companies to which they were not entitled. Providing such information had never before been a pre-condition for MBIA's consent to a Zohar I extension and, in any event, substantial information had previously been provided by Patriarch to MBIA on multiple occasions over many years.

130.    Most incredibly, MBIA not only rejected its agreement to consent and take necessary steps to extend Zohar I upon the purchase of the Class A-3 Notes by Patriarch, but also has since denied that MBIA had ever received any restructuring proposals regarding the Zohar

Funds. On August 5, 2015, Edward Chaplin, CAO and CFO of MBIA Inc., stated on an earnings call that, "while we believe that a global negotiated solution that would refinance or restructure the Zohar's CDO is in the best interest of all parties, a proposal to that end has not materialized at this point . . . ." This statement is directly contradicted by the extension and restructuring proposals presented to MBIA by Patriarch throughout 2013 and 2014, as described above.

131.    Following MBIA's August 5, 2015 earnings call, Ms. Tilton sent a letter to Mr. Brown objecting to the statements he had made on the call. She reminded Mr. Brown that "contrary to [MBIA's] assertions on the earning call, Patriarch has for at least the last two years continuously sought to engage MBIA in conversations regarding a restructure of the Zohar funds." She also reminded Mr. Brown that "Patriarch hired Moelis in connection [with] such efforts and a number of restructuring proposals were made to MBIA." Ms. Tilton expressed surprise that despite Mr. McKiernan's "repeated[] request[s] that the Zohar I maturity be extended," his assertions that "Barclays' was the impediment to such extension," and her purchase of the A-3 Notes "to help effectuate such restructure," MBIA had "to date refused to consent to the extension of Zohar I." Finally, Ms. Tilton requested that MBIA let her know if it "has changed its position and will now agree to extend the maturity of Zohar I."

132.    MBIA's true strategy was revealed in an October 9, 2015 Moody's report on MBIA, which suggested that MBIA had an interest in allowing Zohar I to default so that MBIA could gain certain "rights and authority over the notes," which MBIA believed "would see them in a better position to take steps to mitigate their losses of a potential default of both the Zohar I and II CLOs."

133.    MBIA's true strategy was further confirmed in a November 23, 2015 report by BTIG (an equity analyst that followed MBIA), which reported that MBIA Inc.'s President and CFO had told an investment analyst, "[i]f we are required to pay a claim [on Zohar I], we think

41

paying a claim will give us additional leverage to move the entire process toward a consensual restructuring prior to the maturity of Zohar II."[8]

### 3.  Zohar I Defaults as a Result of MBIA's Actions and Patriarch Is Left with Potentially Worthless A-3 Notes.

134.    Because of MBIA's misrepresentations, Patriarch XV held notes worth substantially less than they would have been had MBIA honored its commitment to consent to a Zohar I maturity extension.  The Class A-3 Notes lost value because MBIA refused to consent to an extension of Zohar I in contravention of years of MBIA's commitment to provide that consent.

135.    Among other things, MBIA's actions caused a maturity default to occur with respect to Zohar I.  Under the Zohar I Indenture, prior to default, the Class A-3 Notes are entitled to payments of principal and interest generated by the Zohar I collateral pari pasu with the Class A-1 Notes and Class A-2 Notes.  However, upon a default, the principal and interest under the Class A-3 Notes become subordinated to the Class A-2 Notes and Class A-1 Notes.  Thus, the Class A-3 Notes are currently not entitled to principal and interest payments until the Class A-1 and Class A-2 Notes now held by MBIA as subrogee are paid in full.  The change in subordination of the Class A-3 Notes, standing alone, has negatively impacted their value.

136.    Apart from the lost value of the Class A-3 Notes, MBIA's conduct has caused additional injury to Ms. Tilton.  Ms. Tilton funded and directed Patriarch XV's investment in the Class A-3 Notes.  Moreover, Ms. Tilton reasonably relied on MBIA's representation that a global restructuring was in its best interest and that, if the A-3 Noteholder were removed, it would agree to an extension as a first step towards a global restructuring.  Thus relying, Ms. Tilton spent her

---

[8]  Ms. Tilton subsequently brought an action against MBIA for fraudulent inducement of her purchase of the A-3 notes.  *See Lynn Tilton et al. v. MBIA Inc. et al.*, Case No. 68880/2015 (Sup. Ct. Westchester Cty.).  The Supreme Court of Westchester denied MBIA's motion to dismiss the fraudulent inducement claim and the case proceeded through discovery; both parties moved for summary judgment.  That case, with the summary judgment motions pending, has been stayed due to the bankruptcy.

own money to engage restructuring advisors to draw up proposals that MBIA always secretly intended to reject. She also spent countless hours meeting with MBIA, financial advisors, lawyers, noteholders and potential investors in what is now clear was a futile effort to negotiate a restructuring plan and raise capital to fund the plans.

137. Similarly, had MBIA not made misrepresentations and hid its intentions, Ms. Tilton could have pursued productive avenues toward an alternative restructuring, including buying out the A-1 Noteholder at a discount and/or MBIA's position in Zohar I rather than that of the A-3 Noteholder. Indeed, the A-1 Noteholder had expressed a willingness to sell its notes to MBIA at a discount in 2013 and 2014. Instead, MBIA repeatedly misrepresented its intentions to Ms. Tilton, foreclosing the possibility of a productive restructuring that would have benefited the Zohar Funds and all noteholders and instead ensuring that MBIA would have maximum bargaining power in Zohar I and Zohar II upon a Zohar I default.

138. In sum, with MBIA stringing her along, Ms. Tilton spent almost three years (from 2012 to 2015) seeking MBIA's cooperation in effectuating a refinancing of the Zohar Funds to extend their maturity date prior to the default of Zohar I in November 2015. The refinancing would have been in the best interest of the Zohar noteholders, and could have significantly mitigated MBIA's exposure to the Zohar Funds. But despite Ms. Tilton's good faith efforts to reach an agreement, MBIA consistently delayed implementation of her refinancing proposals, while regularly assuring her that it was giving them serious consideration and wanted to work with her to arrange and finalize a refinancing. At the same time, MBIA took steps behind her back to attempt to acquire the collateral for itself. Throughout this period, and continuing to the present, MBIA failed to disclose to Ms. Tilton its true actions, intent, and goals.

57772/0001-17905092v2

D.  **MBIA Campaign Against Plaintiffs Was Spurred by the Fact That MBIA Did Not Have Sufficient Funds to Pay Its Zohar Insurance Obligations.**

139.  By early 2015, knowing it secretly intended not to extend the Zohar I maturity date despite assuring Ms. Tilton otherwise, MBIA was well aware that upon a Zohar I default it would have to pay the Class A-1 and Class A-2 noteholders approximately $149 million for all outstanding principal, plus any accrued but unpaid interest, because it had insured those notes. Furthermore, MBIA would be obligated under its insurance guarantee to pay Zohar II's Class A-1 and A-2 noteholders roughly five times that amount—approximately $770 million—if Zohar II defaulted on its January 2017 maturity date.

140.  MBIA thus faced an enormous insurance exposure that it could not afford to pay. Indeed, by early 2015, market observers recognized that MBIA's financial health was deteriorating, in part because of its significant exposure to the Zohar Funds.  For example, in a statement issued on March 3, 2015, Moody's acknowledged that, although MBIA's exposure on Zohar I was "manageable," "failure to reach a global settlement on all Zohar deals would expose MBIA . . . to meaningful claim payments and losses on the much larger Zohar II CLO."  Moody's further announced that it would put MBIA's financial strength rating on "negative" outlook due to "the heightened risk in the Zohar I and II CLO notes that MBIA [ ] insures."  Moody's concluded that, "absent a successful remediation, these exposures could result in meaningful strain on [MBIA's] capital and liquidity profiles."

141.  Although MBIA managed to pay off its Zohar I obligation by the time that fund defaulted in November 2015, Zohar II's looming January 2017 maturity date threatened to push MBIA to financial collapse.  As MBIA explained in a 10–K dated February 29, 2016, "[u]nless a substantial amount of the [Zohar II] insured exposure is paid at maturity, or if we are unsuccessful at reaching an agreed upon restructuring of the insured exposure, [MBIA] may ultimately have

44

insufficient resources to continue to pay claims.  Such failure could cause [DFS] to put MBIA . . . into a rehabilitation or liquidation proceeding."

142.    In other words, MBIA needed money and needed it fast.  MBIA thus sought to acquire the valuable equity of the Portfolio Companies by inducing Ms. Tilton to resign as collateral manager and launching a campaign to take over the Portfolio Companies.  MBIA would then attempt to sell the companies as quickly as possible to recoup funds in excess of its insurance payments regardless of the financial strength of the Portfolio Companies or whether market conditions were favorable.

143.    Notably, MBIA is permitted to pay its surplus noteholders out of surplus funds only with prior approval from DFS.  At the time of the November 2015 earnings call, and since July 2012, DFS had not approved any of MBIA's requests to make interest payments on its $953 million worth of surplus notes due to MBIA's "liquidity and financial condition, as well as the availability . . . of 'free and divisible surplus.'"

144.    MBIA's need to raise enough funds to pay off its Zohar II obligation, and to stave off an impending rehabilitation or liquidation proceeding, increased after MBIA paid off the noteholders of Zohar I upon that fund's default.  Pursuant to the terms of the Zohar I Indenture, after a default, the Controlling Party (MBIA at the time) has the power to direct the Trustee to sell or foreclose upon the Zohar I collateral to the extent permitted by applicable law and/or not in conflict with any rule of law.  MBIA knew that if DFS had placed MBIA into receivership or rehabilitation, MBIA would have lost its position as the Controlling Party under the Zohar I Indenture and, therefore, lost all rights to control the timing and manner of any collateral sale.

E.     **MBIA Provokes the SEC to Investigate Ms. Tilton and Her Patriarch Entities and Colludes with the SEC Against Them, But the SEC Dismisses All Charges.**

145.   At the same time MBIA was negotiating with Ms. Tilton to extend the Zohar I maturity date, and unbeknownst to Ms. Tilton, MBIA began clandestine communications with the SEC about Ms. Tilton, Patriarch, and the Zohars, feeding the agency misinformation in an attempt to provoke an SEC investigation of Ms. Tilton and the Patriarch Entities. MBIA apparently saw the SEC investigation as an opportunity to bolster MBIA's efforts to capture the equity value in the Portfolio Companies for itself, even though MBIA had long recognized that Ms. Tilton, and not MBIA, owned that equity.

146.   MBIA gave the SEC regular updates on its discussions with Ms. Tilton and its desire to obtain possession of the Zohar Funds' assets. During a series of meetings with the SEC, MBIA acknowledged that, in many respects, a restructuring made sense and could have served the noteholders' best interests. But MBIA in fact had no actual intention of completing a restructuring with Ms. Tilton. Instead, MBIA set its sights on suing her in an attempt to strip Ms. Tilton of her valuable equity and fees, fully understanding the litigation advantage it could potentially gain through its communications with the SEC. MBIA's Mr. McKiernan admitted at the time to the SEC that separating the Zohars and Ms. Tilton is not as simple as having her resign as collateral manager because she "has equity" in the Zohar Funds and the Portfolio Companies. Yet MBIA continued to string Ms. Tilton along into believing that its agreement to a restructuring proposal was imminent. By late August 2013, MBIA conveyed to the SEC that it had gone so far as to negotiate a tentative agreement with Ms. Tilton—a tentative agreement that, unbeknownst to Ms. Tilton, MBIA had no intention of finalizing.

147.   Instead of going through with the restructuring—which would have resulted in all noteholders being made whole—MBIA decided to implement a steal-the-equity "strategy" that

involved "try[ing] to make [Ms. Tilton] go all in," so it could snatch the equity from Ms. Tilton and "own Zohar I," as the SEC documented in internal handwritten notes of its meetings with MBIA.

148. After several years of feeding the SEC a self-serving version of events, MBIA's efforts to use the SEC to gain a litigation advantage over Ms. Tilton finally came to fruition. In late 2013 and early 2014, MBIA entered into a secret deal with the SEC to obtain "confidential," nonpublic Portfolio Company financial information from the SEC that the agency had subpoenaed from Ms. Tilton. As email correspondence obtained by Ms. Tilton during the SEC proceeding revealed, the agency allowed MBIA to "freely commence litigation against Ms. Tilton" and her "related entities" using the confidential "information MBIA learns in the documents," while MBIA insisted that the SEC "not inform Ms. Tilton . . . that the documents and information have been provided to MBIA" without first apprising MBIA. In other words, MBIA was free to use the confidential documents to its advantage as long as those documents could not be traced back to the SEC.

149. This confidential information MBIA received from the SEC confirmed to MBIA that certain Portfolio Companies retained substantial value despite the financial downturn. And that confirmation solidified MBIA's resolve to solve its financial problems by taking the valuable equity from Ms. Tilton.

150. The SEC accepted MBIA's illegitimate version of the facts and commenced a civil fraud investigation against Ms. Tilton and the Patriarch Entities. As a result, various potential restructuring options became unavailable and thus default could not be avoided.

151. Nevertheless, after a three-week trial, which followed a seven-year investigation (the "SEC Proceeding"), Ms. Tilton was exonerated. The SEC Proceeding resulted in a complete

dismissal of all charges against Ms. Tilton, Patriarch Partners, LLC, and the Patriarch Entities.  *In re Lynn Tilton*, Initial Decision, SEC Exchange Act Release No. 1182 (the "SEC Decision"), 2017 WL 4297256 (ALJ Sept. 27, 2017).  This decision was a full rejection on the merits of the charges that secured creditors have pressed in various litigations against Ms. Tilton and the Patriarch Entities—an especially telling vindication in an SEC administrative proceeding in which the SEC typically prevails ninety percent of the time before its own in-house administrative law judges.[9]

F.    **MBIA Induces Ms. Tilton to Resign as Collateral Manager on False Premises to Further Its Plan to Take Control of the Portfolio Companies and Steal Her Equity.**

152.    For more than a decade, MBIA repeatedly acknowledged both in internal communications and in communications with Patriarch that Ms. Tilton owns equity interests in at least sixty Portfolio Companies, including controlling interests in at least forty.

153.    Ms. Tilton's ownership and control of the Portfolio Companies, as well as her position as collateral manager of the Zohar Funds, created a problem for MBIA's plan to liquidate certain Portfolio Companies in an attempt to rescue itself from the brink of financial ruin: MBIA needed Ms. Tilton's consent to sell the equity, but Ms. Tilton would not do so unless selling would maximize value for noteholders.  Thus, to circumvent Ms. Tilton's ownership and control of the Portfolio Companies, MBIA, with the consent and assent of the Zohar III Controlling Class, developed a plan to: (i) induce Ms. Tilton to step down as collateral manager, (ii) recruit and appoint a successor collateral manager that would do MBIA's bidding, and (iii) collaborate with the successor collateral manager to launch a scorched-earth litigation campaign to take control of—and then liquidate—the Portfolio Companies.

---

[9]    *See* Jean Eaglesham, SEC Wins With In-House Judges, THE WALL STREET JOURNAL (May 6, 2015), available at https://www.wsj.com/articles/sec-wins-with-in-house-judges-1430965803.

154.    MBIA's Mr. McKiernan openly described to the SEC how this corporate coup would occur.  According to him, if MBIA could not directly wrest from Ms. Tilton control of the Portfolio Companies in the event the Zohar Funds defaulted, MBIA might do so "indirectly"— such as by working with an investor to use "manager removal rights," and pursuing other "things of that nature," which would "get you the next step toward the operating companies."  Mr. McKiernan SEC Tr. 30:12-31:19.  Or, as the SEC's investigative notes put it, MBIA would implement a "strategy" that involved "try[ing] to make [Ms. Tilton] go all in," so it could snatch her equity and "own Zohar I."  The goal of this strategy, Mr. McKiernan explained at a deposition, is "to obtain more" than what MBIA would be owed under the Indentures.  McKiernan Dep. at 84:23-25, 85:4-5 (Delaware 225 Action).

155.    MBIA, through Mr. McKiernan, put this plan into motion in 2015 when it started giving knowingly false assurances to Ms. Tilton that, if she resigned as collateral manager, MBIA would continue to recognize her ownership and control of the Portfolio Companies.  For example, in negotiations between Ms. Tilton and MBIA in October 2015 regarding a potential Zohar Fund restructuring, Mr. McKiernan sent a proposed deal to Ms. Tilton stating that, even if Ms. Tilton were to "resign from all of [her] roles in relation to Zohar I and II," MBIA recognized that she would "retain [her] rights . . . in underlying Portfolio Companies."

156.    When MBIA reneged on its commitment to extend the Zohar I maturity date, Ms. Tilton and Patriarch Partners XV were forced to file an involuntary bankruptcy petition on November 22, 2015.

157.    Patriarch XV proposed a Chapter 11 Plan of Reorganization for Zohar I and a Disclosure Statement Accompanying Chapter 11 Plan of Reorganization.  The Plan contained two classes of impaired creditors—MBIA and Patriarch XV—and proposed that MBIA would be

repaid in full (for its A-1 and A-2 Notes). The A-3 Notes, held by Patriarch XV, were to be fully subordinated to the A-1 and A-2 Notes, and Patriarch XV would receive no payments on the A-3 Notes until the A-1 and A-2 Notes are paid in full.

158.    MBIA then induced Ms. Tilton to resolve the Zohar I bankruptcy on false premises, "based on the . . . understanding" that it had agreed that Ms. Tilton would step down as collateral manager and that a replacement collateral manager would be appointed and, in exchange, "***Ms. Tilton, obviously, would remain in her positions with the underlying portfolio companies***, which, at least on this record, appears to be a good thing," as noted on the record by U.S. Bankruptcy Judge Robert D. Drain. Transcript of Evidentiary Hearing on Motions to Dismiss Involuntary Petitions, *In re Zohar CDO 2003-1, Ltd.,* No. 15-23581, 15-23682 (Bankr. S.D.N.Y. Feb. 1, 2016) at 128:3-25 (emphasis added).

159.    MBIA, through Mr. McKiernan and its other representatives, gave these and other assurances to Ms. Tilton knowing at the time that, as soon as she resigned as collateral manager, MBIA would renege on these promises and set in motion its plan to deprive Ms. Tilton of her ownership and control rights and obtain both for themselves.

160.    At that time, neither MBIA nor the Zohar III Controlling Class had any basis under the Indentures or Collateral Manager Agreements to remove Ms. Tilton as collateral manager of Zohar II and III. MBIA therefore made false assurances that Ms. Tilton would "retain [her] rights . . . in underlying Portfolio Companies" and "remain in her positions with the underlying portfolio companies" to induce Ms. Tilton to resign.

161.    Because she believed and reasonably relied on MBIA's assurances, Ms. Tilton voluntarily stepped down as collateral manager of all three Zohar Funds, effective March 3, 2016, with the expectation that MBIA would continue recognizing her control and ownership rights

(directly and through the successor collateral manager), as MBIA had assured Ms. Tilton it would. As Ms. Tilton explained at the trial in the Delaware 225 Action: "I voluntarily resigned [as collateral manager of the Zohar Funds] . . . with the notion that I would still be able to control the companies that I own," as "agreed to by MBIA."

162.    Ms. Tilton would not have stepped down as collateral manager had she known that, as soon as she resigned, MBIA would immediately initiate its plan of appointing a successor collateral manager that would work with MBIA in an attempt to steal her equity, take control of the Portfolio Companies, and initiate a fire sale of the equity.  That, however, is exactly what MBIA did, as discussed in more detail below.

> **G.    MBIA Directs U.S. Bank to Sell the Zohar I Collateral in a Commercially Unreasonable Auction.**

163.    In addition to instigating legal battles against Ms. Tilton, discussed below, MBIA and U.S. Bank together endeavored to try to sell Portfolio Company equity to MBIA through a commercially unreasonable auction.  MBIA and U.S. Bank designed that auction to provide a windfall to MBIA at the expense of the remaining Zohar I noteholder, Plaintiff Octaluna I.

164.    Zohar I defaulted in November 2015.  Because MBIA provided insurance for the Class A-1 and A-2 notes of Zohar I, upon default, MBIA had the right under the Indenture to direct that the fund's collateral be liquidated to recoup its insurance payment.

165.    Thus, in June 2016, after MBIA had allowed Zohar I to default, MBIA, as the Controlling Party of Zohar I, directed the Zohar I trustee, U.S. Bank, to sell assets that Zohar I purported to own.  MBIA worked with U.S. Bank to structure that auction in a manner that would steer those assets to MBIA.  MBIA and U.S. Bank designed the auction so that MBIA could win without having to pay a penny.  The auction sale—of which MBIA has admitted to being the driving force—was a sham from its inception.  Had MBIA's instructions been followed to the

letter, the auction would have taken place within ten days of public notice and would have permitted bids only for all of the Zohar I collateral collectively. MBIA and U.S. Bank also conspired to include in the auction equity interests in the Portfolio Companies actually and beneficially owned by Ms. Tilton—despite the fact that MBIA had long recognized that Ms. Tilton, not Zohar I, owns that equity—including through the inclusion of a "catch-all" category of collateral that purported to sweep into the auction "any and all other collateral."

166. On September 12, 2016, Ms. Tilton—through Plaintiffs Patriarch XV and Octaluna I—sued MBIA and U.S. Bank in New York state court, seeking a temporary restraining order ("TRO") and preliminary injunction of the auction scheduled for September 15. Ms. Tilton alleged, among other things, that MBIA directed U.S. Bank to include her equity in the Portfolio Companies as part of the collateral to be sold—disregarding that her equity is not "collateral" within the meaning of the Indenture—in an apparent attempt to permit MBIA to claim later that the Zohar I collateral sale included unspecified Portfolio Company equity (which MBIA sought to capture for itself). Furthermore, U.S. Bank scheduled the auction to take place on a commercially unreasonable timeframe and in an otherwise commercially unreasonable manner, making it unlikely that any potential bidders would have enough time between the auction notice and sale to properly evaluate the distinct and complex financial assets comprising Zohar I's collateral.

167. On September 13, 2016, U.S. Bank removed the action to the United States District Court for the Southern District of New York on the basis of the Edge Act, 12 U.S.C. §§ 611-632, because U.S. Bank, a party to the auction case, is a national banking association organized under the laws of the United States, and because the auction proceeding arose in part out of "international or foreign banking" transactions or operations in which U.S. Bank was involved.

168.    On September 14, 2016, Judge Sidney Stein accepted jurisdiction and granted the TRO.   Despite the Court's intervention, MBIA and U.S. Bank still ensured that the auction remained a sham.   After the TRO was granted, U.S. Bank proposed certain changes to the auction's terms while continuing to insist that the Zohar I collateral included Ms. Tilton's equity interests in the Portfolio Companies.

169.    The case was then permanently assigned to Judge Jed Rakoff.   In the face of the TRO and Ms. Tilton's preliminary injunction motion, MBIA and U.S. Bank then acceded to some of Ms. Tilton's requests.   After a hearing on Ms. Tilton's motion for a preliminary injunction, Judge Rakoff issued an order requiring that U.S. Bank re-notice the auction, distribute the notice to a "reasonably wide group of prospective bidders," allow the auction to remain open for at least thirty days, and in all other respects conduct the auction on the modified terms proposed by U.S. Bank.

170.    U.S. Bank re-noticed the auction to take place on November 29, 2016, but on that date U.S. Bank unilaterally postponed the sale.   On December 2, 2016, U.S. Bank re-noticed the auction for one week later, and uploaded to the data room—open to any potential bidders— additional materials containing confidential information about the Portfolio Companies that was not protected from disclosure and should not have been provided.   At a December 7 hearing, the court ordered that the closing date for the auction be extended to December 21.   The next day, the liquidation agent selected by MBIA to facilitate the auction, Duff and Phelps, purported to reschedule the auction, but Duff and Phelps never did so.   Instead, it distributed only a Notification of Rescheduling of Disposition of Assets—which was addressed solely to Zohar I and its noteholders—rather than a public bid package containing the complete terms of sale and required bid-submission documents.

171.    In an attempt to paper over its failure to provide proper notice of the December 21 auction date, Duff and Phelps circulated an email on December 20 stating that the auction scheduled for the next day was proceeding, along with a "[c]orrection" directing potential bidders to "refer to the attached Fourth Notice of Public Sale and Invitation to Bid," rather than the December 2 Third Notice, which had been attached to a "[r]eminder" email sent earlier on December 20.  Thus, bidders received the Fourth Notice of Public Sale and Invitation to Bid for the first time on the afternoon before the auction was to occur.  Even more incredibly, that Notice had been back-dated to December 8.  Over Ms. Tilton's objection, the auction took place on December 21.

172.    MBIA won the auction with a no-cash, credit-only bid on terms that are inconsistent with MBIA's and U.S. Bank's fiduciary and contractual obligations, and that have allowed MBIA to walk away from the sale with far more than what it is legally entitled.  Meanwhile, MBIA has purported to strip Ms. Tilton of her preexisting rights and interests to valuable equity in the Portfolio Companies, while depriving Octaluna I and Ms. Tilton of proceeds from which they would have benefitted had MBIA and U.S. Bank sought to maximize their value derived from the sale—as they were required to do pursuant to their fiduciary obligations.

173.    The auction was conducted in a commercially unreasonable manner as a result of U.S. Bank's actions: at MBIA's direction, U.S. Bank repeatedly shifted auction dates without providing adequate explanation or notice, thereby dampening bidder interest and undermining bidders' opportunity to evaluate the assets properly.  These actions culminated in the lack of adequate notice for the December 21st auction date and U.S. Bank's clumsy (and transparent) retroactive "correction."  U.S. Bank, acting at MBIA's behest, made no effort to maximize the value of the collateral or to sell these assets at a price that would recoup their fair value, which

would have been to the ultimate benefit and best interest of Octaluna I, Zohar I, and Ms. Tilton. U.S. Bank also permitted confidential and proprietary Portfolio Company financial information to remain in the open data room after the auction's conclusion.

174.   At MBIA's direction, the collateral sold at the auction purportedly included equity in the Portfolio Companies that Ms. Tilton in fact ultimately and beneficially owns.  U.S. Bank purported to sell this equity even though no court had ever held that this equity is part of the "Collateral" as defined in the Zohar I Indenture.  U.S. Bank had no right to transfer, as part of this or any other sale, any equity interests purportedly held by Zohar I because those equity interests actually belong to Octaluna I, and ultimately to Ms. Tilton.  Additionally, transfer of these equity interests is subject to contractual and other restrictions.  Among other things, any such transfer requires Ms. Tilton's express consent, yet she advised in advance of the auction that she did not— and would not—provide it.  U.S. Bank proceeded to purport to sell the equity to MBIA anyway in breach of its contractual and fiduciary duties as Trustee.

175.   As noted, MBIA purportedly acquired Ms. Tilton's Portfolio-Company equity through a credit-bid of approximately $149 million—far less than the actual worth of what MBIA claims was included as Zohar I collateral, given the purported inclusion of the valuable equity in the sale.  As a result, MBIA has purported to acquire equity interests to which it is not entitled, and it purports to have done so at a fire-sale price.  If successful, MBIA will reap a windfall from potential future sales of these interests to a third party, ensuring that any value derived from such future sales will not inure to either Octaluna I or Zohar I.

176.   After the auction, Judge Rakoff dismissed the action as moot and denied Ms. Tilton's motion to amend her complaint to allow damages and rescission claims.  The court's (i) denial of a preliminary injunction, which necessarily involves only a preliminary determination

of *likelihood* of success, irreparable harm and public interest, (ii) the dismissal on mootness grounds, and (iii) the denial of Ms. Tilton's motion to amend, were all without prejudice to Ms. Tilton's and the other Plaintiffs' right to bring separate claims for money damages against MBIA and U.S. Bank and rescission of the auction in a new action.  And in Ms. Tilton's Answer, Counterclaim, and Third-Party Complaint filed in *Zohar CDO 2003-1, Ltd. et al. v. Patriarch Partners, LLC et al.*, No: 1:17-cv-00307 (WHP) (S.D.N.Y. Nov. 27, 2017), she in fact sought damages and rescission of the auction.[10]

177.    Equity in more than twenty Portfolio Companies ultimately and beneficially owned by Ms. Tilton through her affiliated entities was improperly included in the Zohar I auction and was purportedly (but in fact illegally and invalidly) transferred by U.S. Bank to MBIA through the Zohar I auction process.  When Judge Rakoff dismissed the action as moot, he had not yet issued a reasoned decision explaining his previous preliminary injunction stage bottom-line order allowing the auction to proceed.  But on August 28, 2017—some eight months after declaring the action moot—Judge Rakoff issued an advisory opinion regarding the already completed auction addressing the preliminary injunction action.  The court noted that "commercial reasonableness"— the standard in determining whether the auction could proceed—was difficult to apply for such specialized assets.   Without clear commercial precedent, the court declined to hold at the preliminary injunction stage that the 30-day notice period was unreasonable.   The court also implied that, despite MBIA's and U.S. Bank's best efforts, the auction could not have sold equity interests that did not belong to the Zohar Funds.

---

[10]   That action has been stayed due to the bankruptcy.

**H.    Working Secretly Through AMZM, MBIA and the Zohar III Controlling Class Launch and Direct a Scorched-Earth Litigation Campaign Against Ms. Tilton and the Other Plaintiffs, While Attempting to Hide Their Role.**

**1.    MBIA and the Zohar III Controlling Class Misuse Their Control of AMZM to Launch a Litigation Campaign Against Plaintiffs.**

178.   Upon Patriarch's voluntary resignation as the collateral manager of the Zohar Funds, effective March 3, 2016, MBIA seized the opportunity to hire AMZM as the successor collateral manager of Zohar I and II.  Ms. Tilton had no role or input in MBIA's decision to hire AMZM, even though the parties agreed that she would participate in the process of hiring the new collateral manager, and she had made herself available to interview possible successors and provide guidance about the transition.  MBIA instead reneged on its promises and sidelined her. Upon information and belief, MBIA also conspired with the Zohar III Controlling Class to appoint AMZM as that fund's collateral manager, again without Ms. Tilton's input, all in furtherance of Defendants' scheme to oust Ms. Tilton and seize control of the equity in the Portfolio Companies.

179.   Through their purported appointment of AMZM as the new collateral manager of the Zohar Funds, MBIA and the Zohar III Controlling Class obtained day-to-day control over the Zohar Funds' actions, up to the commencement date of these Chapter 11 Cases.

180.   AMZM did not have collateral manager experience, and MBIA did "not really . . . hire[ ] them" to perform the duties of a collateral manager, as Mr. McKiernan admitted in sworn deposition testimony.  In fact, during its time as collateral manager, AMZM did not facilitate the creation of a single trustee report detailing cash flows, expenditures, and other financial information of the Zohar Funds, despite AMZM's obligation to do so on a monthly and quarterly basis under the Indentures and AMZM CMAs.  Instead, MBIA and the Zohar III Controlling Class used their control of AMZM to direct AMZM to pursue a campaign of sham litigations against Ms. Tilton in an attempt to bleed her dry, wrest control of the Portfolio Companies from Plaintiffs,

and seize the valuable Portfolio Company equity—much to the detriment of the Portfolio Companies' stakeholders. This multi-front legal battle over control and equity ownership of the Portfolio Companies created a cloud of litigation uncertainty that eventually resulted in the initiation of these Chapter 11 Cases.

181.    As a first step in its plan, in April 2016, AMZM, through the Zohar Funds, brought a books-and-records action against Patriarch in the Delaware Chancery Court, seeking documents and information pertaining to the Zohar Funds' collateral. *See Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. CA-12247 (Del. Ch. Apr. 22, 2016). The Zohar Funds asserted that Patriarch breached certain provisions of the Patriarch CMAs by failing to transfer certain transaction documents and other information to AMZM. The Zohar Funds claimed that the documents and information it sought were necessary for AMZM to "understand precisely what debt and equity investments the Zohar Funds own in the Patriarch portfolio companies, what those debt and equity investments are worth, and what rights the Zohar Funds have with regard to those investments." The Chancery Court decided in favor of the Zohar Funds based on a narrow issue of contract interpretation.

182.    Notwithstanding the Zohar Funds' arguments to the Delaware Chancery Court that the reason they sought the documents at issue in the "books and records" case was in order for their successor collateral manager to be able to run the Zohar Funds, the reality is that Defendants wanted this information to aid in their attempt to wrest control of the Portfolio Companies from Ms. Tilton.

      **2.**      **MBIA Obtains a High Interest $328 Million Financing Facility and Steps Up its Litigation Campaign, in Coordination with the Zohar III**

57772/0001-17905092v2

**Controlling Class and AMZM, to Wrest Control of Portfolio Companies from Ms. Tilton.**

183.    On August 8, 2016, MBIA admitted in a quarterly report that it "does not currently have a sufficient amount of liquid assets to pay all or a substantial amount" of the impending claim on the Zohar II notes, and that if the Department of Financial Services ("DFS") "at any time concludes that MBIA . . . does not have, or will be unable to raise sufficient liquid assets to pay its expected claims in a timely manner, it could . . . put MBIA . . . into a rehabilitation or liquidation proceeding." MBIA also warned investors that the "determination to commence such a proceeding or issue such an order is not within the control of [MBIA]."

184.    On an August 9, 2016 earnings call, investors questioned MBIA executives regarding "the status of regulator discussions regarding possible regulatory action, receivership or of some sort of stop payment." MBIA's President and Chief Operating Officer, Bill Fallon, acknowledged that MBIA was in "constant contact with [DFS]."

185.    Although MBIA managed to cover its approximate $770 million insurance obligations under Zohar I and II (Zohar II defaulted on January 20, 2017), as it indicated on its Form 10-Q, it was able to do so only by raising $328.25 million from third parties by, among other things, pledging MBIA's purported "right, title and interest in the Zohar I Collateral and the Zohar II Collateral," which MBIA claims includes the Portfolio Companies' equity owned by Ms. Tilton. MBIA's financing facility bore a 14 percent interest rate. According to the deposition testimony from MBIA's Chief Risk Officer, MBIA was desperate to "liquidate[ ]" the Zohar collateral "at the quickest time period that's feasible" to pay off its high-interest financing facility. On June 10, 2019, MBIA refinanced this funding facility and issued new notes with an aggregate principal amount of up to $335 million, according to MBIA's 8-K. These notes bear a twelve percent annual interest rate and mature on January 20, 2022. MBIA's 8-K further explained that the refinanced

funding facility is "secured by a first priority security interest in all of MBIA Corp.'s [purported] right, title and interest in the recovery of its claims from" Zohar I and Zohar II. MBIA is wholly reliant upon its purported interests in the Zohar I and II collateral to pay off its staggering $335 million funding facility.

186.    MBIA thus re-focused its efforts on gaining control of the Portfolio Companies. It started by, with the Zohar III Controlling Class's consent and approval, causing AMZM, through the Zohar Funds, to execute written consents that purported to remove Ms. Tilton as a director of three Portfolio Companies that Ms. Tilton had successfully run for years—including in paying off all loans those Portfolio Companies had previously taken out from the Zohar Funds—and to install in her place AMZM's and MBIA's own unqualified, conflicted personnel as directors of three Portfolio Companies on the theory that the equity is wholly owned by the Zohar Funds. This action was entirely contrary to MBIA's representations to Ms. Tilton that it would not interfere with her directorship positions post-resignation as collateral manager and that she would otherwise maintain ownership and control of the Portfolio Companies. It also was directly contrary to MBIA's repeated internal acknowledgment (examples of which are set forth above) that Ms. Tilton, through the Patriarch and Octaluna Entities, properly owns and controls the Portfolio Companies, in accordance with the original design and intent of the deals.

187.    In fact, AMZM acknowledged in an October 2016 "status update" to Zohar II stakeholders, including MBIA, that the Zohar Funds hold only "'equity upside' interests" in the Portfolio Company equity, just as Ms. Tilton has consistently said. (That update was not sent to Ms. Tilton even though she is the ultimate owner of Zohar II.) Nevertheless, MBIA approved AMZM's execution of the written consents barely a month later—in November 2016—and asserted for the first time that the Zohar Funds own all of the equity.

57772/0001-17905092v2

188.    Next, immediately after executing these written consents, MBIA, along with the Zohar III Controlling Class, approved the filing of the Delaware 225 Action—a "test case" lawsuit in the words of AMZM's Bryan Marsal—to gain control of three of the Portfolio Companies, bringing the summary proceeding in the name of the Zohar Funds in November 2016.  *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. CA-12946 (Del. Ch. Nov. 29, 2016).  The Zohar Funds sought an order from the Delaware Chancery Court declaring that the written consents rightfully ousted Ms. Tilton from her positions as the sole director of Portfolio Companies FSAR Holdings, Inc. ("FSAR") and UI Acquisition Holding Co. ("UI"), and as a director of Portfolio Company Glenoit Universal Ltd. ("Glenoit").  The written consents directly contravene Ms. Tilton's ultimate and beneficial ownership of the equity shares, which have substantial value because none of the three Portfolio Companies owe any money to the Zohar Funds.

189.    In asserting these claims, the Zohar Funds sought to annul the irrevocable proxies executed by the Zohar Funds that grant Ms. Tilton and Patriarch exclusive voting rights with respect to any shares of FSAR, UI, and Glenoit stock held in the Zohar Funds' names.  These irrevocable proxies were executed by Ms. Tilton on behalf of the Zohar Funds and granted to entities wholly owned and controlled by Ms. Tilton (Plaintiff Patriarch Partners XIV and non-plaintiff Ark II CLO 2001-1, Limited) a twenty-year exclusive right to vote those Portfolio Companies' shares.  Each of the irrevocable proxies expressly states that it is meant to effectuate the "original intent of the Grantor and Grantee" (*i.e.*, the Zohar Funds and Ms. Tilton, through the named affiliates) "to protect the interests of the Company, the Grantor, and the Grantee . . . by giving the Grantee the right to vote and act for the Grantor."  Each, as duly executed, is acknowledged by a representative of the relevant Portfolio Company.

190.    Ms. Tilton opposed the Section 225 claims on the merits and asserted that the written consents were invalid as a result of MBIA's and AMZM's inequitable conduct and unclean hands.  Ms. Tilton introduced evidence at trial demonstrating that (1) the written consents were executed (and AMZM brought a lawsuit to enforce them) to implement MBIA's "sell" strategy for MBIA's benefit and to the detriment of other stakeholders, including Ms. Tilton and the Portfolio Companies; (2) MBIA installed AMZM as its hand-picked successor and MBIA, not AMZM or the Debtors, had control over the strategy for seeking to control the Portfolio Companies; and (3) AMZM's lawsuit was brought seeking to install directors who were unqualified (including from MBIA itself) to take control of the Portfolio Companies at MBIA's behest.

191.    The evidence also demonstrated that MBIA sought to take control of, and then promptly sell, the Portfolio Company equity, and obtain for itself a windfall (without paying Ms. Tilton or other stakeholders what is owed for investment in the Portfolio Companies).

192.    Ultimately, the court invalidated the proxies on technical grounds, without addressing Ms. Tilton's inequitable conduct or unclean hands arguments or evidence.  It also found that the Zohar Funds are the beneficial owners of the shares that were at issue for the three Portfolio Companies and could therefore vote those shares.  Ms. Tilton appealed that decision and sought a stay of the Chancery Court's order while the appeal was pending.  The Chancery Court granted Ms. Tilton a stay pending appeal because she had raised "serious legal questions . . . worthy of consideration by [the Delaware] Supreme Court," *Zohar II, 2005-1, Ltd. v. FSAR Holdings, Inc.*, 2017 WL 6761234, at *1 (Del. Ch. Dec. 29, 2017) (Am. Order & J.), and the Delaware Supreme Court itself upheld that stay.  An appeal of the Chancery Court's decision remains pending in the Delaware Supreme Court, stayed due to the bankruptcy.

193.    While the Delaware 225 action was pending, MBIA and the Zohar III Controlling Class escalated their campaign against Ms. Tilton by approving AMZM's filing of a civil RICO action seeking over a billion dollars from Plaintiffs and a ruling that the Zohar Funds own all of the equity in all of the Portfolio Companies, and alleging unfounded claims that Ms. Tilton masterminded an elaborate scheme to "pillage" the Zohar Funds of the equity in the Portfolio Companies.  The RICO accusations were based, in large part, on the same now-disproven charges asserted in the SEC proceeding, in which the administrative law judge wholly rejected all fraud and other charges against Ms. Tilton.  The RICO claim was, like the SEC's case, wholly rejected on December 29, 2017, when the federal court in New York granted Ms. Tilton's motion to dismiss.  The court found that the RICO claim was barred in its entirety and criticized the complaint's "artful pleading," which attempted to avoid that result.

194.    MBIA's and the Zohar III Controlling Class's desperation became more apparent with each litigation front, and it became increasingly clear that they sought to injure Ms. Tilton in every possible way.  Nowhere was this more evident than in their filing of the RICO action. Indeed, the real intent behind the RICO accusations was apparently to smear Ms. Tilton and the other Plaintiffs, and ultimately destroy her reputation, career, and business operations.  As MBIA and the Zohar III Controlling Class intended, the RICO claim subjected Ms. Tilton to sensationalist and misleading news articles and business harms stemming from companies' hesitancy to do business with her in the face of false allegations of misconduct.  Third-party companies decided to sever their ties with her and various Portfolio Companies; the loss of these critical business relationships negatively impacted the value of Plaintiffs' interests in the Portfolio Companies, severely impaired Ms. Tilton's ability to turn the companies around, and substantially decreased the value of Plaintiffs' Zohar Funds notes and Ms. Tilton's preference shares.

195.    Finally, after receiving the Chancery Court's ruling that the three written consents at issues in the Delaware 225 Action were valid, and while discovery was stayed in the RICO case while Plaintiffs' ultimately successful motion to dismiss was pending, AMZM, at the direction of MBIA and the Zohar III Controlling Class, executed a number of additional written consents in an attempt to take control of numerous additional Portfolio Companies, and then filed two new suits in Delaware that involve over a dozen of the same Portfolio Companies already at issue there.  In these suits, Defendants seek to enforce the written consents they executed and take control of these Portfolio Companies from Ms. Tilton.  These entirely duplicative actions were stayed by the filing of these Chapter 11 Cases.[11]

196.    In sum, at the direction of MBIA, and with the authorization and consent of the Zohar III Controlling Class, AMZM spent more time in the past three years litigating against Plaintiffs than managing the Zohar Funds' collateral, recklessly neglecting its responsibilities as collateral manager.   For example, with MBIA's and the Zohar III Controlling Class's authorization, knowledge, and consent, AMZM failed to issue any trustee reports from the time it became collateral manager in 2016 to the filing of this bankruptcy, despite its responsibility to do so monthly under the Zohar Indentures and AMZM CMAs.  AMZM's actions were especially egregious because, as collateral manager, it held a position of trust and confidence with respect to the Zohar Funds and their owner, Ms. Tilton.  But by filing lawsuits that embroil the Portfolio Companies in litigation, publicly slandering the leadership of those Portfolio Companies (Ms. Tilton) with false allegations of fraud and mismanagement, and publicly disclosing the Portfolio Companies' confidential information, AMZM made third-party companies reluctant to

---

[11]   *See Zohar CDO 2003-1, Ltd., v. Croscill Home et al.*, No. 1:17-cv-1797-JFB-SRF (D. Del.), and *Zohar CDO 2003-1, Ltd. v. Octaluna LLC*, No. 1:18-cv-00108-JFB-SRF (D. Del.).

57772/0001-17905092v2

conduct business with the Portfolio Companies, caused Portfolio Companies to lose business opportunities, and damaged the value of Plaintiffs' interests in the Portfolio Companies. As collateral manager with fiduciary duties to the Zohar Funds and their owner, AMZM should have been supporting the Portfolio Companies, promoting them as great businesses and partners, cross-selling their goods and services, and always striving to increase their value. Instead, AMZM, under MBIA's and Zohar III Controlling Class's direction and control, undermined their leadership and ensnared them in lawsuits across the country, eroding their value instead of enhancing it.

197. MBIA's, Zohar III Controlling Class's and AMZM's campaign and the resulting damage to the value of the Portfolio Companies specifically and uniquely targeted and harmed Ms. Tilton and her Octaluna Entities as sole creditor and holder of the Zohar Funds' preference shares. Specifically, because Ms. Tilton only recoups the value of the Zohar Funds' preference shares directly owned by the Octaluna Entities (and ultimately owned by Ms. Tilton) once all other noteholders are paid off, under the waterfall payment structure that was essential to the Zohar Funds investment strategy, any damage to the value of the Portfolio Companies uniquely harms Ms. Tilton by lowering the value of the preference shares and her ultimate recoupment of any residual value after noteholders are paid in full.

198. In that way, the litigious campaign of MBIA, the Zohar III Controlling Class, and AMZM triply damaged Ms. Tilton and other Plaintiffs because: (1) it decreased the value of the Portfolio Companies, which decreased the value the Zohar Funds' preference shares owned by Plaintiffs; (2) it resulted in the use of the Zohar Funds' cash to pay millions of dollars in attorney's fees and litigation costs, which depleted funds available to pay Plaintiffs as noteholders and any potential payout to Plaintiffs at the end of the waterfall; and (3) caused the Plaintiffs to incur tens of millions of dollars in legal fees and expenses defending against their scheme, as well as

significant additional expenses.  Defendants thus used money that should flow to Plaintiffs to bankroll their campaign to steal her business and valuable equity assets.

> **3.      MBIA Hides Its Plans to Take Over and Quickly Sell the Portfolio Companies and Its Belief That There Is Significant Value in the Portfolio Companies.**

199.     Throughout the Delaware 225 Action, MBIA and AMZM with the consent of the Zohar III Controlling Class re-doubled their attacks on Ms. Tilton and denied that the litigation was the first step in a larger plan to take control of, and sell, all Portfolio Companies currently owned and controlled by Ms. Tilton.  For example, the Zohar Funds' lead witness at trial, AMZM's Elizabeth LaPuma, repeatedly denied that MBIA was providing AMZM with any direction or oversight, testified that AMZM "lacked sufficient information to decide on a valuation for the companies," and asserted that "[t]here is no plan" to take control of the boards of other Portfolio Companies.  These denials did not square with the facts.

200.     Throughout the Delaware proceedings, MBIA and AMZM fought intensely to prevent Ms. Tilton from exposing the real story.  To overcome MBIA's and AMZM's resistance, Ms. Tilton was forced to move in New York state court to compel MBIA to comply with subpoenas for the production of documents and the testimony of Mr. McKiernan.  MBIA also persisted in refusing to make its purported board nominees available for deposition.  It was only once the judge admonished the parties that the "absence of [the purported board nominees'] testimony" could result in a significant gap in the evidentiary record that MBIA and AMZM reluctantly agreed to submit them to examinations.

201.     The façade that MBIA and AMZM had erected quickly fell apart.  When the New York state court ordered MBIA to comply with Ms. Tilton's subpoenas, MBIA was forced to turn over damning evidence demonstrating that it had in fact conducted valuations of the Portfolio Companies—and that it in fact believes the preference shares are "in the money," with just a

handful of the over fifty Portfolio Companies that had been valued worth far more than MBIA and noteholders are owed.  In fact, not only did valuations exist, but MBIA had relied on the valuations in making representations in public filings that there is "sufficient" value in the Portfolio Companies to more than cover what is owed MBIA.

202.    MBIA's position fully collapsed when MBIA produced a February 2017 "Next Steps" report that PJT Partners had prepared for MBIA.  Recognizing the critical importance of the revelations in that document, MBIA and PJT simultaneously attempted to claw it back for "privilege" literally one hour before the deposition of PJT's representative.  But the Delaware Chancery Court correctly rejected those efforts because of Ms. Tilton's "substantial need" for the document to impeach Ms. LaPuma and Mr. McKiernan as to MBIA's role and plans for the Portfolio Companies.

203.    The "Next Steps" report revealed MBIA's intended plans in no uncertain terms: to "sell" the Portfolio Company equity it supposedly obtained in the Zohar I "collateral" auction; to obtain additional equity through a subsequent "[a]uction [of] Zohar II assets"; and to then "[s]ell Zohar II collateral post auction or directly through [AMZM] as collateral manager."  That too was directly contrary to the testimony of Ms. LaPuma and Mr. McKiernan, who swore that AMZM and MBIA had no immediate plans to sell the Portfolio Companies.  Mr. McKiernan, moreover, admitted at his deposition in the Delaware 225 Action that MBIA sought to reap a windfall by this plan, keeping for itself any residual value from the Portfolio Companies instead of allowing that value to flow through the waterfall established in the Indentures for the benefit of all stakeholders.

204.    Thus, through her unflagging efforts, Ms. Tilton has exposed the real intentions of MBIA, the Zohar III Controlling Class, and their collateral manager, AMZM.  They believed, like Ms. Tilton, that the Portfolio Companies are worth far more than what MBIA has paid out.  MBIA

67

and the Zohar III Controlling Class has been attempting to take control of—and then quickly fire-sell—the Portfolio Companies and keep all of the proceeds for itself without regard for Ms. Tilton's ownership of those Portfolio Companies or the value of Ms. Tilton's interests in the Portfolio Companies.

205.    The litigation campaign of MBIA, the Zohar III Controlling Class, and AMZM's was funded by principal and interest payments made by the Portfolio Companies, which MBIA and the Zohar III Controlling Class used to fund their litigation campaign to wrest control and equity from Ms. Tilton and her affiliated entities.

**I.    Ms. Tilton Voluntarily Files Petitions for Relief Under Chapter 11 for the Zohar Funds to Rescue Them from the Flood of Value-Destroying Litigation.**

206.    The assets of the Zohar Funds, including the cash flows of principal and interest from loans to the Portfolio Companies, and the cash flow from the monetization of "equity upside" interests in the Portfolio Companies, have tremendous value.

207.    However, the nonstop litigation campaign against Ms. Tilton and the other Plaintiffs brought and directed by MBIA, the Zohar III Controlling Class, and AMZM cast a cloud over the Zohar Funds and their Portfolio Companies, rendering the Zohar Funds unable to monetize their assets and maximize value for the sake of all stakeholders.  Moreover, due to the presence and constant specter of ongoing litigation, the Portfolio Companies were unable to obtain critical financing and their negotiations with potential buyers and lenders had stalled.

208.    In Ms. Tilton's capacity as the sole director of each of the Zohar Funds, she filed voluntarily petitioned for relief under Chapter 11 for each of the Zohar Funds on March 11, 2018, principally to lift the litigation cloud and permit the bankruptcy court to oversee an orderly process of unlocking the value in the Zohar Funds through sales and refinancing of the Portfolio Companies.

J.     **Defendants Immediately Seek to Undermine the Success of the Monetization Process, While Ms. Tilton Works Tirelessly to Monetize the Portfolio Companies and Maximize Value for all Stakeholders.**

209.    Upon the commencement of these Chapter 11 Cases, Defendants immediately sought to take control of them for Defendants' exclusive benefit through an immediate barrage of Court filings.  Plaintiffs are confident they would have prevailed if they had litigated Defendants' motions; however, in the interest of maximizing and preserving value, Plaintiffs agreed to mediate. After nearly five full days of mediation between Plaintiffs, the Zohar Funds, MBIA, and the Zohar III Controlling Class, the parties agreed to a comprehensive settlement that, among other things (i) provided for the replacement of Ms. Tilton as sole director of the Zohar Funds with a new Independent Director and Chief Restructuring Officer (with Ms. Tilton remaining as tax director), (ii) stayed all litigation among the parties for fifteen months, (iii) contemplated a cash collateral order to allow the Debtors to fund the administrative costs of these Chapter 11 Cases, and (iv) provided for a joint monetization process (the duration of which is subject to an ongoing dispute between the parties) through which Ms. Tilton and the Debtors' Independent Director and Chief Restructuring Officer would seek to sell or refinance the Debtors' interests in the Portfolio Companies.

210.    Notwithstanding entry into the Settlement Agreement, MBIA and the Zohar III Controlling Class attempted to limit Plaintiffs' rights as secured creditors in these cases to limit Plaintiffs' ability to protect against attempts of MBIA and the Zohar III Controlling Class to seize value for their own benefit.

211.    Following approval of the Settlement Agreement, Ms. Tilton invested her full effort into the monetization process, working with the Zohar Funds' Independent Director (Joseph Farnan) and Chief Restructuring Officer (Michael Katzenstein).  Indeed, Mr. Farnan has written to Ms. Tilton acknowledging her tireless efforts "preparing the companies for monetization while

continuing to manage the day to day needs and advancement of the companies." With Mr. Farnan's and Mr. Katzenstein's full knowledge and approval, after contacting thirty-seven different investment banks, nine Portfolio Companies hired top investment bankers (and negotiated engagement letters and NDAs with all of them).

212. Over the past sixteen months, to complete the confidential marketing memoranda and quality of earnings reports necessary for the marketing of the Portfolio Companies, Ms. Tilton has spent millions of dollars of her own money and thousands of hours writing and editing those memoranda and reports. While the bankers have marketed the Portfolio Companies to hundreds of potential buyers, Ms. Tilton has also personally attended more than 100 meetings in support of the sales of specific Portfolio Companies. The Zohar Funds were fully and contemporaneously apprised of and included in these monetization efforts, including through numerous meetings between Ms. Tilton and Messrs. Farnan and Katzenstein, as well as numerous phone calls between them, and Ms. Tilton further kept them apprised of sales activities by text and email.

213. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

214. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

215.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

216.    Working tirelessly for the benefit of all stakeholders, Ms. Tilton then delivered restructuring proposals that would have mitigated Defendants' damages and ended the threat of value destructive litigation. The proposals did not result in a settlement.

217.    The 15 Month Window under the Settlement Agreement was to expire on August 21, 2019 by its terms.  After being extended by the Court, it expired on September 30, 2019.

218.    ████████████████████████████████████████

██████████████████████████████████████████████.

219.     MBIA and the Zohar III Controlling Class have attempted to destroy all potential value for Plaintiffs, and at the same time have situated themselves so they can continue their campaign to litigate against Plaintiffs and force all value in the Zohar Funds to their own pockets.

## V. CLAIM FOR RELIEF

### COUNT I
### Equitable Subordination Pursuant to 11 § 510(c) (Against the Defendants)

**A.     Defendants Are Statutory Insiders.**

220.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

221.     MBIA, the Zohar III Controlling Class, the U.S. Bank, and AMZM for years has consistently exercised control over the material day-to-day activities of the Debtors.

222.     For the bulk of the Debtors' existence, MBIA (as the credit enhancer) and the Zohar III Controlling Class (or their predecessors) were the so-called "Controlling Party" and "Controlling Class," respectively, under the Zohar Funds' Indentures, entitling them to exercise significant control and rights over each of the Debtors.  From 2016 to the filing of this bankruptcy case, AMZM was the Collateral Manager of Zohar I, Zohar II, and Zohar III, and U.S. Bank was the Trustee of Zohar I, II, and III and ran the Zohar I auction with and at the direction of MBIA.  Each Defendant was thus a "person in control of the debtor" and a statutory insider pursuant to 11 U.S.C. § 101(31)(B).

223.     After defaults under the Indentures for Zohar I and Zohar II occurred in November 2015 and January 2017, respectively, resulting in MBIA paying and becoming subrogated to the Class A-1 and A-2 Notes of Zohar I and the Class A Notes of Zohar II.  After the Zohar I and II defaults, MBIA has not only exercised its control as the so-called Controlling Party, but has had the ability to exercise the default remedies of the Controlling Party.

72

224.    After MBIA and the Zohar III Class induced Ms. Tilton to resign as the collateral manager of the Debtors, they appointed AMZM as replacement collateral manager.  At the time, neither MBIA nor the Zohar III Controlling Class had any grounds to remove Ms. Tilton as collateral manager of any Zohar II or Zohar III.  MBIA and the Zohar III Controlling Class retained the right to replace AMZM if it failed to act as MBIA and the Zohar III Controlling Class directed, thereby obtaining effective day-to-day control over Debtors' actions up to the filing of the Bankruptcy petitions.

225.    After Ms. Tilton's resignation, MBIA along with the Zohar III Controlling Class, hired AMZM as the successor collateral manager of the Zohar Funds.  Ms. Tilton had no role or input in the decision to hire AMZM, even though MBIA had previously agreed that she would participate in the process of hiring the new collateral manager, and she had made herself available to interview possible successors and provide guidance about the transition.  Instead, MBIA and the Zohar III Controlling Class installed AMZM as the new collateral manager, vesting in AMZM significant authority to manage and control the Debtors, and contractually beholden to MBIA and the Zohar III Controlling Class alone.  Thereafter, for multiple years, and through an onslaught of expensive, wasteful litigation, AMZM did MBIA's and the Zohar III Controlling Class's bidding (wielding the resources of the Debtors to do so).

**B.    In the Alternative, Defendants Are Non-Statutory Insiders.**

226.    Alternatively, Defendants are each a non-statutory insiders as they are "in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's-length."  Moreover, as set forth herein, Defendants have acted outrageously and in bad faith towards Plaintiffs, and have obtained an unfair advantage with respect to Plaintiffs, and their claims should therefore be subordinated on this independent basis.

227.    Following ouster of Ms. Tilton as collateral manager and as controlling party, MBIA directed Defendant U.S. Bank to commence an auction of all the collateral possessed by one of the Debtors, which MBIA then purchased for itself in a credit-only bid against its approximately $148 million dollar claim resulting from payment on its insurance obligations as Credit Enhancer of the Zohar I A-1 and A-2 notes.

228.    MBIA and U.S. Bank, as Trustee, worked together to auction the collateral of the Debtors to MBIA, through objectionable means.  MBIA, with U.S. Bank's active help and collusion, sought to concoct an uncompetitive auction procedure to allow it purchase the collateral for itself.  The Zohar I auction, led and controlled by MBIA and U.S. Bank, is a clear example of MBIA and U.S. Bank's control over the Debtor's management decisions, voting stock, and disposition of assets, and was far from an arm's length transaction.

229.    AMZM, at MBIA's and the Zohar III Controlling Class's behest, also caused the Debtors to take various actions against the interests of Ms. Tilton and the other Plaintiffs, including instituting various unjustifiable litigations against Ms. Tilton and the other Plaintiffs seeking declarations that Debtors, and not Plaintiffs, are the beneficial owners of, and have the legal right to control, each of the Portfolio Companies.[12]

---

[12]    The specific Portfolio Companies for which this is the case, as set out in Debtors' complaint in the Southern District of New York in their now-dismissed RICO action, are 180s Inc., Acme International Enterprises, Inc., American Doors, LLC, American LaFrance, LLC, Amweld International, LLC, Best Textiles Acquisition, LLC, Bomar Industries International Inc., CBA/Universal Instruments, Croscill Home LLC, Denali, Inc., Dura Operating, LLC, Duro Textiles LLC, East Alliance Limited, eMag Solutions, LLC, Fetco Home Décor, Inc., Galey & Lord, LLC, Glenoit Universal, Ltd., Global Automotive Systems, LLC, Gorham Tissue and Paper, LLC, Hartwell Industries, Inc., Heritage Aviation, Iconic American Trucks, LLC, IMG Holdings Inc., Intrepid Healthcare, Jewel of Jane LLC, Libertas Copper, LLC, LVD Acquisition, LLC (Oasis), MAV (PVI Acquisition, LLC), MD Helicopters, Inc., Natura Water, LLC, Netversant Solutions, LLC, Performance Designed Products, LLC/FSAR,  Petry Holding, Inc., Rand (RM Acquisition, LLC), Rapid Rack Holdings, Inc., Red Shield Acquisition, LLC, Remco Maintenance, LLC, Scan-Optics, LLC, Silverack, LLC, Spiegel, LLC, Snelling Staffing, LLC, Stila Styles, LLC, Transcare Corporation, Vulcan Engineering Co., and Xinhua Sports & Entertainment/Patriarch Partners Media Holdings, LLC.  Denali Inc. and LVD Acquisition, LLC were subsequently sold and are no longer at issue.

74

230. In 2015, the Debtors gave Ms. Tilton a multi-year, long-term irrevocable proxy for each Portfolio Company that is a corporation—each of which was signed and acknowledged by a Portfolio Company executive—and authorized amendments to LLC agreements for each Portfolio Company that is a limited liability company that gave Ms. Tilton or the other Plaintiffs control over voting rights in the Portfolio Companies.

231. Despite execution of the proxies, AMZM, at the direction of MBIA and the Zohar III Controlling Class, executed written consents on behalf of the Zohar Funds that purported to remove Ms. Tilton as director of three Portfolio Companies—FSAR Holdings, Inc., Glenoit Universal Ltd., and Performance Designed Products LLC/UI Holdings Co. The execution of the written consents and the later Delaware Chancery Court lawsuit about whether the written consents were valid are prime examples of AMZM's, MBIA's, and the Zohar III Controlling Class's ability to control the day-to-day actions of the Debtors and to take litigation positions that benefit MBIA to the detriment of Ms. Tilton and affiliates as creditors of the Debtors.[13]

232. Finally MBIA, the Zohar III Controlling Class, and AMZM's litigation campaign against Ms. Tilton, purportedly on behalf of the Zohar Funds, is further evidence of control over the Debtors, or in the alternative a sufficiently "close relationship" with the Debtors so as to confer at least non-statutory insider status on MBIA.

---

[13] As noted above, the court ultimately invalidated the proxies on technical grounds, without addressing Ms. Tilton's inequitable conduct or unclean hands argument or evidence, and also found that the Zohar Funds are the beneficial owners of the shares that were at issue for the three Portfolio Companies and could therefore vote those shares. Ms. Tilton appealed that decision and sought a stay of the Chancery Court's order while the appeal was pending. The Chancery Court granted Ms. Tilton a stay pending appeal because she had raised "serious legal questions . . . worthy of consideration by [the Delaware] Supreme Court," *Zohar II, 2005-1, Ltd. v. FSAR Holdings, Inc.*, 2017 WL 6761234, at *1 (Del. Ch. Dec. 29, 2017) (Am. Order & J.), and the Delaware Supreme Court upheld that stay. An appeal of the Chancery Court's decision remains pending in the Delaware Supreme Court, stayed due to the bankruptcy.

### C.    Defendants Have Engaged in Years of Inequitable Conduct Requiring Subordination of their Creditor Claims.

233.    As set forth herein, Defendants have engaged in a years-long pattern of inequitable conduct towards Plaintiffs, including, but not limited to, the following:

- MBIA's misrepresentations relating to Ms. Tilton's purchase of the Zohar I A-3 notes for nearly $104 million in March 2015, *see supra* ¶¶ 93-123;

- MBIA's efforts in preventing a global restructuring of Zohar I and II, leading to a default of both funds, *see supra* ¶¶ 124-44;

- MBIA's encouragement of the SEC to investigate Plaintiffs on bogus charges later proven baseless, *see supra* ¶¶ 145-51;

- MBIA's collusion with the SEC to obtain confidential information in order to gain a litigation advantage against Ms. Tilton, *see supra* ¶¶ 148-50;

- MBIA's and U.S. Bank's execution of a commercially unreasonable sham purported auction of Zohar I's assets, *see supra* ¶¶ 163-77;

- MBIA's inducement of Ms. Tilton and her Patriarch Entities to resign as Collateral Manager for all three Zohar Funds under false pretenses, *see supra* ¶¶ 152-62;

- MBIA's and the Zohar III Controlling Class's bad faith replacement of Ms. Tilton and her Patriarch Entities with AMZM as Collateral Manager for all three Zohar Funds, without consulting Plaintiffs as previously agreed and for the purpose of launching a bad faith litigation campaign against Plaintiffs, *see supra* ¶¶ 178-82;

- MBIA and the Zohar III Controlling Class's baseless litigation campaign against Plaintiffs, through their agent AMZM, including filing a meritless civil RICO action, *see supra* ¶¶ 183-205;

- AMZM's execution of written consents, nominally on behalf of the Zohar Funds, and at the behest and direction of MBIA and the Zohar III Controlling Class, that purported to remove Ms. Tilton as director of multiple Portfolio Companies by voting Portfolio Company shares MBIA had previously acknowledged Ms. Tilton beneficially owns, *see supra* ¶¶ 186-90;[14]

- MBIA's post-petition conduct, *see supra* ¶¶ 212-19.

---

[14]   The order entered on a lawsuit brought to adjudicate three of those consents has been stayed as noted above.

57772/0001-17905092v2

**D.    Defendants' Misconduct Conferred an Unfair Advantage on Them and Resulted In Particularized Injury To Plaintiffs as Creditors.**

**1.    Defendants Misconduct Conferred an Unfair Advantage on Them.**

234.    As set forth herein, Defendants' misconduct conferred an unfair advantage to themselves, including, but not limited to, the following:

235.    First, by inducing co-creditor Ms. Tilton to resign as collateral manager of the Zohar Funds on a false promise that MBIA would continue to recognize her ownership and control of the Portfolio Companies and that MBIA and the Zohar III Controlling Class would allow Ms. Tilton input in choosing the new collateral manager, MBIA and the Zohar III Controlling Class obtained the ability to appoint AMZM as Ms. Tilton's successor as collateral manager, and thereby to effectuate MBIA's and the Zohar III Controlling Class's goals through a litigation strategy at the expense of other creditors.

236.    Second, after MBIA and the Zohar III Controlling Class installed AMZM as the collateral manager of the Zohar Funds, charged with running their day-to-day affairs AMZM obtained millions of dollars in fees from the Debtors as a result of its tenure as collateral manager and the inequitable conduct that it, in conjunction with MBIA and the Zohar III Controlling Class, engaged in.

237.    Third, MBIA and U.S. Bank orchestrated an sham auction to gain control over the collateral, purportedly including equity owned by Ms. Tilton and her affiliated entities, through a "credit bid" against its approximately $148 million claim.  U.S. Bank recovered substantial fees from the Zohar Funds in its role as Trustee, including as a result of its inequitable management of the farcical Zohar I auction.

238.    Fourth, through their actions in these Chapter 11 Cases, MBIA and the Zohar III Controlling Class have not acted in good faith and seek to obtain far more than they are owed as creditors.

### 2.    The Injury Suffered by Plaintiffs Is Particularized.

239.    As set forth herein, Ms. Tilton, the Patriarch Entities, and the Octaluna Entities suffered particularized harm as a result of Defendants' inequitable conduct.

240.    Since the Patriarch Secured Parties hold over $896 million of secured notes issued by the Debtors, Ms. Tilton and Patriarch have an interest in the equitable subordination of Defendants' claims separate and apart from the interests of the estates as a whole.

241.    Defendants' actions have, moreover, harmed the value of those loans in a unique and particularized way.

242.    Although Defendants are well aware of the value of the Portfolio Companies and the significant sales price they may generate if Plaintiffs are permitted to run them without interference, they nevertheless have persisted in their litigation strategy, which only tarnishes the Portfolio Companies and taints the market, hindering Ms. Tilton's good faith attempts at a successful restructuring or sales.  Any decrease in the value of the Portfolio Companies specifically and uniquely harms Ms. Tilton, because Ms. Tilton owns both (a) direct claims and equity interests in the Portfolio Companies, the value of which is separately harmed by Defendants' wrongful conduct, and (b) any residual value in the Portfolio Companies after Defendants' notes are paid in full, which goes to her either as a result of her secured notes issued by the Zohar Funds or as the Zohar Funds' sole preference share holder.  Moreover, to the extent the value in the Portfolio Companies is no longer sufficient pay the Zohar Funds' noteholders in full, it is as a direct result of MBIA's and the Zohar III Controlling Class's persistent conduct (assisted by the other Defendants) during the lead up to and continuing throughout the course of these Chapter 11 Cases.

243.    Defendants' actions alleged herein have also caused Plaintiffs to suffer significant money damages, including tens of millions of dollars in legal fees, and reputational harms, as forth herein.

**E.      Equitable Subordination of Defendants' Claims Is Consistent With Provisions of the Bankruptcy Code.**

244.    Asking the Court to subordinate MBIA's and the other Defendants' claims to the claims of the Plaintiffs is consistent with the basic goal of equality of distribution in bankruptcy.

245.    MBIA and the other Defendants engaged in inequitable and unfair conduct that caused harm to the Plaintiffs.  Due to Defendants' control over the Debtors, they have has failed to act with good faith or inherent fairness in dealings with the Debtors.  Instead, Defendants have been conferred unfair advantages as First-Priority Secured Creditor.

246.    Putting Defendants' secured creditor claim ahead of other creditors' claims would offend the principles of equity.  Defendants' creditor claims should not be allowed to share equally with the other creditors of the Debtors' estate.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment:

a)   Subordinating each Defendant's claims, individually and in total, against the Debtors, to the claims of Plaintiffs;

b)   Granting any necessary and appropriate injunctive relief;

c)   Awarding Plaintiffs their attorneys' fees and costs; and

d)   Granting such other or further relief as is just, proper, and equitable.

Dated: October 1, 2019
      Wilmington, Delaware

Respectfully submitted,

By: */s/ Norman L. Pernick*
**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

      – and –

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (Admitted Pro Hac Vice)
Mary Beth Maloney (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-2315
Facsimile: (212) 351-6315
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

Robert Klyman, Esquire (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7562
Facsimile: (213) 229-6562
rklyman@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Plaintiffs Lynn Tilton; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; Octaluna, LLC; Octaluna II, LLC; and Octaluna III, LLC*

80