## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Zohar III, Corp., *et al.*,[1]

               Debtors.

Chapter 11

Case No. 18-10512 (KBO)

Jointly Administered

---

LYNN TILTON; PATRIARCH PARTNERS
VIII, LLC; PATRIARCH PARTNERS XIV,
LLC; PATRIARCH PARTNERS XV, LLC;
OCTALUNA, LLC; OCTALUNA II, LLC;
AND OCTALUNA III, LLC,

               Plaintiffs,

      v.

MBIA INC., MBIA INSURANCE
CORPORATION, U.S. BANK, N.A.,
ALVAREZ & MARSAL ZOHAR
MANAGEMENT, CREDIT VALUE
PARTNERS, LP, BARDIN HILL
INVESTMENT PARTNERS F/K/A
HALCYON CAPITAL MANAGEMENT LP,
COÖPERATIEVE RABOBANK U.A.,
VÄRDE PARTNERS, INC., ASCENSION
ALPHA FUND LLC, ASCENSION HEALTH
MASTER PENSION TRUST, CAZ
HALCYON OFFSHORE STRATEGIC
OPPORTUNITIES FUND, L.P., CAZ
HALCYON STRATEGIC OPPORTUNITIES
FUND, L.P., BROWN UNIVERSITY, HCN
LP, HALCYON EVERSOURCE CREDIT
LLC, HLF LP, HLDR FUND I NUS LP,
HLDR FUND I TE LP, HLDR FUND I UST
LP, HALCYON VALLÉE BLANCHE

Adversary No. 19-50390 (KBO)

---

[1] The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

MASTER FUND LP, BARDIN HILL
EVENT- DRIVEN MASTER FUND LP,
PRAETOR FUND I, A SUB FUND OF
PRAETORIUM FUND I ICAV; HIRTLE
CALLAGHAN TOTAL RETURN
OFFSHORE FUND LIMITED; HIRTLE
CALLAGHAN TOTAL RETURN
OFFSHORE FUND II LIMITED; HIRTLE
CALLAGHAN TRADING PARTNERS, L.P.;
AND THIRD SERIES OF HDML FUND I
LLC.,

### DEFENDANTS MBIA INC.'S AND MBIA INSURANCE CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS EQUITABLE SUBORDINATION COMPLAINT

PACHULSKI STANG ZIEHL & JONES, LLP
919 N. Market Street
P.O. Box 8705
Wilmington, Delaware  19899

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York  10281

*Attorneys for Defendants
MBIA Insurance Corporation and MBIA Inc.*

TABLE OF AUTHORTIES .......................................................... iii

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF RELEVANT FACTS ........................................ 5

    A.    The Zohar Funds And The Defendants' Contractual Rights And Remedies ................................................................ 5

    B.    Tilton, Her Affiliates, And Their Conflicted Roles At The Zohar Funds ....................................................................... 7

    C.    Tilton's Purchase Of The A-3 Notes, The Westchester Action And The Zohar I Payment Default ................................. 8

    D.    The Zohar I Involuntary Bankruptcy ............................. 12

    E.    The Zohar I Foreclosure Auction ................................... 13

    F.    Plaintiffs' Additional Prepetition Litigation With The Zohar Funds ......... 14

    G.    The Zohar II And Zohar III Payment Defaults .............. 16

    H.    The Delaware Chapter 11 Cases And Adversary Proceedings ......... 16

ARGUMENT ........................................................................... 19

I.        APPLICABLE LEGAL STANDARDS ................................. 19

II.      THE COMPLAINT FAILS TO STATE A CLAIM FOR EQUITABLE SUBORDINATION ......................................... 20

    A.    The Complaint Does Not Adequately Allege Inequitable Conduct By MBIA ............................................. 21

        1.    Legal Standards For Pleading Inequitable Conduct ...... 21

        2.    MBIA Did Not Engage In Inequitable Conduct ........... 23

    B.    Plaintiffs Fail To Plead Injury Or Unfair Advantage To MBIA Resulting From MBIA's Alleged Conduct ............ 37

    C.    Equitable Subordination Would Be Inconsistent With The Bankruptcy Code ............................................. 39

III.    THE COMPLAINT'S SOLE CAUSE OF ACTION IS BARRED BY JUDICIAL ESTOPPEL ............................................. 41

IV.    THE COMPLAINT DOES NOT STATE A CLAIM AGAINST MBIA INC. ......................................................... 43

# **TABLE OF CONTENTS**

**Page**

CONCLUSION........................................................................................................................44

**CASES:**

*300 Gold Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*),
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................................... 31-32

*ABF Cap. Mgmt. v. Kidder Peabody & Co.* (*In re Granite Partners, L.P.*),
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) ...................................................................................21

*Am. Cigar Co. v. MNC Com. Corp.* (*In re M Paolella & Sons, Inc.*),
    85 B.R. 965 (E.D. Pa. 1988) ................................................................................................21

*Apace Commc'ns, Ltd v. Burke*,
    17 F. Supp. 3d 238 (W.D.N.Y. 2014) ....................................................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................................19, 36

*Baldiga v. Moog, Inc.* (*In re Comprehensive Power Inc.*)
    578 B.R. 14, 29 ( Bankr. D. Mass. 20170 ...............................................................................41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................19, 36

*Bisk Educ., Inc.* v. *Aspect Software, Inc.* (*In re Aspect Software Parent, Inc.*),
    578 B.R. 718 (Bankr. D. Del. 2017) .....................................................................................20

*Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*,
    727 F.3d 917 (9th Cir. 2013) ............................................................................................ 32-33

*Burtch v. Opus, LLC* (*In re Opus E., LLC*),
    528 B.R. 30 (Bankr. D. Del. 2015), *aff'd*,
    2016 Wl 1298965 (D. Del. Mar. 31, 2016) .......................................................................... 21-22

*Charal Inv. Co. v. Rockefeller* (*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*),
    311 F.3d 198 (3d Cir. 2002) ...............................................................................................20

*Chase Invs., Ltd. v. Kent*,
    681 N.Y.S.2d 319 (App. Div. 2d Dep't 1998) ...................................................................... 29-30

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998) ...............................................................................21, 23, 36, 38

*Cohen v. KB Mezzanine Fund II, L.P.* (*In re SubMicron Sys. Corp.*),
    291 B.R. 314 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006) ..............................20, 21, 22

# TABLE OF AUTHORITIES

**PAGE(S)**

*Cosoff v. Rodman* (*In re W.T. Grant Co.*),
699 F.2d 599 (2d Cir. 1983).................................................................28

*Danise v. Saxon Mortg. Servs. Inc.*,
738 F. App'x 47 (3d Cir. 2018) (unpublished) ......................................41

*Davis v. Wells Fargo*,
824 F.3d 333 (3d Cir. 2016).....................................................................5

*DiPippo v. Cnty. of Putnam*,
No. 17-cv-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019) .............43

*Dixon v. Am. Cmty. Bank & Tr.* (*In re Gluth Bros. Constr., Inc.*),
424 B.R. 392 (Bankr. N.D. Ill. 2009) ...............................................25-26

*EBC I, Inc. v. Goldman Sachs & Co.*,
832 N.E.2d 26 (N.Y. 2005).....................................................................23

*Elway Co. v. Miller* (*In re Elrod Holdings Corp.*),
392 B.R. 110 (Bankr. D. Del. 2008) ......................................................37

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003).................................................................30

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004).................................................................29

*Garza v. Citigroup Inc.*,
192 F. Supp. 3d 508 (D. Del. 2016)........................................................43

*Gertrude L.Q. v. Stephen P.Q.*,
466 A.2d 1213 (Del. 1983) .....................................................................39

*Giuliano v. Ferdinand* (*In re Liquid Holdings Grp., Inc.*),
No. 16-10202, 2018 WL 2759301 (Bankr. D. Del. June 6, 2018)..........29

*GNK Enters., Inc. v. Conagra, Inc.* (*In re GNK Enters., Inc.*),
197 B.R. 444 (Bankr. S.D.N.Y. 1996).....................................................33

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001)................................................................29

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d. 17 (S.D.N.Y. 2015)......................................................41

*IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*,
  C.A. No. 12892-VCS, 2017 WL 4082886 (Del. Ch. Sept. 7, 2017)......................................39

*In re Burlington Coat Factory Secs. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)................................................................................................20

*In re Mid-Am. Waste Sys., Inc.*,
  284 B.R. 53 (Bankr. D. Del. 2002) .......................................................................................37

*In re Wash. Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part on other grounds*,
  No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ................. 39, 40-41

*J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*,
  947 F. Supp. 2d 449 (D. Del. 2013).......................................................................................29

*J.P. Morgan Chase Bank N.A.* v. *Baupost Grp., LLC*
  (*In re Enron Creditors Recovery Corp.*),
  380 B.R. 307 (S.D.N.Y. 2008)...............................................................................................39

*Kirschner v. J.P. Morgan Chase Bank, N.A.* (*In re Millennium Lab Holdings II, LLC*),
  No. 15-12284, 2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019).......................................20

*Klein v. Stahl GMBH & Co. Maschinefabrik*,
  185 F.3d 98 (3d Cir. 1999).....................................................................................................41

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003)...................................................................................................41

*Lightsway Litig. Servs., LLC v. Yung* (*In re Tropicana Ent., LLC*),
  520 B.R. 455 (Bankr. D. Del. 2014).......................................................................................19

*Lock v. Schreppler*,
  426 A.2d 856 (Del. Super. Ct. 1981) .....................................................................................30

*McBeth v. Porges*,
  171 F. Supp. 3d 216 (S.D.N.Y. 1999)....................................................................................30

*McTernan v. City of York, Pa.*,
  577 F.3d 521 (3d Cir. 2009).....................................................................................................5

*Miller v. Greenwich Cap. Fin. Prods., Inc.* (*In re Am. Bus. Fin. Servs., Inc.*),
  457 B.R. 314 (Bankr. D. Del. 2011) .......................................................................................29

*Murray v. Xerox Corp.*,
811 F.2d 118 (2d Cir. 1987)..................................................................29

*Nat'l Westminster Bank, U.S.A. v. Ross*,
130 B.R. 656 (S.D.N.Y. 1991), *aff'd sub nom.*
*Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992) ..........................33

*New Hampshire v. Maine*,
532 U.S. 742 (2001)...........................................................................41

*NHB Assignments LLC v. Gen Atl. LLC* (*In re PMTS Liquidating Corp.*),
452 B.R. 498 (Bankr. D. Del. 2011) ........................................................29

*Nisselson v. Ford Motor* Co. (*In re Monahan Ford Corp. of Flushing*),
340 B.R. 1 (Bankr. E.D.N.Y. 2006)........................................................20

*O'Halloran v. Prudential Sav. Bank* (*In re Island View Crossing II, L.P.*),
604 B.R. 181 (Bankr. E.D. Pa. 2019) ......................................................33

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
973 N.E.2d 735 (N.Y. 2012)..................................................................24

*Official Comm. of Unsecured Creditors of Radnor Holding Corp. v. Tennenbaum Cap.
Partners, LLC* (*In re Radnor Holdings Corp.*),
353 B.R. 820 (Bankr. D. Del. 2006) ........................................................25

*Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse*
(*In re Champion Enters., Inc.*),
No. 09-14014, 2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010).............24-25, 26, 28, 33-34

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit
Partners L.P.* (*In re Fedders N. Am., Inc.*),
405 B.R. 527 (Bankr. D. Del. 2009) ......................................................20, 22

*Official Comm. of Unsecured Creditors ex rel. Jevic Holding Corp. v. CIT Grp./Bus.
Credit , Inc.* (*In re Jevic Holding Corp.*),
No. 08-11006, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011).......................22

*Paradise Hotel Corp. v. Bank of Nova Scotia*,
842 F.2d 47 (3d Cir. 1988)................................................................. 23-24

*Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*,
No. 16-cv-7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017)................................. 13-14, 34

# TABLE OF AUTHORITIES

*Poplos v. Norton*,
No. 6243, 1983 WL 19785 (Del. Ch. June 21, 1983), *aff'd,*
474 A.2d 141 (Del. 1983) ...................................................................................30

*Ryan Operations G.P. v. Santiam-Midw. Lumber Co.*,
81 F.3d 355 (3d Cir. 1996)..................................................................................41

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*,
554 F.3d 382 (3d Cir. 2009)...........................................................................21, 25

*Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*,
329 B.R. 438 (Bankr. D. Del. 2005) ...................................................................22

*Student Fin. Corp. v. Royal Indem. Co. (In re Student Fin. Corp.)*,
No. 02-11620, 2004 WL 609329 (D. Del. Mar. 23, 2004) ..................................30

*Sumner v. Extebank*,
452 N.Y.S.2d 873 (App. Div. 1st Dep't 1982), *aff'd as modified,*
449 N.E.2d 704 (N.Y.1983)...............................................................................33

*Tanksley v. Daniels*,
902 F.3d 165 (3d Cir. 2018), *cert. denied,* 139 S. Ct. 1596 (2019) .........................5

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004) .................................................................................38

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett,*
931 A.2d 438 (Del. 2007) ..............................................................................29, 31

*UMB Bank, N.A. v. Sun Cap. Partners V, LP (In re LSC Wind Down, LLC)*,
610 B.R. 779 (Bankr. D. Del. 2020) .................................................................5, 19

*United States v. Noland*,
517 U.S. 535 (1996)............................................................................................34

*United States v. State St. Bank & Tr. Co.*,
520 B.R. 29 (Bankr. D. Del. 2014) ...........................................................22, 25, 34

*Ventur Grp., LLC v. Finnerty*,
892 N.Y.S.2d 69 (App. Div. 1st Dep't 2009) ......................................................30

*Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*,
527 B.R. 169 (D. Del. 2015)...............................................................20-21, 22-23

*Waslow v. MNC Com. Corp.* (*In re M. Paolella & Sons, Inc.*),
    161 B.R. 107 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1984)..............................23, 25, 33

*Wenske v. Blue Bell Creameries, Inc.*,
    No. 2017-0699-JRS, 2018 WL 5994971 (Del. Ch. Nov. 13, 2018) .........................................43

*Wesley v. Varand*,
    505 F. App'x 91 (3d Cir. 2012) (per curiam) ...................................................................19, 32

*Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*,
    C.A. No. 12247, 2016 WL 6248461 (Del. Ch. Oct. 26, 2016), *aff'd,*
    165 A.3d 288 (TABLE) (Del. 2017)................................................................................14, 42

*Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*,
    C.A. No. 12946, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017)..........................................15, 42

## STATUTES & OTHER AUTHORITIES:

11 U.S.C:
    § 101(31)(B)......................................................................................................................24
    § 510(a).............................................................................................................................39

Fed. R. Bankr. P. 7009 ...................................................................................................................20

Fed. R. Civ. P. 9(b) ........................................................................................................................20

N.Y. U.C.C. § 9-627(c)(1) (McKinney 2016 & Supp. 2020) .........................................................33

*Restatement (Second) of Torts* (1997)*:*
    § 538...............................................................................................................................30
    § 544(a) ...........................................................................................................................30

Defendants MBIA Inc. and MBIA Insurance Corporation ("MBIA" and together with MBIA Inc., collectively, the "MBIA Defendants"), by and through their undersigned counsel, hereby submit this memorandum of law in support of their motion to dismiss (the "Motion") the complaint [D.I. 2] (the "Complaint")[2] filed by plaintiffs (a) Lynn Tilton ("Tilton"); (b) Patriarch Partners VIII, LLC ("Patriarch VIII"), Patriarch Partners XIV, LLC ("Patriarch XIV"), and Patriarch Partners, XV, LLC ("Patriarch XV" and together with Patriarch VIII and Patriarch XIV, the "Patriarch Entities"); and (c) Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC (together, the "Octaluna Entities" and, collectively with Ms. Tilton and the Patriarch Entities, "Plaintiffs").  In support of this Motion, the MBIA Defendants submit the Declaration of Ingrid Bagby (the "Bagby Declaration"), and Exhibits 1-31 attached thereto, and respectfully state as follows:

## PRELIMINARY STATEMENT

The Plaintiffs' Complaint is devoid of fact, laden with heaps of baseless fantasy, and, at bottom, a stunning narrative of counterfactual, revisionist history.  Lynn Tilton derived hundreds of millions of dollars from her failed management of the Zohar Funds and the subject portfolio companies, while siphoning off their assets for her personal benefit.  Tilton took billions from her CLO investors, paying them back nothing at maturity and relying on MBIA, who she defrauded and kept in the dark for years, to make many of those investors whole to the tune of almost $1 billion.  Tilton forced the Zohar Funds into bankruptcy not once but twice, scurrying away the first time when pushed to defend her bona fides.  Tilton has become a litigation machine, using her ill-gotten gains and an ever-changing stable of law firms to hide information, defend

---

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Complaint, the Indentures (defined below), or the Settlement Agreement (defined below), as applicable. Capitalized terms in the Preliminary Statement but not defined herein have the meaning ascribed to them in the Motion.

misconduct, and delay and challenge every nuance of the chapter 11 proceeding she initiated and the settlement agreement she drafted and signed onto. And in the wake of all that, Tilton has the temerity to complain that the noteholders and MBIA are responsible for the purported consequences of her malfeasance. Nothing Lynn Tilton says or does is remotely shocking anymore, but this action remains a jaw-dropping display of consummate *chutzpah*.

This is not empty rhetoric. The judicial system has just begun to hold Tilton accountable for her gamesmanship and malfeasance. For example, a New York bankruptcy court has recommended that the district court enter a judgment against Tilton for attempting to enrich herself at the expense of one of the Zohar portfolio companies in breach of her fiduciary duties of loyalty and good faith. *See* Post-Trial Findings of Fact and Conclusions of Law, *In re Transcare* (LaMonica v. Tilton), No. 18-AP-1021 (SMB) (Bankr. S.D.N.Y. July 6, 2020), ECF No. 138. And earlier this month, the Delaware Supreme Court mandated a final judgment be entered on the Court of Chancery's critical trial opinion flatly rejecting the very same claims of equity ownership Tilton relies on in this Complaint. And, of course, this Court has continued to enforce and uphold the letter and spirit of the bankruptcy settlement agreement through its oversight of the joint monetization process.

As the Complaint acknowledges, Tilton controlled the Funds and their company debt and equity asset portfolio during their long decline through her various conflicted roles at both the Zohar Funds themselves and the Portfolio Companies. In that regard, Tilton concededly served for years as the Funds' collateral manager, lending agent, director, noteholder, preference share holder in addition to the sole director, officer or manager for the Funds' Portfolio Companies. Tilton willingly resigned as collateral manager in early 2016 only after the first Zohar Fund defaulted on its note payment obligations and a bankruptcy court made clear its intention to hold Tilton accountable for her representations and contractual obligations. Similarly, one day after

this Court issued an order establishing specific parameters for Tilton's performance of her obligation to monetize the Portfolio Companies, Tilton again attempted to stay one step ahead of the law by resigning from her positions at and conceding her claimed ownership of the Portfolio Companies. The Complaint's fundamental premise that the Zohar stakeholders fraudulently and concertedly abused their legal and contractual rights to steal Zohar assets from Tilton or subordinate her concededly already junior interests is implausible and nonactionable as a matter of law.

*First*, all of MBIA's complained-of actions were authorized by the governing Zohar transaction documents and performed by MBIA in accordance with applicable law and on a commercial, good-faith, arm's-length basis. MBIA's representations in the course of standard creditor/debtor negotiations with Tilton were not, and are not plausibly alleged to be, actionable. The parties discussed the *possibility* of extending the Zohar I Note Maturity Date in exchange for Tilton's resignation as collateral manager, but indisputably did not reach a final, binding agreement. Ultimately, Tilton's claims of "fraud" boils down to nothing more than failed settlement talks; the alleged "promises" made by MBIA were plainly non-binding proposals contingent on contracts that never materialized. MBIA's alleged statements were not false statements of fact, and Plaintiffs could not have justifiably relied on them as a matter law. Thus, such statements were not fraudulent. Similarly, allegations regarding MBIA's good-faith cooperation with the SEC and the exercise of its contractual remedies in directing the Zohar I Auction and appointing AMZM to serve as collateral manager cannot constitute inequitable conduct. Because the Complaint does not allege facts establishing that the MBIA Defendants engaged in inequitable conduct, it does not state a claim for equitable subordination. *See infra* Point II.A, IV.

*Second*, the Complaint fails as a matter of law because it does not allege that Plaintiffs incurred any particularized injury caused by MBIA's alleged conduct. According to the Complaint, all of MBIA's purported conduct occurred prior to March 2018, at which time Tilton commenced the Zohar chapter 11 proceedings and expressly swore to the Court that all creditors would be paid in full from the Collateral. That is, Tilton conceded that, as of the petition date, she had not incurred any injury in her capacity as a creditor of the Zohar Funds. Further, any decrease in the value of the Portfolio Companies or other Zohar Collateral purportedly caused by MBIA's conduct would not constitute an independent, particularized injury conferring standing to Plaintiffs. *See infra* Point II.B.

*Third*, the relief sought here is inconsistent with the Bankruptcy Code. Specifically, Plaintiffs' request to subordinate Defendants' claims under 11 U.S.C. § 510(c), if granted, would fundamentally undermine Plaintiffs' commitments in the transaction documents and the parties' Court-approved settlement to subordinate Plaintiffs' payments to MBIA — commitments which are expressly enforceable under Section 510(a) of the Bankruptcy Code. Subordination would likewise violate the well-established principle that debt shall not be subordinated to equity. *See infra* Point II.C.

*Fourth,* any claims predicated on Tilton's purported equity ownership fail. Tilton has expressly abandoned her claim of equity ownership and should be estopped from continuing to seek the relief sought in the Complaint based on those same claims. *See infra* Point III.

## STATEMENT OF RELEVANT FACTS[3]

### A.    The Zohar Funds And The Defendants' Contractual Rights And Remedies

1.      Zohar CDO 2003-1, Limited ("Zohar I"), along with Zohar II 2005-1, Ltd. ("Zohar II") and Zohar III, Ltd. ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), are collateral loan obligation funds formed by Tilton in 2003, 2005 and 2007, respectively. *See* Compl. ¶¶ 55, 58. The Zohar Funds issued notes to investors in exchange for cash, which they used to acquire collateral assets that, in turn, were intended to generate cash flow for payments of principal and interest owed by the Zohar Funds on their investors' notes. *Id.* ¶¶ 51–58, 63. These collateral assets include loans to and equity interests in a group of companies (collectively, the "Portfolio Companies"). *Id.* ¶ 56.

2.      Pursuant to their respective trust indentures (each, an "Indenture" and, collectively, the "Indentures"), the Zohar Funds each granted a lien on all of their property (the "Collateral") to U.S. Bank National Association, in its capacity as trustee under each of the Indentures ("U.S. Bank" or the "Trustee"). *Id.* ¶¶ 22, 59; *see* Exs. 1-2 (Indentures) at § 3.2.[4] Thus, as Trustee, U.S. Bank holds a continuing security interest in and lien on the Collateral on behalf of the senior noteholders and MBIA, and is charged with performing the duties assigned to it in the Indentures. *See* Exs. 1-2 (Indentures), Art. 6. MBIA is a monoline insurance company that acted as the "Credit Enhancer" to Zohar I and Zohar II (but not Zohar III). *See id.* at 1; Compl. ¶¶ 20, 60–61. In that capacity, MBIA issued financial guaranty insurance policies for the benefit of

---

[3]    On a motion to dismiss under Rule 12(b)(6), a court may consider facts in the public record and documents that are "integral to or explicitly relied upon" in the complaint. *See UMB Bank, N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC)*, 610 B.R. 779, 783 (Bankr. D. Del. 2020) (citing *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 1596 (2019); *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009); *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

[4]    Except where indicated otherwise, the cited provisions in the Indenture and Collateral Management Agreements ("CMAs") for Zohar I are substantially similar to those for Zohar II.

the holders of the Zohar I Class A-1 and Class A-2 notes, but not the Zohar I Class A-3 notes (the "Zohar I Policy"), and the Zohar II Class A-1, Class A-2 and Class A-3 notes (the "Zohar II Policy" and, together with the Zohar I Policy, the "Policies"). Compl. ¶¶ 60-61; Ex. 1 (Zohar I Indenture) at 2. The Policies guaranteed that scheduled interest and principal would be paid to the insured noteholders by MBIA if Zohar I or Zohar II defaulted. *Id.* ¶ 60. All outstanding principal and interest owed on the Zohar I Class A notes was due to be repaid on November 20, 2015 (the "Note Maturity Date"). *Id.* ¶ 94. The Class A notes issued by Zohar II matured on January 20, 2017. *Id.* ¶¶ 139, 141, 185. MBIA Inc. is MBIA's parent company. *Id.* ¶ 21.

3.      As the Credit Enhancer and guarantor assuming the risk of payment defaults by Zohar I and Zohar II, MBIA is referred to as the "Controlling Party" in the Indentures and possesses certain exclusive rights and powers under the Indentures and other agreements governing the Zohar Funds (the "Transaction Documents"). Ex. 1 (Zohar I Indenture) at 20-21, 96-101, 199; Ex. 2 (Zohar II Indenture) at 20, 110-115, 199, 213. For example, MBIA is entitled to receive certain reports and information regarding the Collateral not available to other stakeholders. Exs. 1-2 (Indentures) § 16.1. The Transaction Documents provide that, upon a payment by MBIA under the Policies, MBIA shall become subrogated to the insured noteholders' payment rights and, as the Credit Enhancer, become the senior secured creditor with payment rights senior in priority to each class of notes, including Plaintiffs' interests. Compl. ¶ 223; Exs. 1-2 (Indentures) § 16.5. MBIA also gained the right to remove for cause the initial collateral manager for Zohar I and Zohar II following an "Event of Default" under the Indentures. Exs. 3-4 (CMAs) § 5.5.

4.      Further, the Indentures expressly provide MBIA with rights to monetize the Collateral and attempt to recover its payments under the Policies, including by directing the Trustee to sell the Collateral "in any manner permitted by law." Exs. 1-2 (Indentures) §§ 5.4, 5.13,

5.17.  Significantly, Section 13.2(a) of the Indentures states that MBIA has no obligation or duties to any other Zohar constituents:

> [MBIA] ***shall not have any obligation or duty to any Person*** or to consider ***or take into account the interests of any Person and shall not be liable to any Person for any action taken*** by it or ***at its direction*** or any failure by it to act or to direct that an action be taken, ***without regard to whether such action or inaction benefits or adversely affects any other Secured Party***, the Credit Enhancer, the Issuer, ***or any other Person.***  Exs. 1-2 (Indentures) § 13.2(a).

5.  The Zohar III Controlling Class consists of various private investors who hold more than 50 percent of the aggregate outstanding amount of the Class A-1 Notes issued by Zohar III.  Similar to MBIA's role with respect to Zohar I and Zohar II, the Zohar III Controlling Class is entitled to exercise various rights under the Zohar III Indenture, including directing a liquidation of the Collateral upon a default.  Compl. ¶ 10.  In or around December 2018, a senior Zohar III noteholder transferred its Zohar III notes to multiple entities managed by an affiliate of Halcyon Strategic Opportunities Fund, L.P., but the Zohar III Controlling Class otherwise remains the same in all material respects.  *Id.* at 3 n.3.

6.  Pursuant to their respective rights as Controlling Party and Controlling Class under the Transaction Documents, MBIA and the Zohar III Controlling Class selected Alvarez & Marsal Zohar Management, LLC ("AMZM") as the successor collateral manager for each of the Zohar Funds in March 2016.  Compl. ¶¶ 45, 178-79; Exs. 3-5 (CMAs § 5.5).  AMZM served as collateral manager pursuant to new collateral management agreements (collectively, the "AMZM CMAs") until its termination pursuant to the bankruptcy settlement agreement described below.  Compl. ¶¶ 178-79; Exs. 6-8 (AMZM CMAs).

**B.  Tilton, Her Affiliates, And Their Conflicted Roles At The Zohar Funds**

7.  Plaintiff Lynn Tilton is the founder, principal owner and sole manager of the Patriarch Entities, which served as collateral managers for the Zohar Funds until they resigned

and were replaced by AMZM in March 2016. Compl. ¶¶ 2, 4, 13–16, 45. The Patriarch Entities are also the managing members of the Octaluna Entities, through which Tilton purports to hold the Preference Shares in, and the Class B notes issued by, each of the Zohar Funds. *Id.* ¶¶ 1 n.4, 11, 13-19, 46, 68. In her capacity as the holder of preference shares, Tilton replaced the Zohar Funds' disinterested, independent boards of directors with herself and served as the Zohar Funds' sole director from January 2017 until May 2018, at which time the Court appointed Joe Farnan as the Zohar Funds' Independent Director pursuant to the Settlement Agreement (defined below). *Id.* ¶¶ 46, 211. Tilton also purports to own the Class A-3 notes in Zohar I. *Id.* ¶ 68.

8.      Tilton served in multiple conflicted roles in connection with the Zohar Funds. While acting as collateral manager for the Zohar Funds, Tilton appointed herself the sole managing member or board member for almost all of the Portfolio Companies. Compl. ¶ 75. Tilton appointed an additional Patriarch affiliate, Patriarch Partners Agency Services, LLC ("PPAS"), as administrative agent to the Zohar Funds responsible for receiving and distributing loan interest payments made by the Portfolio Companies to the applicable Indenture Trustee under each of the Zohar Funds' credit agreements with the Portfolio Companies. *Id.* ¶ 66. Patriarch Partners Management Group, LLC ("PPMG") is yet another Patriarch affiliate that charges fees to the Portfolio Companies in exchange for providing so-called managerial services. *Id.*

C.      **Tilton's Purchase Of The A-3 Notes, The Westchester Action And The Zohar I Payment Default**

9.      In 2012, Tilton determined that Zohar I was not likely to satisfy its note payment obligations by the Note Maturity Date. Compl. ¶¶ 95, 97, 99. In 2012 and 2013, Tilton held discussions with MBIA and the Zohar I noteholders requesting that they agree to extend the Zohar I Note Maturity Date from November 2015 to match the January 2017 maturity date for the Class A notes issued by Zohar II. *Id.* ¶¶ 97, 100-05. Tilton and MBIA expressly agreed during

these discussions that the possible terms for any potential extension and restructuring of Zohar I would be set forth in writing. *Id.* ¶ 101. In accordance therewith, in March 2013 Tilton provided MBIA with a written term sheet reflecting her proposed terms for a Zohar I extension, and MBIA provided Tilton with a counter-proposal in May 2013. *Id.* ¶¶ 103-04; Exs. 9-10 (2013 term sheets incorporated by reference into the Complaint). Both parties' written term sheets confirm that their respective proposals were not binding commitments and were, instead, contingent on the execution of a written agreement regarding such note maturity extension. Exs. 9-10. No such agreement was reached. Compl. ¶¶ 104-05.

10. From the end of 2013 to early 2015, Patriarch allegedly continued to explore a possible restructuring of the Zohar Funds and provided MBIA with certain information to facilitate further discussions, but again MBIA made no commitments and no agreement was reached. *Id.* ¶¶ 106, 111-12. On February 17, 2015, MBIA met with Tilton and, as demonstrated by the parties' contemporaneous emails describing the parties' meeting and incorporated by reference in the Complaint, discussed multiple go-forward options for the Zohar Funds that MBIA would consider after receiving information Tilton agreed to provide. Compl. ¶¶ 116, 121; Ex. 11 at 2-3 (Email from L. Tilton, dated Feb. 17, 2015); *id.* at 1 (Email from A. McKiernan, dated March 25, 2015). The Complaint contends that the parties discussed an extension of the Zohar I Note Maturity Date at the February 17 meeting, and that MBIA implicitly committed to such an extension by email on March 25, 2015. Compl. ¶¶ 116, 121. That contention, however, is belied by parties' communications which make clear that, rather than having made promises or commitments of any kind, MBIA expressly reserved all rights and stated only that it intended to "evaluate [Tilton's] proposals" based on information that Tilton agreed to provide to MBIA and its advisors. Ex. 11 at 1 (Email from A. McKiernan, dated March 25, 2015); *id.* at 2-3 (Email from L. Tilton, dated Feb. 17, 2015).

11.     Tilton allegedly learned on March 19, 2015 that the then-owner of Zohar I's uninsured A-3 Notes intended to sell those notes.  Compl. ¶ 119.  On March 21, 2015, Tilton informed MBIA by email that she was considering a bid to acquire the A-3 Notes.  *Id.* ¶ 120; Ex. 12 (Email from L. Tilton, dated March 21, 2015).  MBIA did not respond to Tilton's March 21, 2015 email or otherwise communicate with her regarding her possible acquisition of the A-3 Notes. Compl. ¶¶ 120-21.  The Complaint does not allege that MBIA requested or encouraged Tilton to purchase the A-3 Notes.[5]  On March 26, 2015, Tilton caused Patriarch XV to acquire the Zohar I A-3 Notes, having a face value of $350 million, for a purchase price of approximately $104 million.  *Id.* ¶ 122.

12.     On October 15, 2015, in anticipation of Zohar I's November 20, 2015 note payment default, MBIA proposed terms for a possible Zohar refinancing transaction.  Compl. ¶ 155; Ex. 13.  On October 22, 2015, Patriarch made a counter proposal, to which MBIA responded on October 24, 2015.  Compl. ¶ 155; Exs. 14-15.  In its response to Patriarch's counter-proposal, MBIA stated that "as long as Patriarch is in full compliance with this [proposed] agreement" MBIA would forebear on exercising its contractual remedy to remove Patriarch as collateral manager and Tilton and Patriarch would retain any rights held with respect to Zohar Funds or Portfolio Companies, as applicable.  Compl. ¶ 155; Ex. 15.

---

[5]     According to the Complaint, MBIA's March 25, 2015 email to Tilton referencing the parties' prior meeting on February 17, 2015 "necessarily included" a purported commitment by MBIA to extend the Zohar I Maturity Date.  Compl. ¶ 121.  The face of that email, however, sent in response to Tilton's own written account and "Meeting Minutes" of that February 17 meeting contradicts that allegation. Ex. 11 at 1 (Email from A. McKiernan, dated March 25, 2015).  The Complaint further obfuscates the timing and nature of the parties' email communications in an apparent attempt to draw a non-existent link between the March 25, 2015 email from MBIA (Ex. 11) and an entirely different email from Tilton on March 21, 2015, regarding her possible A-3 note purchase.  Compl. ¶ 120-21.  The face of the parties' emails, however, make clear that MBIA did not respond in any way to Tilton's March 21, 2015 email regarding the A-3 notes. Compl. ¶¶ 120-21; Exs. 11-12.

13.     Significantly, both MBIA's and Patriarch's written proposals expressly stated that they were non-binding and subject to further negotiation and execution of final documentation. Exs. 13-15. The parties never reached an agreement on any refinancing transaction, and on November 2, 2015, Plaintiffs commenced an action against the MBIA Defendants in the Supreme Court of the State of New York, Westchester County (the "Westchester Action") for fraud, breach of contract and promissory estoppel. Similar to Plaintiffs' allegations here, Tilton alleged in the Westchester Action that MBIA made false oral promises that induced Plaintiffs to purchase the Zohar I A-3 Notes. Compl. ¶ 133, n.8. Plaintiffs claim damages in the amount of their approximately $104 million purchase price for the Zohar I A-3 Notes, plus additional unquantified damages incurred in the process of acquiring the notes and the time and energy expended and diverted from other Zohar-related endeavors. *See id.*[6]

14.     As anticipated, Zohar I lacked sufficient cash to satisfy its note payment obligations. On November 20, 2015, Zohar I defaulted on its note payment obligations, and MBIA paid $149 million under the Zohar I Policy on the Note Maturity Date, making whole the senior insured noteholders. Compl. ¶¶ 20, 139, 164. As a result, MBIA became subrogated to the rights of the senior noteholders and entitled under the Indenture to reimbursement for its Policy payment before any funds could pass through the Zohar I priority of payments waterfall to Tilton's interests. *Id.* ¶¶ 135, 223. MBIA also became entitled under the Indenture to direct the liquidation of Zohar I's Collateral. *Id.* ¶ 164.

---

[6]     In 2016, the Westchester court dismissed Plaintiffs' breach of contract claim and denied MBIA's motion to dismiss with respect to Plaintiffs' claims of fraud and promissory estoppel. *See* Decision and Order at 19, Tilton v. MBIA, Inc., No. 68880/15 (Sup. Ct. Westchester Cnty. Dec. 27, 2016). MBIA removed the Westchester Action to federal court based on its relatedness to this adversary proceeding and moved to have it transferred to this District for reference to this Court in the interests of justice and party convenience. The New York District Court agreed that the Westchester Action was related to this action; however, it denied MBIA's motion to transfer and remanded the suit back to New York state court on equitable grounds. *See* Opinion & Order, Tilton v. MBIA, Inc., No. 19-cv-9733 (S.D.N.Y. Sept. 18, 2020).

D.     **The Zohar I Involuntary Bankruptcy**

15.     On November 22, 2015, two days after Zohar I's note payment default, Patriarch XV, as holder of the Zohar I A-3 notes, purported to commence an involuntary bankruptcy proceeding against Zohar I in the United States Bankruptcy Court for the Southern District of New York.  Compl. ¶¶ 156-57; *see also In re Zohar CDO 2003-1, Ltd.*, No. 15-23680 (Bankr. S.D.N.Y. Nov. 22, 2015) ("*In re Zohar I*"), ECF No. 1.  MBIA and Zohar I's then-directors moved to dismiss the Zohar I involuntary petition, in part because Tilton's cram-down plan set no schedule or timeframe for monetization of the Collateral and Tilton refused to provide information needed to assess the value of the Collateral.  *In re Zohar I*, ECF No. 6.  On February 1, 2016, the Honorable Robert D. Drain held an evidentiary hearing on the motion to dismiss, during which MBIA's financial advisor testified that he lacked the access to Portfolio Company management and the relevant information needed to evaluate Zohar I's Collateral and the consideration to creditors under Tilton's proposed plan.  Ex. 16 (Hr'g Tr.) at 111:1-114:4; 114:20-23; 115:9-116:2. Based on this testimony, Judge Drain stopped the hearing and met with the parties in chambers. *Id.* at 125:2-126:10; 127:21-24.  After that chambers discussion, Judge Drain adjourned the hearing and ordered the parties to meet and discuss a potential consensual resolution where Tilton would resign and be replaced as collateral manager for all three of the Zohar Funds.  *Id.* at 128:1–129:7. Under Judge Drain's contemplated resolution, Tilton would be required to provide the successor collateral manager and MBIA with adequate financial information about the Zohar Collateral and the Portfolio Companies.  *Id.*  Judge Drain acknowledged, however, that the parties had not yet committed to terms and that further mediation might be needed to reach a mutual resolution.  *Id.* at 129:14–130:3.

16.     The parties met once on February 3, 2016 and exchanged proposed term sheets, but could not agree on a resolution.  Exs. 17-18.  Rather than continue the Zohar I

bankruptcy under the oversight of Judge Drain, Tilton voluntarily and unilaterally provided notice that the Patriarch Entities would resign as collateral manager effective March 3, 2016, and withdrew the involuntary petition against Zohar I. *Id.*; *see* Exs. 19-20; Compl. ¶ 161. Following Ms. Tilton's resignation, and pursuant to their rights as Controlling Parties, MBIA and the Zohar III Controlling Class appointed AMZM as successor collateral manager for the Zohar Funds. Compl. ¶ 178.

E.    **The Zohar I Foreclosure Auction**

17.    Following Zohar I's note payment default, and pursuant to its rights under the Indenture, MBIA directed the Zohar I Trustee to conduct a liquidation auction of the Zohar I Collateral. Compl. ¶ 165. A public auction of the Zohar I Collateral was initially scheduled by the Trustee to take place on September 15, 2016, but Tilton and the Octaluna Entity that holds the Zohar I preference shares sued MBIA and the Trustee and obtained a temporary restraining order in the District Court of the Southern District of New York. *Id.* ¶¶ 166-68; *see also* Notice of Removal, *Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*, No. 16-cv-7128 (S.D.N.Y. Sept. 13, 2016) (the "Auction Action"), ECF No. 1. Similar to Plaintiffs' allegations here, in the Auction Action Tilton argued that the Zohar I auction (1) was commercially unreasonable and (2) improperly sought to sell Portfolio Company equity purportedly owned by Tilton. Compl. ¶ 166. After an evidentiary hearing on October 10, 2016, the Honorable Jed S. Rakoff denied Tilton's preliminary injunction motion, vacated a temporary restraining order and ordered the Zohar I auction be completed pursuant to procedures approved by the court. Compl. ¶¶ 169-71; *see also* Order, Auction Action, No. 16-cv-7128 (S.D.N.Y. Oct. 18, 2016), ECF No. 76; *see also Patriarch Partners XV, LLC v. U.S. Bank N.A.*, No. 16-cv-7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017). Specifically, the court rejected Tilton's contention that the Zohar I auction was commercially unreasonable and confirmed that Zohar I had the right to auction any and all

unidentified equity assets owned by Zohar I. Compl. ¶ 177; *see also Patriarch Partners XV, LLC*, 2017 WL 3822603 at *6. The court's opinion did not address the merits of the parties' underlying equity ownership dispute or resolve which particular equity assets were in fact owned by Zohar I (and were therefore included for sale in the auction) and which, if any, were in fact owned by Tilton. *Id.* The court's ruling confirmed, however, that Zohar I had the authority to sell any and all Collateral assets belonging to it, and Zohar I sold all such assets.

18. In the auction, MBIA made the highest bid for all of Zohar I's Collateral. Compl. ¶¶ 172-75. Under the Indenture, Tilton held a "last look" right to match the highest bid, but she declined to exercise that right. Ex. 1 (Zohar I Indenture) § 5.4(a)(v)(A). As a result, Zohar I sold all of its Collateral to MBIA, and MBIA is now the beneficial owner of the Zohar I Collateral. Compl. ¶¶ 172-75. Notwithstanding the foregoing, Tilton claims she personally owned the Portfolio Company equity that Zohar I owned and sold to MBIA in the auction. Compl. ¶¶ 4, 165.

F.      **Plaintiffs' Additional Prepetition Litigation With The Zohar Funds**

19. The Zohar I litigations described above are but one subset of a series of litigations involving Tilton, Plaintiffs, and the Zohar Funds. For example, in April 2016, the Zohar Funds sued the Patriarch Entities in the Delaware Court of Chancery and obtained a judgment that the Patriarch Managers had breached their obligations to turn over Zohar Funds' books and records to AMZM as successor collateral manager. Compl. ¶ 181; Ex. 28; *see also Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. CA-12247, 2016 WL 6248461 (Del. Ch. Oct. 26, 2016). The Patriarch Entities appealed, and the Delaware Supreme Court affirmed the Zohar Funds' rights to their own documents. *Patriarch Partners, LLC v. Zohar CDO 2003-1, LLC*, 165 A.3d 288 (Table), 2017 WL 2643972 (Del. June 19, 2017).

20.     The Zohar Funds also commenced an expedited special proceeding against Patriarch pursuant to Delaware Corporation Law § 225 (the "Delaware 225 Action"), seeking confirmation of the Zohar Funds' ownership of equity in three Portfolio Companies and of the Zohar Funds' rights and powers to name those companies' directors.  Compl. ¶ 188; Ex. 31; *see also Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc*., No. CA-12946, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).  In November 2017, following a six day trial, the Delaware Court of Chancery entered a judgment that Zohar II and Zohar III are the legal and beneficial owners of the disputed equity.  *See id.* at *39.  The Delaware Supreme Court recently rejected Tilton's attempts to vacate the Delaware 225 trial opinion, and Tilton and the Funds have agreed to the entry of a partial final order and judgment in the 225 Action based on the Delaware Court of Chancery's trial opinion. *See* Ex. 21 (Order, Delaware 225 Action (Del. Oct. 13, 2020)).  In November 2017 and January 2018, the Zohar Funds filed two additional actions in the Delaware Court of Chancery similar to the Delaware 225 Action seeking confirmation of their ownership and management rights with respect to more than ten additional Portfolio Companies.  Compl. ¶ 195.  In an attempt to avoid adjudication of those cases in the Court of Chancery, where an outcome similar to the Delaware 225 Action would be likely, Tilton removed them to federal court.  *See* Notice of Removal, *Zohar CDO 2003-1, Ltd. v. Croscill Home LLC*, No. 1:17-cv-01797 (D. Del. Dec. 14, 2017), ECF No. 1; Notice of Removal, *Zohar CDO 2003-1, Ltd. v. Octaluna, LLC*, No. 1:18-cv-00108 (D. Del. Jan. 18, 2018), ECF No. 1.  The Zohar Funds opposed the removal, and a federal magistrate judge ruled and recommended that they be remanded and fee shifting be imposed against Tilton for making the meritless removal.  Ex. 22.  That recommendation was pending before the district judge when these cases were stayed by Tilton's commencement of the Zohar chapter 11 proceedings.

21.     In January 2017, the Zohar Funds also filed suit against Plaintiffs and other Tilton affiliates in New York asserting causes of action under the federal RICO statute and New

York common law. Compl. ¶ 193; *see also* Complaint, *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, No. 1:17-cv-00307 (S.D.N.Y. Jan. 16, 2017) (the "RICO Action"), ECF No. 1. Tilton and the other RICO Action defendants initially moved to dismiss the claims but, before that motion was adjudicated, filed an answer with counterclaims against the Zohar Funds and third-party claims against certain of the same Defendants here based largely on the same alleged conduct at issue in this adversary proceeding. Ex. 23. On December 29, 2017, the court dismissed the Zohar Funds' RICO claim and declined to exercise supplemental jurisdiction over the state-law claims. *See* Opinion & Order at 25, 35, *RICO Action* (S.D.N.Y. Dec. 29, 2017), ECF No. 105. In September 2020, the court denied the Funds' and MBIA's requests to transfer the RICO Action from New York to Delaware, and that case is now proceeding in New York. *See* Opinion & Order, *RICO Action*, (S.D.N.Y. Sept. 18, 2020), ECF No. 169.

G.     **The Zohar II And Zohar III Payment Defaults**

22.    Zohar II defaulted when its notes matured in January 2017. Compl. ¶ 223. Upon Zohar II's note payment default, MBIA paid $770 million in claims on its Policy so that the Zohar II Class A-1, A-2, and A-3 noteholders were paid in full. *Id.* ¶¶ 20, 139. As a result, MBIA is subrogated to the rights of the holders of those notes and is entitled under the Indenture to reimbursement for its Policy payment before any funds can pass through the Zohar II waterfall to Tilton's interests. *Id.* ¶ 223. Zohar III defaulted on its payment obligations in April 2019.

H.     **The Delaware Chapter 11 Cases And Adversary Proceedings**

23.    On March 11, 2018 (the "Petition Date"), Tilton—as the then-sole director of the Zohar Funds—caused the Zohar Funds to file voluntary petitions for relief under the

Bankruptcy Code in the Delaware Bankruptcy Court.[7]  Compl. ¶ 208.  Except for the Westchester

Action, to which the Zohar Funds are not a party, all of the Zohar litigations described above,

among others, were automatically stayed under the Bankruptcy Code.  *See* 11 U.S.C. § 362(a).

Tilton's appeal of the 225 Action, in which the Delaware Court of Chancery rejected her equity

"ownership" theories, was likewise stayed with oral argument before the Delaware Supreme Court

little more than one week away.  Compl. ¶ 192.

        24.     Following motion practice and a court-ordered mediation in the Zohar

Bankruptcy Cases, Tilton and her affiliates, on the one hand, and the Zohar Funds' senior creditors

(including MBIA), on the other hand, agreed to a settlement that contained three primary elements:

(1) independent governance of the Zohar Funds; (2) the monetization of the Zohar Portfolio

Companies through sales or refinancings (the "Monetization Process") until the Zohar senior

creditors, including MBIA, were paid in full on their claims against the Zohar Funds ("Paid in

Full"); and (3) a litigation stay period of either 15 or 18 months, subject to satisfaction of certain

monetization targets (the "Window Period").  Compl. ¶ 209; Ex. 24 (the "Settlement Agreement").

On May 21, 2018, the Delaware Bankruptcy Court entered an order approving the terms of the

Settlement Agreement.  *See* Ex. 25.  Under the Settlement Agreement, Tilton is required to work

in good faith with the Debtors' fiduciaries to sell or refinance the Portfolio Companies until the

parties to the Settlement Agreement agree in writing to terminate the Settlement Agreement or

until MBIA and the Secured Creditors are Paid in Full.  Ex. 24 ¶¶ 10, 12.  Under the Settlement

Agreement, MBIA has no involvement with or control over the Monetization Process.  Indeed, the

---

[7]    Unless indicated otherwise, all docket references contained herein shall refer to the docket in the above-captioned chapter 11 cases.  *See In re Zohar III, Corp.*, No. 18-10512 (Bankr. D. Del.) (the "Zohar Bankruptcy Cases").

Complaint does not allege that MBIA engaged in any post-petition activity with respect to the Debtors, the Monetization Process or the Portfolio Companies.

25.     Notwithstanding Tilton's monetization obligations, as of the close of the Window Period only two Portfolio Companies had been sold and no sales proceeds had been paid towards reducing MBIA's Paid in Full amounts.  Compl. ¶ 217; *id.* at 74 n.12.  As a result, the litigation stay under the Settlement Agreement expired on September 30, 2019.  Compl. ¶ 217. Just one day later, despite having agreed to compensate MBIA the Paid in Full amounts undisputedly owed under the Settlement Agreement (Ex. 24), Plaintiffs commenced this action seeking to equitably subordinate MBIA's and the other Defendants' claims in these Zohar Bankruptcy Cases.  Compl. ¶¶ 139, 141, 209.  Similar to Plaintiffs' pleadings in the RICO and Delaware 225 Actions (Exs. 23, 31), the Complaint is premised on the assertion that Tilton owns the Portfolio Company equity recorded in the names of the Zohar Funds.  Compl. ¶¶ 4, 165.

26.     Since filing the Complaint, Plaintiffs have taken new self-serving positions in the Zohar Bankruptcy Cases that are fundamentally inconsistent with their assertions of Tilton's equity ownership in prior litigations.  On March 21, 2020, Tilton abruptly and without prior notice to MBIA or the Zohar Funds' fiduciaries immediately and effectively resigned as director, manager, and CEO of all but one of the Portfolio Companies and withdrew her prior objections to the Zohar Funds' claims of legal and beneficial ownership of, and voting rights attendant to, the Portfolio Company equity interests that had previously been in dispute.  *See* Zohar Bankruptcy Cases, ECF Nos. 1523, 1525, 1542.  Specifically, in their March 2020 filings with the Bankruptcy Court, Plaintiffs conceded that the Debtor Zohar Funds "are now the beneficial owners of the equity recorded in their names and are free to exercise any and all rights attendant to that ownership," and that Plaintiffs "will no longer litigate these issues."  *See* Zohar Bankruptcy Cases, ECF Nos. 1523 ¶ 2; *see also* Zohar Bankruptcy Cases, ECF Nos. 1525 ¶ 4.  Plaintiffs' about-face

occurred one day after the Bankruptcy Court imposed certain Portfolio Company sales parameters establishing a timely process for monetization and confirmed for the third time in seven months that Tilton must perform her obligations under the Settlement Agreement. *See* Order, Zohar Bankruptcy Cases, ECF Nos. 1500; *see also* Zohar Bankruptcy Cases, ECF Nos. 974, 1389 (Hr'g Tr.) at 66:16-71:10 (confirming Court's jurisdiction to effect company sales over Tilton objection).

## ARGUMENT

## I.   APPLICABLE LEGAL STANDARDS

27.    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Lightsway Litig. Servs., LLC v. Yung* (*In re Tropicana Ent., LLC*), 520 B.R. 455, 467 (Bankr. D. Del. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts need not accept a plaintiff's legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A claim is facially plausible only when the plaintiff pleads facts that lead the court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *In re LSC Wind Down*, 610 B.R. at 783 (citing *Iqbal*, 556 U.S. at 678). Further, courts should disregard "allegations of a conspiracy that [are] implausible on [their] face." *Wesley v. Varand*, 505 F. App'x 91, 94 (3d Cir. 2012) (per curiam).

28.    Additionally, a plaintiff seeking equitable subordination based on allegations of fraud must "state with particularity the circumstances constituting fraud" to survive a motion to dismiss. Fed. R. Civ. P. 9(b); *see also* Fed. R. Bankr. P. 7009; *Nisselson v. Ford Motor*

Co. (*In re Monahan Ford Corp. of Flushing*), 340 B.R. 1, 21, 45 (Bankr. E.D.N.Y. 2006) (Rule 9(b)'s heightened pleading standard applies to equitable subordination claims sounding in fraud, regardless of whether defendant "is deemed an insider or not"). Rule 9(b) requires a plaintiff to "support their allegations of ... fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' ... the 'who, what, when, where and how' of the events at issue." *Bisk Educ., Inc.* v. *Aspect Software, Inc.* (*In re Aspect Software Parent, Inc.*), 578 B.R. 718, 723 (Bankr. D. Del. 2017) (quoting *Charal Inv. Co. v. Rockefeller* (*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*), 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997))); *Kirschner v. J.P. Morgan Chase Bank, N.A.* (*In re Millennium Lab Holdings II, LLC*), No. 15-12284, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) (plaintiffs must allege "date, place or time" to plead fraud with requisite particularity or some other similar means of "precision" and "substantiation").

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR EQUITABLE SUBORDINATION

29.    Section 510(c) of the Bankruptcy Code provides creditors a cause of action for equitable subordination. Equitable subordination alters the Bankruptcy Code's priority scheme and therefore is a "drastic" and "unusual" remedy, "which should be applied only in limited circumstances." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 553–54 (Bankr. D. Del. 2009); *Cohen v. KB Mezzanine Fund II, L.P.* (*In re SubMicron Sys. Corp.*), 291 B.R. 314, 327 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006). To establish a claim for equitable subordination, a party must allege facts satisfying the following three elements: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must

not be inconsistent with the provisions of the bankruptcy code." *Walnut Creek Mining Co. v. Cascade Inv., LLC* (*In re Optim Energy, LLC*), 527 B.R. 169, 175-76 (D. Del. 2015) (quoting *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3rd Cir. 1998)).

30.     As demonstrated below, the Complaint does not allege facts establishing any of these required elements and should be dismissed with prejudice.

## A.     The Complaint Does Not Adequately Allege Inequitable Conduct By MBIA

### 1.     Legal Standards For Pleading Inequitable Conduct

31.     Equitable subordination is an extraordinary remedy "designed 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors.'" *In re Optim Energy, LLC*, 527 B.R. at 175 (quoting *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009)). There are "three general categories of conduct which may constitute inequitable conduct warranting subordination: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtors as a mere instrumentality or alter ego." *In re SubMicron Sys.*, 291 B.R. at 327-28. At minimum, a "party seeking equitable subordination must plead and prove an actionable wrong, the same wrong that he would have to prove to recover a money judgment." *ABF Cap. Mgmt. v. Kidder Peabody & Co.* (*In re Granite Partners, L.P.*), 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997) (citing *Am. Cigar Co. v. MNC Com. Corp.* (*In re M Paolella & Sons, Inc. I*), 85 B.R. 965, 972 (E.D. Pa. 1988) ("the factual predicates of these [damages] counts are but subsets of the allegations made concerning equitable subordination"); *see also Burtch v. Opus, LLC* (*In re Opus E., LLC*), 528 B.R. 30, 105 (Bankr. D. Del. 2015) (court had "no basis to equitably subordinate" defendants' claims where they had "committed no fraud, breach of fiduciary duty, undercapitalization, or

action sufficient to warrant piercing the corporate veil"), *aff'd*, 2016 Wl 1298965 (D. Del. Mar. 31, 2016).

32. "The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." *Official Comm. of Unsecured Creditor ex rel. Jevic Holding Corp. v. CIT Grp./Bus. Credit, Inc.* (*In re Jevic Holding Corp.*), No. 08-11006, 2011 WL 4345204, at \*14 (Bankr. D. Del. Sept. 15, 2011). "Where equitable subordination is requested against a non-insider creditor, the plaintiff's burden is heavier" than its burden against a non-insider defendant — a plaintiff "must allege 'a more egregious level of misconduct'" against a non-insider. *Sierra Invs., LLC v. SHC, Inc.* (*In re SHC, Inc.*), 329 B.R. 438, 447 (Bankr. D. Del. 2005). Against a non-insider, a complaint must allege conduct that is "'gross and egregious,' 'tantamount to fraud, misrepresentation, overreaching or spoliation,' or 'involving moral turpitude.'" *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014). Federal Rule 9(b)'s heightened pleading standard further applies to equitable subordination claims against non-insiders, requiring a plaintiff to "plead facts . . . with particularity." *In re SHC*, 329 B.R. at 447; *see also In re Fedders N. Am.,* 405 B.R. at 554 (where equitable subordination defendant "is not an insider or fiduciary of the company," a plaintiff must plead facts "with particularity"). The facts and circumstances that support a finding of inequitable conduct by a non-insider creditor "are few and far between." *State St. Bank & Tr. Co.*, 520 B.R. at 87.

33. Even where the defendant is an insider, a plaintiff cannot establish a valid claim without demonstrating that a defendant engaged in "fraud, illegality, or breach of fiduciary duties warranting equitable subordination." *In re SubMicron Sys.*, 291 B.R. at 328. Under this less-stringent standard, "'[t]o qualify as inequitable conduct, the insider or fiduciary creditor must

have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment.'" *In re Optim Energy,* 527 B.R. at 175. Importantly, the Third Circuit has expressly held that a party's enforcement of its legal rights does not constitute inequitable conduct as a matter of law. *Citicorp Venture Cap.*, 160 F.3d at 986–87; *see also Waslow v. MNC Com. Corp.* (*In re M. Paolella & Sons, Inc. II*), 161 B.R. 107, 120 (E.D. Pa. 1993) ("[A] creditor does not act inequitably in exercising its contractual rights[.]"), *aff'd*, 37 F.3d 1487 (3d Cir. 1984).

### 2. MBIA Did Not Engage In Inequitable Conduct

34. Here, the Complaint fails to allege facts that, if true, would establish that the MBIA Defendants engaged in behavior rising to the level of inequitable conduct. The Complaint does not contain a single allegation that the MBIA Defendants caused the undercapitalization of the Zohar Funds or used the Debtors as MBIA's instrumentalities or alter egos. Nor does the Complaint allege that MBIA owed fiduciary duties to Plaintiffs, the Zohar Funds or anyone else. Any assertion that MBIA owed or breached any fiduciary duty must, in any event, be rejected as contrary to the Transaction Documents and applicable law.[8]

35. It is well-established that courts look to the terms of contracting parties' agreement to assess whether they had a fiduciary relationship. *See EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 30-31 (N.Y. 2005). It is similarly well-established that "a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim." *In re M. Paolella & Sons, Inc. II*, 161 B.R. at 118; *see also Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir. 1988) ("Creditor-debtor relationships . . . rarely are found to give

---

[8]  The Complaint does allege — in only one of the Complaint's nearly 250 paragraphs — that the results of the Zohar I Auction were "inconsistent with MBIA's and U.S. Bank's fiduciary and contractual obligations." Compl. ¶ 172. In addition to the reasons set forth herein, this allegation should be disregarded as vague, conclusory and completely unsupported.

rise to a fiduciary duty"); *Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735, 741 (N.Y. 2012) ("there is generally 'no fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding creditor'"); *Apace Commc'ns, Ltd v. Burke*, 17 F. Supp. 3d 238, 244 (W.D.N.Y. 2014) (a creditor owes no fiduciary duty to a debtor's equity holders).

36.     The Complaint concedes that the Transaction Documents govern the Zohar Funds and the parties' rights and obligations therewith.  Compl. ¶ 59.  The Indentures, in turn, make clear that MBIA owes no duties—fiduciary or otherwise—to Plaintiffs or any other Zohar stakeholder.  *See* Exs. 1-2 (Indentures § 13.2(a)) (MBIA "shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction").  Further, MBIA undisputedly bargained for its rights and remedies as Credit Enhancer and Controlling Party under the Transaction Documents and, in those roles, became subrogated to the senior Zohar I and Zohar II noteholders after payments to those Funds totaling nearly $1 billion.  *See* Compl. ¶¶ 59-60, 223.  As a typical CLO creditor (as explained further below), whose rights and obligations vis-à-vis the Funds and Plaintiffs are governed by Transaction Documents expressly disclaiming any duties to anyone, MBIA does not owe fiduciary duties to Plaintiffs or the Funds.

37.     Accordingly, the only available ground for determining the MBIA Defendants acted inequitably would be if they had engaged in fraudulent or illegal conduct.  For the reasons set forth below, the Complaint does not and cannot establish any such predicate, regardless of their status as insiders or non-insiders.

### a.     MBIA Is Not An Insider Of The Debtor Zohar Funds

38.     The Bankruptcy Code defines the term "insider" to include directors, officers or persons or entities "in control of" a debtor.  *See* 11 U.S.C § 101(31)(B).  For a creditor defendant such as MBIA, "courts have refused to apply insider status absent a showing of a *high*

*level of control* by the lender." *Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse* (*In re Champion Enters., Inc.*), No. 09-14014, 2010 WL 3522132, at *6 (Bankr. D. Del. Sept. 1, 2010) (emphasis added).  This requires facts showing day-to-day operational management by a lender and key decision-making authority.  *Id.* (citing, *e.g.*, *In re M. Paolella & Sons, Inc. II*, 161 B.R. at 118 (secured creditor was not an insider because it "did not participate in the debtor's management, determine its operating decisions, or have any presence on its board"); *Official Comm. of Unsecured Creditors of Radnor Holding Corp. v. Tennenbaum Cap. Partners, LLC* (*In re Radnor Holdings Corp.*), 353 B.R. 820, 841, 847 (Bankr. D. Del. 2006) (shareholder-lender defendant was "not an insider" because it was not shown to have "exercised 'day-to-day control' over [debtor's] business affairs and dictated [debtor's] business")).

39.     Consistent with the foregoing, a creditor whose rights and powers are based in contract is not an insider.  The Third Circuit has held that a creditor may qualify for "nonstatutory insider" status only if it has such "a close relationship" with the debtor that "transactions between them were not conducted at arm's length."  *State St. Bank & Tr.*, 520 B.R. at 81 (citing *In re Winstar*, 554 F.3d at 396–97).  Such non-arm's-length relationships are uncommon and are found where the lender is able to "coerce" the debtor into "one-sided transactions" not in the debtor's best interests.  *Id.*  "However, where a lender's influence on a debtor's actions merely arises by operation of bargained-for rights under a credit agreement, those 'reasonable financial controls negotiated at arms' length between a lender and a borrower do[ ] not transform a lender into an insider.'"  *In re Champion Enters.*, 2010 WL 3522132, at *7 (quoting *In re Radnor Holdings,* 353 B.R. at 847) (the "exertion of influence regarding financial transactions in which the creditor has a direct stake" will not transform an ordinary creditor into an insider) (citations omitted)); *see also Dixon v. Am. Cmty. Bank & Tr.* (*In re Gluth Bros. Constr., Inc.*), 424 B.R. 392, 391-92 (Bankr. N.D. Ill. 2009) ("[C]ontrol does not exist simply because

bargaining power was greatly skewed in favor of lender or because the lender and debtor share a close relationship.").

40.     The "insider" labels Plaintiffs have ascribed to the MBIA Defendants are unsupported and, indeed, contradicted by the Complaint's own factual allegations and referenced documents.   Plaintiffs assert that MBIA is a statutory or, alternatively, non-statutory insider because it purportedly gained "effective" control over the Funds through the appointment of AMZM as collateral manager and exhibited its control over and non-arm's-length relationship with the Funds in directing US Bank to conduct the Zohar I Auction and AMZM to bring certain litigation.   Compl. ¶¶ 179-80, 224, 228, 231-32.   Conspicuously absent from the Complaint, however, are factual allegations that MBIA exercised day-to-day control over the Funds' operations or made key decisions on their behalf as required to establish insider control.   Nor does the Complaint allege that MBIA coerced the Zohar Funds to enter in one-sided transactions as required to support Plaintiffs' non-statutory insider claim.   To the contrary, the only alleged influence MBIA exerted over the Funds—namely, its appointment of AMZM and directions to US Bank and AMZM—undisputedly arose from MBIA's contractual rights as Credit Enhancer and Controlling Party under the Transaction Documents.   Compl. ¶¶ 10, 59-60, 144, 222-23; *see also* Exs. 1-2 (Indentures) §§ 5.4(a), 5.5(a)(ii), 5.13; Exs. 3-4 (Tilton CMAs) at 2 (definition of "Cause" of termination includes event of default), 19 (§ 5.5).   Because MBIA undisputedly bargained for these rights and remedies in arm's-length negotiations and was entitled to exercise them in its efforts as senior creditor to recover the nearly $1 billion it paid to the Funds (Exs. 1-4), "the Complaint's allegations are indicative of nothing more than a normal distressed-borrower/lender relationship and do not provide a basis from which the Court could infer that Defendants' relationship or dealings with [the Debtor Funds] merit applying insider status."   *In re Champion Enters.*, 2010 WL 3522132, at *8.

41.     Plaintiffs' assertion that MBIA is an "insider" is implausible—indeed, nonsensical in this context—and should be rejected.  As with any CLO, the Zohar Funds were created by contract and have no employees or operating business.  Exs. 1-2.  The Funds have a singular purpose: to satisfy their payment obligations to their creditor noteholders in accordance with the contractual payment priority waterfalls.  Thus, it is entirely reasonable, equitable and consistent with market practice for MBIA as the Zohar I and II senior creditor to be contractually empowered upon the Funds' payment default to direct their contractually-appointed representatives—US Bank and AMZM—to liquidate assets via auction or pursue litigation on behalf of the Funds.  It is also entirely reasonable for US Bank and AMZM to implement such directions pursuant to their contractual duties.  Critically, the Complaint does not allege facts that would support an inference that MBIA was acting on anything but arm's-length terms vis-à-vis US Bank or AMZM or that those entities were acting outside the scope of their contractual duties. *See* Memoranda of Law filed by Defendants U.S. Bank National Association and Alvarez & Marsal Zohar Management, LLC, dated Oct. 30, 2020, in support of their motions to dismiss (which memoranda are incorporated herein by reference).  Indeed, AMZM undisputedly commenced the Zohar litigations for the benefit of the Zohar Funds pursuant to the express terms of the governing Collateral Management Agreement and Indenture.  *See* Compl. ¶¶ 3, 6, 181, 190, 193, 195-96, 229; Exs. 6-8 § 2.2(c).[9]

---

[9]    Unlike MBIA, Tilton for years exercised unfettered, day-to-day control over the Zohar Funds through her multiple capacities as collateral manager, lender's agent and officer, director and/or manager of the Portfolio Companies and, then, when such levers of control were denied to her, replaced the Zohar Funds' disinterested, independent board of directors with herself as the Funds' sole director.  Such unbridled control over the Funds and their assets by Tilton since the Zohar Funds' inception only further illustrates the sheer implausibility of MBIA's purported "insider" status.

42. Accordingly, even with the Complaint's factual allegations taken as true, the MBIA Defendants did not exercise the requisite control or coerce any one-sided transactions as legally required to merit either statutory or non-statutory insider status.

### b. MBIA Did Not Engage In Any Fraudulent Or Illegal Conduct

43. Regardless of whether the Complaint adequately alleges MBIA is an insider (it does not), the Complaint does not allege facts supporting the implausible inference that the MBIA Defendants—which have paid out nearly $1 billion following Tilton's failed management of the Zohar Funds and Portfolio Companies—defrauded Plaintiffs or engaged in any illegal conduct. The Complaint contends that between 2013 and 2018 MBIA engaged in a "years-long pattern of inequitable conduct." Compl. ¶ 233. Absent from the Complaint, however, are factual allegations that MBIA's relationship with the Funds is "beyond the scope of normal lender-borrower agreements in distressed debt negotiations." *In re Champion Enters.*, 2010 WL 3522132, at *8 ("Normal lender conduct does not amount to inequitable conduct for equitable subordination purposes"). Rather, the facts alleged in the Complaint, along with the documents incorporated therein, demonstrate that MBIA at all times acted pursuant to its express rights as Credit Enhancer to recover amounts owed to it under the governing Zohar contracts and applicable law. Such alleged conduct does not and cannot support a finding of inequitable conduct. *See In re Champion Enters.*, 2010 WL 3522132, at *8 ("a lender's goal to 'recoup the most amount of money as possible'" on its loans is "understandable and permissible") (quoting *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 610 (2d Cir. 1983) (no inequitable conduct by creditor in monitoring debtor and choosing "the most advantageous time to foreclose on a loan that has been out of formula for several years"). The Complaint certainly does not plead "gross and egregious" conduct "or immoral turpitude" with the particularity required to support an equitable subordination claim against MBIA.

### i. MBIA's Negotiations With Patriarch Were Not Fraudulent

44. To establish a viable claim of fraud, a complaint must allege "(1) a material representation or omission of fact; (2) made with knowledge of falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff." *Miller v. Greenwich Cap. Fin. Prods., Inc.* (*In re Am. Bus. Fin. Servs., Inc.*), 457 B.R. 314, 324 (Bankr. D. Del. 2011).[10]

45. It is bedrock law that fraudulent statements must be factual and not promissory or relate to future events. *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 210 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187-88 (2d Cir. 2004) (dismissing claim based on representation of ability to assist in future sale of asset. In other words, "[p]redictions about the future cannot give rise to actionable common law fraud. Nor can expressions of opinion." *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001); *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987) ("[p]romises of future conduct are not actionable," and "efforts to frame broken promises [as] misrepresentation of present fact are fruitless"); *see also J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 459 (D. Del. 2013) (defendant's "alleged promise to purchase 'substantial quantities' of [plaintiff's] shoes in the future was, at most, an oral statement of future intent"); *Chase Invs., Ltd. v. Kent*, 681 N.Y.S.2d 319, 320 (App. Div. 2d Dep't 1998) (defendant's

---

[10] Because New York and Delaware standards governing fraud are substantially similar, under applicable choice of law principles, this Court may look to either state's substantive body of law to determine whether the MBIA Defendants' alleged conduct is actionable and supports a claim for equitable subordination. *See NHB Assignments LLC v. Gen Atl. LLC* (*In re PMTS Liquidating Corp.*), 452 B.R. 498, 510 (Bankr. D. Del. 2011) (any distinction between Delaware and New York law with respect to fraud claim created a "false conflict" because the result was the same under either); *Giuliano v. Ferdinand* (*In re Liquid Holdings Grp., Inc.*), No. 16-10202, 2018 WL 2759301, at *6 n.13 (Bankr. D. Del. June 6, 2018) ("[T]he New York standard for common law fraud is substantially similar to Delaware's standard[.]").

statements as to what it expected to occur in the future are not representations of fact and thus cannot sustain a claim for fraud).

46.     A plaintiff can only plead justifiable reliance where it had reason to believe the statement at issue was "firmly entertained" and "[would] be carried out." *Student Fin. Corp. v. Royal Indem. Co.* (*In re Student Fin. Corp.*), No. 02-11620, 2004 WL 609329, at *4 (D. Del. Mar. 23, 2004) (quoting *Restatement (Second) of Torts* § 544(a) (1977)).  A plaintiff cannot have justifiably relied where the defendant's performance was known to be impossible or the plaintiff failed to exercise proper diligence to uncover the falsehood.  *See Poplos v. Norton*, No. 6243, 1983 WL 19785, at *4 (Del. Ch. June 21, 1983), *aff'd*, 474 A.2d 141 (Del. 1983) (plaintiff "is expected to use his senses and not rely blindly on the [defendant's] assertion"); *see also Ventur Grp., LLC v. Finnerty*, 892 N.Y.S.2d 69, 71 (App. Div. 1st Dep't 2009) (fraud claims dismissed where sophisticated plaintiff failed to investigate representations by seller of investment firm that it would deliver clients of key employee who were not tied to firm by employment contract).  In assessing reasonable reliance, courts must consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003); *see also Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Super. Ct. 1981) (citing *Restatement* (*Second*) *of Torts* § 538). "Whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss." *McBeth v. Porges*, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 1999).

47.     The Complaint does not plead inequitable conduct by MBIA based on its alleged statements regarding a possible extension of the Zohar I Note Maturity Date or purported global restructuring of the Zohar Funds because such statements were not fraudulent as a matter of law.  The Complaint identifies three purportedly false statements made by MBIA, each of which

were made as part of expressly non-binding proposals to or negotiations with Patriarch conditioned upon execution of a written agreement and, were neither false statements of fact nor statements on which Plaintiffs could justifiably rely. *See* Compl. ¶¶ 101, 116, 121, 155, 158, 160.[11] MBIA's alleged March 8, 2013 statement that it would consent to an extension of Zohar I was made pursuant to a proposed transaction, the terms of which Patriarch agreed to draft and present to Zohar I noteholders in a written term sheet. Compl. ¶ 101. That term sheet and MBIA's term sheet in response expressly state that neither MBIA nor Patriarch was making "a commitment or agreement of any kind" and that no obligation would arise until all parties agreed to formal written documentation. Compl. ¶¶ 103-04; Exs. 9-10 (2013 term sheets). Tilton's self-described February 17, 2015 "Meeting Minutes" email likewise makes clear that MBIA made no false statements of fact at that meeting and, at most, made a statement of future intent conditioned on its review of information and consideration of the "options" Tilton described in her email. Ex. 11 (Tilton 2/17/15 email) (Tilton stated that she expected MBIA to "make a decision on the path [it] would like to follow" only after Patriarch had provided it with information in a data room). MBIA's alleged statements in October 2015 and February 2016 regarding Tilton's possible resignation as collateral manager and retention of certain rights and positions at the Zohar Funds and Portfolio Companies were expressly made as part of nonbinding settlement negotiations, contingent on executed written agreements and, thus, were not knowingly false statements of fact on which Tilton could plausibly or justifiably rely. Compl. ¶¶ 155, 158, 160; Exs. 13, 15, 17; *see also 300 Gold Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 835 (Bankr.

---

[11] All other generalized references in the Complaint to MBIA's purported "repeated" statements are vague and lack the specific who, what, when and where details required to sustain a claim of fraud. *See, e.g.*, Compl. ¶¶ 100, 104, 122, 137; *see also Ernst & Young,* 906 A.2d at 208 (dismissing fraud claims because the "allegations [were] precisely the sort of unspecific, broad-brush generalities that [heightened pleading requirement] is intended to preclude from serving as a basis for a fraud claim").

S.D.N.Y. 1994) (no fraud or inequitable conduct where creditor pursued foreclosure and never engaged in restructuring discussions allegedly offered to debtor together with encouragement for debtor to pay taxes and other debts).

### ii. MBIA's Communications With The SEC Were Not Improper

The Court need not accept and should disregard Plaintiffs' implausible theory that MBIA improperly colluded with and caused the SEC to investigate Plaintiffs for its own litigation advantage. *See* Compl. ¶¶ 145-51. The facts asserted are unremarkable; it is the inferences and accusations Plaintiffs draw from those facts that cannot be credited. MBIA communicated and cooperated with the SEC in connection with its investigation of Tilton and the Patriarch Entities. Compl. ¶¶ 146, 148. The Complaint's wild theory, however, that MBIA misled the SEC and secretly conspired with it to steal Zohar equity from Tilton is completely unsupported and borders on delusional. Compl. ¶¶ 145, 147-50. For example, the SEC handwritten notes and emails incorporated by reference in the Complaint, from which Plaintiffs selectively quote individual words and phrases without context, are plainly unintelligible, fail to communicate complete thoughts, and at bottom support only one logical inference: MBIA responded to information requests from a government agency just as any other rational and responsible creditor would communicate with a regulator. Compl. ¶¶ 147-48; Exs. 26-27 (SEC handwritten notes and emails). The notion that MBIA had the power or wherewithal to cause the SEC to bring charges against Tilton in exchange for secret information is implausible on its face and cannot be credited given the complete lack of support here. *See Wesley*, 505 F. App'x at 94 (implausible allegations of conspiracy among correctional officers and administrators against plaintiff prisoner could be disregarded); *see also Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 927 (9th Cir. 2013) (assertions of defendant wrongdoing were insufficient and

implausible absent specific factual allegations that defendant directed and had knowledge of and role in plaintiff's termination). Accordingly, neither MBIA's communications with SEC investigators, nor the SEC Administrative Law Judge's decision that the Enforcement Division failed to carry its burden in proving Tilton's fraud, support Plaintiffs' claim that MBIA engaged in inequitable conduct.[12]

### iii. The Zohar I Auction Was Commercially Reasonable And Neither Fraudulent Nor Illegal

48.     An asset sale approved by a court is *per se* commercially reasonable. *See* N.Y. U.C.C. § 9-627(c)(1) (McKinney 2016 & Supp. 2020) ; *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 677 (S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d Cir. 1992) (same); *see also GNK Enters., Inc. v. Conagra, Inc.* (*In re GNK Enters., Inc.*), 197 B.R. 444, 450 (Bankr. S.D.N.Y. 1996) (equitable subordination action was improper attack on determination by other court); *Sumner v. Extebank*, 452 N.Y.S.2d 873, 874-75(App. Div. 1st Dep't 1982) (sale of collateral at below market price was commercially reasonable and thus not actionable), *aff'd as modified,* 449 N.E.2d 704 (N.Y.1983). Further, "a creditor does not act inequitably in exercising its contractual rights." *In re M. Paolella & Sons.*, 161 B.R. at 120; *see also O'Halloran v. Prudential Sav. Bank* (*In re Island View Crossing II, L.P.*), 604 B.R. 181, 203 (Bankr. E.D. Pa. 2019) ("The exercise of contractual rights is not inequitable, even if the rights are exercised harshly and cause harm to other creditors"). "Courts commonly recognize that a lender's

---

[12]     Notably, the ALJ's decision did not address whether Tilton or the Patriarch Entities complied with their contractual or fiduciary obligations owed to the Zohar Funds or their stakeholders. *Id.* In any event, neither MBIA nor the Zohar Funds were parties to the SEC enforcement proceedings, and, as the Delaware Chancery Court has held, the outcome of that proceeding is not binding on MBIA or the Zohar Funds or otherwise preclusive. *See* Ex. 31 (Del. 225 Action Opinion, Doc. No. 796) at 86-95 (rejecting Tilton attempt "to bind the Zohar Funds to the [SEC's] Initial Decision [under doctrine of issue preclusion] when neither fund had a 'full and fair opportunity' to litigate the issue").

goal 'to recoup the most amount of money as possible on [its] . . . loans, [is] an understandable and permissible desire.'" *In re Champion Enters.*, 2010 WL 3522132, at *8.

49.     The Complaint's bare assertions that the Zohar I Auction was a sham and commercially unreasonable need not be accepted as true and do not support its claim of inequitable conduct. The Honorable Jed S. Rakoff of the Southern District of New York already rejected Plaintiffs' asserted grounds for commercial unreasonableness and approved the sale of Zohar I Collateral that the Complaint now attacks. Compl. ¶¶ 176-77; *see also* Order, Auction Action (Oct. 18, 2016), ECF No. 76; *Patriarch Partners,* 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017). Far from issuing an "advisory opinion," as the Complaint contends (Compl. ¶ 177), the court held that MBIA had the contractual right to direct US Bank to conduct the Zohar I Auction and that the Trustee had the express authority to sell the Collateral, including the unidentified equity assets that Tilton argued could not be sold. *Patriarch Partners*, 2017 WL 3822603, at *1-2, 5. The court further held that the terms of the Auction governing bids on the disputed equity assets "would not dissuade potential bidders," provided bidders sufficient time to evaluate such assets and, thus, were not commercially unreasonable. *Id.* at *6. As set forth herein and Defendant U.S. National Association's memorandum of law in support of its motion to dismiss the Complaint ([D.I. 65]), which brief is incorporated herein by reference, the Zohar I Auction was conducted pursuant to the Indenture and in accordance with Judge Rakoff's court orders and cannot give rise to a claim of equitable subordination.[13]

---

[13]    The Complaint's assertion that the liquidation agent, Duff & Phelps, failed to send proper notice of the Zohar I Auction does not support its claims against the MBIA Defendants. *In re Champion Enters.*, 2010 WL 3522132, at *10 ("[C]ourts commonly hold that equitable subordination must be based on the claimant's own acts[.]") (citing *United States v. Noland*, 517 U.S. 535, 538 (1996)); *see also State St. Bank & Tr.*, 520 B.R. at 87–88 (refusing to impute misconduct of certain creditors to other creditors).

**MBIA's Appointment Of AMZM Pursuant To Its Contractual Rights Was Neither Fraudulent Nor Illegal**

50.     Neither MBIA's appointment of AMZM as collateral manager, nor AMZM's performance of its contractual duties in managing the Collateral on behalf of the Zohar Funds, including by bringing litigation to enforce the Zohar Funds' rights, constitute inequitable conduct.  MBIA undisputedly had the contractual right as "Controlling Party" to appoint a successor collateral manager of its choice upon Tilton's resignation.  Compl. ¶¶ 10, 45; *see also* Exs. 3-4 (CMA § 5.5).  Under the governing agreements and the Complaint's own allegations, Tilton had no contractual right or role regarding the selection of her successor.  *Id.*  The Complaint asserts, without alleging any facts in support, that the parties agreed Tilton would participate in hiring a successor collateral manager.  Compl. ¶ 178.  This bare assertion, however, is contradicted by Tilton's own representations to Judge Drain that "the parties [were] unable to reach a consensual resolution" and that Tilton elected to resign "to avoid . . . continuing damage arising from protracted unproductive negotiations and battle."  Ex. 20 at 1-2; *see also* Compl. ¶ 158.

51.     AMZM's enforcement of the Zohar Funds' rights through litigation also does not support a claim for equitable subordination against MBIA.  The Complaint is defective as to MBIA because it is devoid of factual allegations that MBIA directed AMZM to pursue litigation.  Such allegations would, in any event, fail to state a claim.  MBIA undisputedly has the contractual right to "institute Proceedings for the collection of all amounts then payable on the Notes" and, additionally, "take any other appropriate action to protect and enforce the rights and remedies of the Secured parties" under the Indentures.  *See* Exs. 1-2 (Indentures) §§ 5.4, 7.5; *see also* Exs. 6-7 (AMZM CMAs) § 2.2(c).  In accordance with these contractual provisions, AMZM indisputably brought litigation in the name of the Zohar Funds to assert their rights to assets for the benefit of the Zohar Funds' creditors.  Comp. ¶¶ 181, 186, 188; *see, e.g.*, *Zohar CDO 2003-1,*

*LLC v. Patriarch Partners, LLC*, No. CA-12247 (Del. Ch. Apr. 22, 2016) ("<u>Books & Records</u>"),

Doc. No. 1; Delaware 225 Action, Doc. No. 1. Plaintiffs' conclusory label of "sham litigation" to

describe cases brought by AMZM against them does not suffice. Compl. ¶ 180; *see also Iqbal*,

556 U.S. at 678. Indeed, AMZM's success in multiple litigations against Plaintiffs (*e.g.*, Exs. 21-

22, 28, 31) and Tilton's ultimate disavowal of her claimed ownership of Portfolio Company equity

(Ex. 29) contradict Plaintiffs' unsubstantiated assertions that AMZM's litigations were brought in

bad faith. Accordingly, any purported directions by MBIA to AMZM to bring litigation against

Plaintiffs is not inequitable as a matter of law *See, e.g.*, *Citicorp Venture Cap.*, 323 F.3d at 235

("pursuit of one's legal rights may not be grounds for equitable subordination" absent "protracted

and unjustified litigation tactics that harm the estate"); *see also* Mem. of Law of Def. Alvarez &

Marsal Zohar Management, LLC, dated Oct. 30, 2020, in support of its Mot. to Dismiss at Arg.,

Point II (*Noerr–Pennington* immunity bars equitable subordination claim on grounds of Zohar

litigation).

### v. The Complaint Does Not Allege Any Post-Petition Conduct By MBIA

52. The Complaint includes MBIA's purported "post-petition conduct" among

the categories of inequitable conduct giving rise to its sole cause of action. Compl. ¶ 233 (citing

*id.* ¶¶ 212-19). The paragraphs of the complaint addressing post-petition events, however, contain

zero allegations of misconduct by MBIA. *Id.* ¶¶ 206-19. At most, the Complaint contains two

conclusory assertions that MBIA "attempted to limit Plaintiffs' rights as secured creditors" (*id.* ¶

210) and "attempted to destroy all potential value for Plaintiffs" (*id.* ¶ 219). Such bare-bones

conclusions are insufficient to support the claim of inequitable conduct. *See Twombly*, 550 U.S.

at 555; *Iqbal*, 556 U.S. at 678.

**B.** **Plaintiffs Fail To Plead Injury Or Unfair Advantage To MBIA Resulting From MBIA's Alleged Conduct**

53. To survive a motion to dismiss, a plaintiff seeking equitable subordination must allege that it was injured or that the defendant gained an unfair advantage as a result of the alleged inequitable conduct. *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 71 (Bankr. D. Del. 2002). Additionally, an individual creditor must demonstrate a "particularized injury, which differs from the injury incurred by all creditors," to establish standing to bring a claim. *Elway Co. v. Miller* (*In re Elrod Holdings Corp.*), 392 B.R. 110, 115 (Bankr. D. Del. 2008).

54. Here, the Complaint makes only bare-bones assertions that MBIA obtained an unfair advantage at Plaintiffs' expense, assertions which are further contradicted by the factual allegations and transaction documents. The Complaint acknowledges and the Indentures expressly provide that MBIA owes no duties whatsoever to Plaintiffs and is entitled to enforce its contractual rights and remedies for purposes of recovering amounts that it paid under the Policies. *See* Exs. 1-2 (Indentures) §§ 5.4, 5.13, 13.2(a). Such recoveries, which MBIA at all times sought pursuant to and in accordance with its contractual rights as Controlling Party, are not "unfair." *See supra* Point II.A.

55. The Complaint also fails to allege facts establishing that Plaintiffs incurred an actual or particularized injury caused by MBIA's purported conduct. All of MBIA's purported conduct is alleged to have occurred prior to Tilton's commencement of the Zohar chapter 11 proceedings. Compl. ¶¶ 51-207, 234-38; *see also supra* Point II.A.2.b.v. And Tilton—as the sole director and holder of Preference Shares in the Zohar Funds and the person in control of all of the Portfolio Companies—swore in her First Day Declaration in these proceedings that there was more than sufficient value as of that date to pay the Zohar Funds' noteholders in full notwithstanding any prior actions by MBIA. *See* Ex. 30 ¶ 6 ("The Zohar Funds' assets . . . are worth billions of

dollars—far in excess of the amount owed to the Zohar Funds' noteholders[.]").  Thus, by Tilton's own admission, MBIA's alleged conduct did not harm Plaintiffs' creditor recoveries or result in any particularized injury to Plaintiffs.  Nor can the legal fees or unidentified "reputational harms" Plaintiffs allegedly incurred in contesting the Zohar Funds' meritorious litigation claims pursued on behalf of all creditors, including Plaintiffs, form the basis of their claimed injury. *See supra* ¶¶ 33, 51 (citing *Citicorp Venture Cap.*, 323 F.3d at 235).

56.     Moreover, the alleged decrease in value of the Portfolio Companies allegedly caused by the Zohar Funds' litigation efforts is not an independent, particularized injury conferring standing to Plaintiffs.  First, Tilton alleges that such decline in company value harms her, in her personal capacity, as the owner of "equity interests in the Portfolio Companies."  Compl. ¶ 242.  Except, as Tilton has made clear in other filings in these Zohar Bankruptcy Cases (*e.g.*, ECF No. 1903), Tilton only holds such equity through her "Ark" affiliates, which are not named plaintiffs here and as non-creditors lack standing to bring an equitable subordination claim. Second, even if Tilton could overcome this defect in pleading, Tilton still only holds derivative interests in the Portfolio Companies as equity owner through the Ark entities or as second-order creditor through the Zohar Funds or Ark and, thus, lacks standing to bring direct claims on such grounds.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) ("The stockholder's claimed direct injury must be independent of any alleged injury to the corporation[.]").  And, in any event, a hypothetical decrease in value at any individual company would not give rise to any particularized injury justifying equitable subordination if, as Tilton swore in her First-Day Declaration, the collective Zohar assets provided more than sufficient value as of the petition date to pay the Zohar Funds' noteholders in full.

## C.    Equitable Subordination Would Be Inconsistent With The Bankruptcy Code

57.    The Bankruptcy Code expressly provides that valid agreements to subordinate rights and payments are enforceable in bankruptcy. 11 U.S.C. § 510(a); *see also J.P. Morgan Chase Bank N.A.* v. *Baupost Grp., LLC* (*In re Enron Creditors Recovery Corp.*), 380 B.R. 307, 312 (S.D.N.Y. 2008) (Section 510(a) of the Bankruptcy Code required enforcement of indenture's terms of payment priority and subordination). Settlement agreements likewise are valid contracts that are strictly enforced according to their terms. *See IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, No. 12892-VCS, 2017 WL 4082886, at *4 (Del. Ch. Sept. 7, 2017); *see also Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217-18 (Del. 1983) (statutory requirement regarding grounds for modification of divorce agreement did not supersede terms of agreement). It is further well-established under the Bankruptcy Code that debt shall not be subordinated to equity. *See In re Wash. Mut., Inc.*, 461 B.R. 200, 256 (Bankr. D. Del. 2011), *vacated in part on other grounds*, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

58.    The Complaint's sole cause of action for equitable subordination is inconsistent with the Bankruptcy Code because it would undermine the parties' enforceable agreements regarding the priority of creditor payments in the Indentures and Settlement Agreement and impermissibly subordinate MBIA's claims as subrogated noteholder to Plaintiffs' alleged equity interests in the Zohar Funds. For instance, the Complaint concedes that the Indentures expressly provide for the contractual subordination of payments to Plaintiffs, in their capacity as holders of junior Zohar notes and preference shares, with respect to payments to reimburse MBIA for payments made to noteholders as Credit Enhancer following Zohar I's and Zohar II's note payment defaults. *See* Compl. ¶¶ 3, 135, 157. Thus, equitable subordination of MBIA's creditor claims would necessarily frustrate and effectively void the contractual

subordination of post-default payments to which Plaintiffs assented in exchange for MBIA's guaranty of Zohar I's and Zohar II's note payments as "Credit Enhancer."

59.     Additionally, Plaintiffs committed in the Settlement Agreement to monetize the Portfolio Companies until MBIA (and the Zohar III Controlling Class) are Paid in Full.  Ex. 24 ¶ 12.  Tilton also expressly agreed that amounts owed to MBIA to reimburse it for its Policy Payments — amounts in excess of $919 million — "are not subject to challenge by Tilton."  Ex. 24 at 2 n.1.  Tilton further agreed that Plaintiffs' claims to proceeds received from the sale or refinancing of any Portfolio Company based on their purported equity interests therein would be paid on "a *pari passu* basis" with the Zohar Funds.  Ex. 24 at ¶ 18.  Notably, however, Plaintiffs' payments would be capped at $250 million, in excess of which amounts would be allocated toward MBIA's and the Zohar III Controlling Class's Paid in Full amounts.  *Id.*  In entering the Settlement Agreement, and agreeing not to pursue its own litigation claims against Tilton for a period of fifteen months, MBIA bargained for the payment of its Paid in Full amounts subject to these terms without challenge by Tilton or any Patriarch Stakeholders.   Plaintiffs' claim for equitable subordination—filed immediately upon expiration of the Settlement Agreement's stay of litigation—completely undermines the parties' agreement and the Court's Order approving it.

60.     Finally, the Complaint cannot subordinate MBIA's claims—claims which MBIA holds as purchaser of the Zohar I assets, Credit Enhancer and subrogated noteholder—to Plaintiffs' interests as the holder of preference shares.  The Complaint alleges that Plaintiffs hold interests based on Tilton's role as holder of the Zohar preference shares.  Compl. ¶¶ 69, 242.  The Complaint concedes, however, that the holder of preference shares is essentially "the equity owner" of the Zohar Funds, which is entitled only to "residual value" following payment of outstanding notes.  Compl. ¶¶ 52, 69.  Under well-established law, MBIA's creditor claims cannot be equitably subordinated to Plaintiffs' equity claims.  *See In re Wash. Mut., Inc.*, 461 B.R. at 256

(equity committee lacked standing because subordination is a remedy available to creditor claims, not equity interests).[14]

## III.    THE COMPLAINT'S SOLE CAUSE OF ACTION IS BARRED BY JUDICIAL ESTOPPEL

61.    The doctrine of judicial estoppel bars a party from "asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midw. Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).  Estoppel applies where the party is asserting or has previously asserted either or both of its inconsistent positions in bad faith—that is, "with intent to play fast and loose" with the court.  *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 111 (3d Cir. 1999); *see also Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d. 17, 31 (S.D.N.Y. 2015) (parties estopped from asserting they were trustees of a foundation after asserting otherwise in a prior proceeding).  Significantly, "judicial estoppel does not require that the party urging estoppel demonstrate that she believed or relied upon the plaintiff's prior inconsistent statement." *Ryan Operations*, 81 F.3d at 360.  Nor is it necessary to show that a party "benefitted from her prior position in order to be judicially estopped from subsequently asserting an inconsistent one." *Id.* at 361.  Judicial estoppel is routinely applied at the motion to dismiss stage.  *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742 (2001); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003); *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47 (3d Cir. 2018) (unpublished).

62.    Here, judicial estoppel squarely applies to prevent Plaintiffs from litigating both sides of Tilton's purported equity ownership.  Plaintiffs cannot in good faith attempt to

---

[14]    The Complaint is also procedurally defective because Plaintiffs have not filed allowed claims against the Debtors.  *See* Mem. of Law of Def. U.S. Bank National Association in support of its Mot. to Dismiss [D.I. 65] at Point III (citing *Baldiga v. Moog, Inc.* (*In re Comprehensive Power, Inc.*), 578 B.R. 14, 29 (Bankr. D. Mas. 2017).

subordinate MBIA's creditor claims in this proceeding based on the bogus theory that "MBIA engage[d] in a clandestine campaign to wrest ownership and control of the Portfolio Companies from Ms. Tilton" (Compl. ¶ 28) after having already represented in sworn statements to the Court that they will no longer litigate the legal and beneficial control ownership of that very same equity. *See* Zohar Bankruptcy Cases, ECF Nos. 1523, 1525. Indeed, Plaintiffs abandoned Tilton's claims of equity ownership only when it suited them—one day after this Court confirmed that Tilton must perform her obligation to sell the Portfolio Companies according to certain parameters and timelines. *See* Zohar Bankruptcy Cases, ECF No. 1500. Plaintiffs' disavowal of ownership in the Chapter 11 cases, where it suits their litigation strategy, and promise not to litigate is fundamentally inconsistent and cannot be squared with the present Complaint — a pleading which asserts a single cause of action premised entirely on allegations that Tilton was in fact the true owner of Portfolio Company equity. Compl. ¶¶ 4, 165.

63. Plaintiffs' flip-flop on their readiness to litigate Tilton's equity ownership claims is just the latest example of Plaintiffs playing fast and loose with this Court and others for their own strategic designs. Plaintiffs' entire argument that Tilton owned the Portfolio Company equity recorded in the Zohar Funds' names, and that the Funds held only "equity upside interests" instead, was asserted in bad faith from the start. Following bench trials in both the Delaware Books and Records and Section 225 Actions, the Delaware Court of Chancery described Plaintiffs' then-current equity ownership positions as "codswallop" (*Zohar CDO 2003-1, LLC*, 2016 WL 6248461, at *14 n.128), and held that Tilton's equity ownership claims were clearly contrary to the evidence adduced at trial. *Zohar II 2005-1, Ltd.*, 2017 WL 5956877, at *34-39. Plaintiffs only managed to stay the entry of a final judgment in the 225 Action by falsely representing to the Court of Chancery that Tilton would expedite her appeal of that case; whereas, in fact, Tilton already planned to and months later did commence the Zohar Bankruptcy Cases staying the 225 Action appeal just ten

days prior to oral argument before the Delaware Supreme Court. Judicial estoppel applies to prevent Plaintiffs from reversing course yet again and prosecuting the Complaint after expressly representing they would no longer litigate their bogus claims of equity ownership.

## IV.     THE COMPLAINT DOES NOT STATE A CLAIM AGAINST MBIA INC.

64.     The foregoing grounds for dismissal of the Complaint with respect to MBIA all similarly apply to MBIA Inc. The claim against MBIA Inc. should be dismissed for the additional reason that no facts or inequitable conduct have been alleged against it, as distinct from MBIA Insurance Corp. MBIA Insurance Corp.—*not* MBIA Inc.—is the Credit Enhancer under the Indentures and the entity which Plaintiffs contend engaged in all of the conduct at issue. In particular, MBIA Inc. has no creditor claim with respect to the Zohar Funds, and Plaintiffs have not alleged how MBIA Inc. is liable to Defendants for equitable subordination. *See Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 513 (D. Del. 2016) ("A parent company is not liable for the actions of a subsidiary solely because of the parent-subsidiary relationship.); *see also Wenske v. Blue Bell Creameries, Inc.*, No. 2017-0699-JRS, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) (parent corporation was not liable for subsidiary's acts merely because they shared directors or officers); *DiPippo v. Cnty. of Putnam*, No. 17-cv-7948, 2019 WL 1004152, at *15 (S.D.N.Y. Feb. 28, 2019) (claims dismissed for failure "to identify which specific defendants violated which specific rights").

## CONCLUSION

**WHEREFORE**, MBIA respectfully requests that the Court enter an Order dismissing the Complaint with prejudice and grant MBIA such other and further relief as the Court deems just and proper.

Wilmington, Delaware
October 30, 2020

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Timothy P. Cairns*
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:          ljones@pszjlaw.com
                    tcairns@pszjlaw.com

and

CADWALADER, WICKERSHAM & TAFT LLP
Gregory Petrick
Ingrid Bagby
Michele Maman
Sean F. O'Shea
Michael E. Petrella
Joshua P. Arnold
200 Liberty Street
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Email: gregory.petrick@cwt.com
        ingrid.bagby@cwt.com
        michele.maman@cwt.com
        sean.o'shea@cwt.com
        michael.petrella@cwt.com
        joshua.arnold@cwt.com

*Counsel to MBIA Inc. and*
*MBIA Insurance Corporation*