**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ——————————————— | ) | |
| | ) | |
| LYNN TILTON, PATRIARCH | ) | |
| PARTNERS VIII, LLC, PATRIARCH | ) | |
| PARTNERS XIV, LLC, PATRIARCH | ) | |
| PARTNERS XV, LLC, OCTALUNA, LLC, | ) | |
| OCTALUNA II, LLC, AND OCTALUNA | ) | |
| III, LLC, | ) | Adv. Proc. No. 19-50390 (KBO) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MBIA INC., MBIA INSURANCE | ) | |
| CORPORATION, U.S. BANK, N.A., | ) | |
| ALVAREZ & MARSAL ZOHAR | ) | |
| MANAGEMENT, CREDIT VALUE | ) | |
| PARTNERS, LP, BARDIN HILL | ) | |
| INVESTMENT PARTNERS F/K/A | ) | |
| HALCYON CAPITAL MANAGEMENT | ) | |
| LP, COÖPERATIEVE RABOBANK U.A., | ) | |
| VÄRDE PARTNERS, INC., ASCENSION | ) | |
| ALPHA FUND LLC, ASCENSION | ) | |
| HEALTH MASTER PENSION TRUST, | ) | |
| CAZ HALCYON OFFSHORE | ) | |
| STRATEGIC OPPORTUNITIES FUND, | ) | |
| L.P., CAZ HALCYON STRATEGIC | ) | |
| OPPORTUNITIES FUND, L.P., BROWN | ) | |
| UNIVERSITY, HCN LP, HALCYON | ) | |
| EVERSOURCE CREDIT LLC, HLF LP, | ) | |
| HLDR FUND I NUS LP, HLDR FUND I | ) | |
| TE LP, HLDR FUND I UST LP, | ) | |
| HALCYON VALLÉE BLANCHE | ) | |

---

[1] The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

MASTER FUND LP, BARDIN HILL        )
EVENT DRIVEN MASTER FUND LP,        )
PRAETOR FUND I, A SUB FUND OF        )
PRAETORIUM FUND I ICAV, HIRTLE        )
CALLAGHAN TOTAL RETURN        )
OFFSHORE FUND LIMITED, HIRTLE        )
CALLAGHAN TOTAL RETURN        )
OFFSHORE FUND II LIMITED, HIRTLE        )
CALLAGHAN TRADING PARTNERS,        )
L.P., AND THIRD SERIES OF HDML        )
FUND I LLC.,        )
        )
                Defendants.        )
        )

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS
TO DISMISS THE AMENDED COMPLAINT OF LYNN TILTON AND THE
<u>PATRIARCH & OCTALUNA ENTITIES FOR EQUITABLE SUBORDINATION</u>**

## TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ...................................................................1

II.   PROCEDURAL HISTORY ......................................................................1

III.  SUMMARY OF ALLEGED FACTS ...........................................................2

    A.    The Zohar Funds ..........................................................................3

    B.    The Portfolio Company Equity ......................................................4

    C.    MBIA's "Steal-the-Equity" Strategy ...........................................5

    D.    The Harm Suffered ......................................................................8

IV.   APPLICABLE LEGAL STANDARD .........................................................9

V.    LEGAL DISCUSSION ........................................................................10

    A.    Equitable Subordination ..............................................................10

        1.    Inequitable Conduct .........................................................11

        2.    Unfair Advantage or Harm ...............................................13

        3.    Consistency with the Bankruptcy Code .............................14

    B.    Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination
        Against US Bank...........................................................................14

    C.    Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination
        Against AMZM.............................................................................20

    D.    Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination
        Against MBIA and The Zohar III Controlling Class ...........................24

        1.    MBIA, Inc. and Värde Partners, Inc. .................................24

        2.    The Amended Complaint's Group Pleading Targeted at the Zohar III
            Controlling Class is Permissible ..............................................25

        3.    The Amended Complaint Sufficiently Alleges that MBIA and the Zohar
            III Controlling Class Were Insiders Upon the Appointment of AMZM
            Through the Petition Date .........................................................25

4.      The Amended Complaint Does Not Sufficiently Allege a Plausible Claim that MBIA and the Zohar III Controlling Class Acted Inequitably ...........27

     a.      The Zohar III Controlling Class.....................................................27

     b.      MBIA Insurance..............................................................................29

           i.      The Extension and Restructuring Negotiations ................30

           ii.      The SEC ...........................................................................33

           iii.      The Collateral Manager's Resignation and Appointment Process ............................................................................34

     c.      Improper Purpose........................................................................35

E.      Leave to Amend Will Not Be Granted .................................................................39

VI.      **CONCLUSION** ........................................................................................40

Plaintiffs in this adversary proceeding seek a judgment equitably subordinating each Defendant's claims, individually and in total, against the above-captioned debtors to the claims of the Plaintiffs. Each Defendant argues that the Amended Complaint should be dismissed because it fails to state a cause of action for equitable subordination. The Court agrees. The Amended Complaint fails to allege sufficient facts from which the Court can infer that the Defendants behaved inequitably.[2] It will be dismissed without leave to amend.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## II.    PROCEDURAL HISTORY

On October 1, 2019, Plaintiffs Lynn Tilton, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC,[3] Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC[4] commenced this action by filing a one count Complaint[5] against the Defendants MBIA, Inc., MBIA Insurance Corporation ("MBIA Insurance" and together with MBIA, Inc., "MBIA"),[6] U.S. Bank, N.A. ("US Bank"), Alvarez & Marsal Zohar Management ("AMZM"), and the Zohar III Controlling Class[7] to equitably subordinate their claims against the above-captioned debtors (the "Debtors") pursuant to section 510(c) of the Bankruptcy Code.[8] After obtaining permission from the Court,[9] the Plaintiffs filed the Amended Complaint on January 6, 2022.[10] It was later revised following the entry of an order requiring the Plaintiffs to strike certain material.[11]

---

[2] Defendants raise a variety of other arguments to support their requests for dismissal. For the most part, the Court did not address them given its determination regarding Defendants' conduct.

[3] Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC are collectively referred to as the "Patriarch Entities".

[4] Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC are collectively known as the "Octaluna Entities".

[5] Adv. D.I. 2.

[6] For the reasons explained in Section V.D.1, MBIA, Inc. will be dismissed from this proceeding because it has not asserted a claim against the Debtors. However, the allegations of the Amended Complaint do not often differentiate between MBIA, Inc. and MBIA Insurance. Accordingly, the Court will mimic the Plaintiffs and refer individually and collectively to the parties as "MBIA".

[7] The Zohar III Controlling Class refers to all Defendants except for MBIA, US Bank, and AMZM.

[8] All references to the Bankruptcy Code refer to title 11 of the United States Code. *See* 11 U.S.C. §§ 101-1532 (2020).

[9] Adv. D.I. 154.

[10] Adv. D.I. 160.

[11] Adv. D.I. 233 ("Am. Compl."). The Plaintiffs largely amended the Complaint to include new allegations of post-petition conduct by MBIA and the Zohar III Controlling Class related to a mediation that occurred in 2018 and 2019 overseen by United States Bankruptcy Judge Kevin Gross and, upon Judge Gross's resignation as mediator, by United States Bankruptcy Judge Christopher S. Sontchi. On February 24, 2022,

The Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules") and Rule 7012 of the Federal Rules of Bankruptcy Procedure.[12]   Briefing completed on February 24, 2022.[13]   Oral argument occurred on March 3, 2022.  The matter is ripe for adjudication.

## III.   SUMMARY OF ALLEGED FACTS

As indicated by its title, this Section summarizes Plaintiffs' allegations in the Amended Complaint.  The Defendants disagree with many.

The Plaintiffs' focus in this action is on MBIA.  MBIA, Inc., along with its subsidiaries, operates as a financial guaranty insurer in the United States.[14]   MBIA Insurance, one of MBIA, Inc.'s wholly owned subsidiaries, provided financial guaranty insurance on the Class A-1 and A-2 notes issued by debtors Zohar CDO 2003-1, Limited ("Zohar I") and Zohar II 2005-1, Limited ("Zohar II").[15]   Ultimately, Zohar I and Zohar II defaulted on their obligations to the noteholders, in 2015 and 2017.  MBIA paid a total of approximately $919 million to the insured Class A noteholders.[16]   In 2019, debtor Zohar III, Limited ("Zohar III") also defaulted on its obligations to, among others, the noteholders comprised of the Zohar III Controlling Class.

The Plaintiffs contend that MBIA, with the assistance and support of US Bank, AMZM, and the Zohar III Controlling Class, took control of the Debtors and perpetrated a years' long scheme to take away from the Plaintiffs over a billion dollars of their equity holdings in a variety of distressed companies that were accumulated through transactions involving the Zohar Funds and their financial investments.  MBIA's behavior was allegedly motivated by a need to rescue

---

the Court ordered that such disclosures be stricken from the Amended Complaint pursuant to a prior applicable version of Rule 9019-5(d)(i) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, which imposes a broad cloak of confidentiality over mediation proceedings.   *See* Case No. 18-10512, D.I. 3113.  Among other things, the Local Rule prohibits disclosure "outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation" as well as any person's reliance on or introduction as evidence in any judicial proceeding "evidence pertaining to any aspect of the mediation effort."

[12] Adv. D.I. 64, 66, 81, 169. Following the filing of the Amended Complaint, the Court permitted US Bank and AMZM to rely on their previously filed, fully briefed motions to dismiss to support their requests for dismissal of the Amended Complaint because the Amended Complaint did not substantially alter the allegations against US Bank or AMZM. Adv. D.I. 165. AMZM submitted supplemental briefing to address Judge Castel's Opinion and Order (as defined and discussed herein). *See* Adv. D.I. 167 & 207.

[13] Adv. D.I. 65, 82, 103, 110, 111, 167, 168, 169, 192, 205-07.

[14] Am. Compl. ¶ 21.

[15] *Id.* ¶ 22.  Prior to its involvement with the Zohar Funds, MBIA gained familiarity with Ms. Tilton and her investment strategy as an insurer for noteholders that invested in another set of CLOs headed by Ms. Tilton referred to as the "Arks". *Id.* ¶ 55.  The Arks repaid noteholders well ahead of the notes' maturity dates. *Id.*  According to the Plaintiffs, MBIA later sought Ms. Tilton out for her assistance when they faced significant insurance obligations involving another failing investment. *Id.* ¶ 56.  Ms. Tilton agreed to collaterally manage MBIA's deal, and MBIA agreed to ensure the Class A Zohar I notes. *Id.*

[16] *Id.* ¶¶ 21-22.

itself from the brink of financial ruin caused by an overwhelming amount of insurance guaranty obligations that arose as a result of the financial crises beginning in 2007.[17]  When faced with the prospect of rehabilitation or liquidation proceedings, Plaintiffs allege that MBIA developed and pursued the alleged scheme for approximately ten years, continuing into these cases.[18]

## A.    The Zohar Funds

The Zohar Funds[19] are a type of investment vehicle referred to as a "collateralized loan obligation."[20]  They obtained funds from several classes of noteholder-investors and pursued an investment strategy developed by Ms. Tilton in which the investor funds were used to purchase a portfolio of distressed senior secured loans at a discount and to originate loans with high interest rates to distressed companies (the "Portfolio Companies") in exchange for promises to repay and for equity in the Portfolio Companies.[21]   Each Zohar transaction was governed by a heavily negotiated Indenture, Collateral Management Agreement ("CMA"), and Collateral Administration Agreement ("CAA").[22]

While it was acknowledged that some loans may underperform, the goal was for the collective portfolio to generate sufficient cash flow for the Zohar Funds to repay the noteholder-investors their promised principal and interest.[23]  Any excess value generated by the Portfolio Companies was to flow up to Ms. Tilton as the Zohar Funds' ultimate owner.[24]  To ensure the success of the Zohar Funds' investment strategy, Ms. Tilton needed the ability to flexibly manage

---

[17] *Id.* ¶¶ 1, 89-94, 129-134, 172.

[18] *Id.*, *passim*.

[19] The term "Zohar Funds" collectively refers to Debtors Zohar I, Zohar II, and Zohar III. *Id.* ¶ 2 n.4.

[20] *Id.* ¶¶ 52-53, 57.

[21] *Id.* ¶¶ 52 & n.7, 57, 65, 71-72.

[22] *Id.* ¶ 60.  In support of their dismissal request, MBIA and the Zohar III Controlling Class submitted the Indentures and CMAs relevant to this dispute.  *See Declaration of Michael E. Petrella in Support of Defendants MBIA Inc.'s and MBIA Insurance Corporation's Motion to Dismiss Equitable Subordination Complaint* [Adv. D.I. 170] ("Petrella Decl."), Exs. 1-8; *Appendix in Support of Memorandum of Law of the Zohar III Controlling Class to Dismiss the Complaint Under Federal Rule of Civil Procedure 12(b)(6) Made Applicable By Bankruptcy Rule 7012*, Adv. D.I. 69 ("Appendix"), Ex. 1.  The documents' authenticity is not disputed.   The Court may consider them for purposes of deciding the motions to dismiss.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[23] Am. Compl. ¶¶ 52-54, 57.

[24] *Id.*  Ms. Tilton wholly owns, through affiliated entities, the Octaluna Entities, which own the Debtors through their ownership of all of the Zohar Funds' preference shares. *Id.* ¶¶ 14, 70.  Octaluna, LLC holds the preference shares of Zohar I. *Id.* ¶ 18.  Octaluna II, LLC holds the preference shares of Zohar II. *Id.* ¶ 19.  Octaluna III, LLC holds the preference shares of Zohar III. *Id.* ¶ 20.

the loan terms and to control and rehabilitate the Portfolio Companies.[25]  As such, Ms. Tilton and her affiliates wore many hats with respect to the Zohar Funds and the Portfolio Companies.[26]

For example, until they were replaced in 2016, the purchase, origination, and management of the loans and the Zohar Funds rested with the Patriarch Entities, Ms. Tilton's affiliated entities which each served as collateral manager for a Zohar Fund.[27]  Ms. Tilton also installed herself in positions of control as director, manager, or chief-executive officer at the Portfolio Companies[28] and as sole director of each of the Zohar Funds.[29]  In addition to owning the preference shares of the Zohar Funds, Ms. Tilton's personal investment vehicles also separately invested in loans and equity of the Portfolio Companies[30] and invested in the Zohar Funds as noteholders.[31]  Through two other affiliates, Patriarch Partners Management Group, LLC and Patriarch Partners Agency Services, LLC, Ms. Tilton provided operational and advisory services to the Portfolio Companies and served as administrative agent for the lenders (including the Zohar Funds and Tilton-affiliated entities) under the various credit agreements with the Portfolio Companies.[32]

### B.    The Portfolio Company Equity

According to the Plaintiffs, while the Zohar Funds purchased and extended the loans to the Portfolio Companies using their investors' funds, Ms. Tilton (through her Octaluna Entities) owned the equity in the Portfolio Companies.[33]  This structure arose because rating agencies insisted that the Zohar Funds could not own equity due to the significant attendant tax and other liabilities.[34]  Ms. Tilton agreed to own and control the Portfolio Companies' equity (along with that of the Zohar Funds) and bear the tax consequences.[35]  While the equity was owned by Ms. Tilton, certain interests were put in the Zohar Funds' name as "record holder" to memorialize the Zohar Funds' priority right to receive the net proceeds from a sale of the Portfolio Companies to repay outstanding noteholder obligations and expenses.[36]  Residual value, if any, following

---

[25] *Id.* ¶¶ 3, 52-54, 57, 66.

[26] *Id.* ¶¶ 3, 67.

[27] *Id.* ¶¶ 15-17, 60, 66.  Patriarch Partners VIII, LLC was the collateral manager of Zohar I.  *Id.* ¶ 15. Patriarch Partners XIV, LLC was the collateral manager of Zohar II.  *Id.* ¶ 16.  Patriarch Partners XV, LLC was the collateral manager of Zohar III.  *Id.* ¶ 17.

[28] *Id.* ¶¶ 3, 57, 67.

[29] *Id.* ¶ 47.

[30] *Id.* ¶¶ 57, 60, 70.

[31] *Id.* ¶ 14. The Octaluna Entities hold the Class B notes of the Zohar Funds.  *Id.* ¶¶ 14, 18-20.

[32] *Id.* ¶ 67.

[33] *Id.* ¶¶ 75, 77.

[34] *Id.* ¶ 72.

[35] *Id.*

[36] *Id.* ¶ 75.

repayment of the notes would flow through the Zohar Funds ultimately to Ms. Tilton.[37]   The structure was agreed and insisted upon by all relevant parties as it created an alignment of party-interests dependent on the success of the Portfolio Companies.[38]   The Plaintiffs allege that the Indentures and other governing documents reflected the parties' understanding and expressly prohibited, subject to narrow exceptions, the Zohar Funds from owning equity.[39]

### C.    MBIA's "Steal-the-Equity" Strategy

The Plaintiffs claim that the foregoing ownership and control structure was honored from the formation of the Zohar Funds, causing Ms. Tilton to bear hundreds of millions of dollars of tax liabilities.[40]   It is the Plaintiffs' position that MBIA, among others, repeatedly acknowledged privately and publicly that the Portfolio Company equity was owned and controlled by Ms. Tilton until it needed cash.[41]   Then, to obtain liquidity, MBIA devised a plan to quickly take control of and sell the Portfolio Companies, disregarding Ms. Tilton's equity interests and ignoring the resulting value depression.[42]

The Amended Complaint alleges that the scheme orchestrated by MBIA amounted to years of inequitable conduct, categorized into nine specified categories:[43]

*First*, following three years of discussions between MBIA and Ms. Tilton, during which MBIA supported an extension of the maturity date of the Zohar I notes and a global restructuring of the Zohar Funds' note obligations, MBIA refused to extend or agree to a restructuring, ultimately "causing" the Zohar I default in 2015.[44]   The Plaintiffs contend that, while a consensual refinancing of the Zohar Funds would have been in the best interests of the noteholders and mitigated MBIA's exposure, MBIA strung Ms. Tilton along while it took "steps behind her back to attempt to acquire the collateral for itself."[45]

*Second and third,* MBIA encouraged and fed misinformation to the Securities and Exchange Commission (the "SEC") during the default negotiations to lead it to investigate and

---

[37] *Id.* ¶¶ 75-76.

[38] *Id.* ¶¶ 71-72, 75-76.

[39] *Id.* ¶ 73 (citing the Indentures).

[40] *Id.* ¶¶ 3, 77-80.

[41] *Id.* ¶¶ 3, 81-94, 142, 193.

[42] *Id.* ¶¶ 3-4, 81-94, 129-134, 193.

[43] *Id.* ¶ 217.   The Plaintiffs imply in the Amended Complaint that the Defendants took other inequitable actions.   *See, e.g., id.* ("As set forth herein, Defendants have engaged in a years-long pattern of inequitable conduct towards [the] Plaintiffs, *including, but not limited to,* the following . . . .") (emphasis added).   In rendering its ruling on whether the Plaintiffs have adequately stated a claim, the Court must confine itself to the well-pled factual allegations only.   *See infra* Section IV (Applicable Legal Standard).

[44] Am. Compl. ¶ 127.; *see also id.* ¶¶ 95-146, 217.

[45] *Id.* ¶ 128.

bring charges of fraud against Ms. Tilton and the Patriarch Entities.[46] Ms. Tilton and the Patriarch Entities ultimately prevailed.[47] Then, in late 2013 and early 2014, Plaintiffs allege that MBIA struck a "secret deal" to obtain from the SEC confidential nonpublic financial information about the Portfolio Companies obtained from Ms. Tilton in the SEC's proceeding.[48] Plaintiffs contend that MBIA used the information against Ms. Tilton in subsequent "sham and frivolous" litigation.[49]

*Fourth*, beginning in 2015, MBIA induced Ms. Tilton to cause the Patriarch Entities to voluntarily resign as collateral managers for the Zohar Fund by making false promises that she could pick the successor collateral manager and remain in control of, and retain all ownership positions in, the Portfolio Companies.[50]

Then, *fifth*, in early March 2016 after the Patriarch Entities voluntarily resigned, MBIA broke its promise. It and the Zohar III Controlling Class selected AMZM as the Patriarch Entities' successor collateral manager.[51] The Plaintiffs allege that AMZM did not have the requisite experience for the job and did not perform all of its required duties. Rather, it was put in place for the purpose of launching a bad faith litigation campaign against the Plaintiffs at the control of MBIA and the Zohar III Controlling Class to "bleed [Ms. Tilton] dry, wrest control of the Portfolio Companies . . . and seize the valuable Portfolio Company equity."[52] The first action was a books and records action brought in April 2016 before the Delaware Court of Chancery on behalf of the Zohar Funds through which AMZM successfully obtained documents and information from the Plaintiffs pertaining to the Zohar Funds' assets (the "B&R Action").[53] The Plaintiffs argue that the Zohar Funds did not need this information but rather obtained it to further the goal of obtaining control of the Portfolio Companies.[54]

*Sixth*, in June 2016, MBIA instructed US Bank, the Trustee under the Zohar Funds' Indentures,[55] to conduct a commercially unreasonable, "sham" auction (the "Zohar I Auction") of the collateral possessed by Zohar I (the "Zohar I Collateral"), which purportedly included equity in more than twenty Portfolio Companies previously claimed to be owned by Ms. Tilton and the other Plaintiffs.[56] Ms. Tilton, through Patriarch Partners XV, LLC ("Patriarch XV") and Octaluna,

---

[46] *Id.* ¶ 6; *see also id.* ¶¶ 135-41, 217.

[47] *Id.* ¶ 6.

[48] *Id.* ¶ 6; *see also id.* ¶¶ 138-41.

[49] *Id.* ¶ 6.

[50] *Id.* ¶ 5; *see also id.* ¶¶ 142-52, 217.

[51] *Id.* ¶ 5; *see also id.* ¶¶ 167-171, 217.

[52] *Id.* ¶ 169.

[53] *Id.* ¶ 170.

[54] *Id.* ¶ 171.

[55] *Id.* ¶ 23.

[56] *Id.* ¶ 5; *see also id.* ¶¶ 153-66, 217.

LLC ("Octaluna I"), attempted to enjoin the auction, challenging its reasonableness and scope.[57] Ultimately, it went forward on modified terms (some proposed by US Bank and others required by the overseeing court).[58]   MBIA won with a no-cash, credit bid, purportedly acquiring the Portfolio Company equity at a depressed value.[59]

*Seventh*, in November 2016, MBIA, with the consent and approval of the Zohar III Controlling Class, instructed AMZM to execute as collateral manager on behalf of the Zohar Funds, written consents that voted Portfolio Company shares to remove Ms. Tilton from her board positions with three Portfolio Companies (the "Written Consents") – FSAR Holdings, Inc., Glenoit Universal Ltd., and UI Acquisition Holding Co. (collectively, the "225 Companies").[60]   The Written Consents conflicted with prior irrevocable proxies executed by Ms. Tilton on behalf of the Zohar Funds that granted Tilton-controlled entities a twenty year exclusive right to vote the 225 Companies' shares.[61]   MBIA, along with the Zohar III Controlling Class, then approved the filing of an action before the Delaware Court of Chancery by AMZM on behalf of the Zohar Funds to determine the validity of the Written Consents (the "225 Action").[62]   The 225 Action was resolved by the Chancery Court in favor of the Zohar Funds.[63]   Based on the validation of AMZM's Written Consents for the 225 Companies, AMZM executed further written consents and commenced litigation to validate them to take control of over a dozen more Portfolio Companies.[64]

While the 225 Action was pending, it is alleged that, *eighth*, AMZM filed a civil RICO claim, with approval of MBIA and the Zohar III Controlling Class, which was ultimately dismissed (the "RICO Action").[65]   Plaintiffs believe that the RICO Action was filed to smear them and destroy Ms. Tilton's "reputation, career, and business operations."[66]

*Ninth*, and finally, it is alleged that, after Ms. Tilton caused the Zohar Funds to seek chapter 11 bankruptcy protection before this Court to stay ongoing litigation and preserve value, MBIA and the Zohar III Controlling Class behaved with bad faith and inequitably.[67]   Specifically, both sought to dismiss the cases and then MBIA tried to back out of the settlement agreement (the "Settlement Agreement") reached between the Plaintiffs, the Zohar Funds, MBIA, and the Zohar

---

[57] *Id.* ¶ 156.

[58] *Id.* ¶¶ 158-60.

[59] *Id.* ¶¶ 161-62, 165.

[60] *Id.* ¶ 5; *see also id.* ¶¶ 175-79, 217.

[61] *Id.* ¶ 178.

[62] *Id.* ¶¶ 177-78.

[63] *Id.* ¶ 181.

[64] *Id.* ¶ 184.

[65] *Id.* ¶ 182, 217.

[66] *Id.* ¶ 183.

[67] *Id.* ¶¶ 8, 217.

III Controlling Class.[68]  The Settlement Agreement, among other things, resolved the dismissal requests and provided for a joint monetization process of the Portfolio Companies.[69]  Plaintiffs further claim that, following the approval of the Settlement Agreement, MBIA and the Zohar III Controlling Class wrongfully interfered with the monetization process and sought to undermine its success, thus attempting to destroy all potential value for the Plaintiffs for their own benefit.[70]

### D.    The Harm Suffered

It is alleged that the foregoing conduct conferred upon the Defendants an unfair advantage and harmed Plaintiffs as creditors.  The overarching theory of harm advanced by the Plaintiffs is that MBIA's actions – helped and supported by US Bank, AMZM, and the Zohar III Controlling Class – "wrongfully attempt[ed] to wrest from Ms. Tilton and the other Plaintiffs assets worth over a billion dollars [including the Portfolio Company equity] and to harm Ms. Tilton by taking every possible step to destroy the value of her interests in the Debtors and the Portfolio Companies, even to the extreme detriment of the Debtors and the Portfolio Companies themselves."[71]  A series of specific harms have been alleged in support.

The purposeless litigation pursued by AMZM "cast a cloud over the Zohar Funds and their Portfolio Companies" rendering the Portfolio Companies unfit to be sold and unable to obtain critical financing.[72]  The litigation prevented the significant value that may have been generated if Ms. Tilton was left to run the Portfolio Companies without interference and successfully restructure or sell them.[73]  The cost of AMZM and its litigation also drained funds from the Zohar Funds that could have been used to repay noteholders.[74]  As a result, the value of the Zohar Funds' notes and preference shares held by Ms. Tilton and her affiliates decreased.[75]  Ms. Tilton does not allege that the value of the Portfolio Companies will be insufficient to repay all of the Zohar Funds' noteholders but rather alleges that *if* it is insufficient, it is the direct result of the conduct of MBIA and the Zohar III Controlling Class.[76]

Plaintiffs further claim that MBIA obtained equity owned by Ms. Tilton and her affiliated entities through the Zohar I Auction, and that US Bank received substantial fees for its role.[77]

---

[68] *Id.* ¶ 8; *see also* Case No. 18-10512, D.I. 266 (*Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class*).

[69] *Id.*

[70] *Id.* ¶¶ 203, 217.

[71] *Id.* ¶ 1.

[72] *Id.* 196.

[73] *Id.* ¶ 226.

[74] *Id.* ¶ 220; *see also id.* ¶¶ 187, 194.

[75] *Id.* ¶¶ 225-226.

[76] *Id.* ¶¶ 12, 226.

[77] *Id.* ¶ 221.

Plaintiffs also argue that they were forced to incur tens of millions of dollars in legal fees and suffered significant reputational damage.[78]

Finally, Plaintiffs generally allege that the conduct of MBIA and the Zohar III Controlling Class in the bankruptcy cases has enabled them to obtain far more than to which they are owed as creditors.[79]

## IV.    APPLICABLE LEGAL STANDARD

Federal Rule 8(a)(2), made applicable to this proceeding by Rule 7008 of the Federal Rules of Bankruptcy Procedure, provides that to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"[80] This rule imposes a "notice pleading standard . . . to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[81] While detailed facts are not necessary, "a plaintiff is required to put the defendant on notice as to the basics of the plaintiff's complaint [and] to set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him so that he can prepare an adequate answer."[82] "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do[.]"[83] Accordingly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and a plaintiff's threadbare recitals of the elements of a cause of action that are only supported by conclusory statements will not suffice.[84]

When reviewing a motion to dismiss under Federal Rule 12(b)(6) challenging the sufficiency of a plaintiff's statement of claim, a court must accept all factual allegations as true, construe such facts in the light most favorable to the plaintiff, and determine whether they allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[85] This is a plausibility standard – it requires more than speculation or a sheer possibility that a defendant acted unlawfully but is not akin to a probability standard.[86] Rather, the alleged facts

---

[78] *Id.* ¶¶ 6 (detailing harm caused by SEC fraud charges), 7, 227.

[79] *Id.* ¶¶ 11-13, 222.

[80] FED. R. CIV. P. 8(a).

[81] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[82] *Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Grp., Inc.)*, 339 B.R. 570, 575 (Bankr. D. Del. 2006); *see also In re APF Co.*, 308 B.R. 183, 188 (Bankr. D. Del. 2004); *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 495 (Bankr. D. Del. 2010).

[83] *Twombly*, 550 U.S. at 545.

[84] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[85] *Iqbal*, 556 U.S. at 678; *Crystallex Int'l Corp. v Petroleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018) (quoting *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015)).

[86] *Iqbal*, 556 U.S. at 678.

must nudge the claims "across the line from conceivable to plausible[.]"[87]

The United States Court of Appeals for the Third Circuit has prescribed a three-step process for courts to determine the sufficiency of a complaint - note the elements of the claim; identify the allegations that are conclusory and not entitled to an assumption of truth; assume the veracity of well-pleaded factual allegations and determine the plausibility of the plaintiff's entitlement to relief.[88]  Instead of being a mini trial for parties to put forth their whole case and competing viewpoints of what the ultimate outcome should be, a dismissal motion focuses on the narrow and fundamental question of whether, if everything the plaintiff alleges is true, the plaintiff can prevail.[89]  In answering that question, a court may draw from "judicial experience and common sense",[90] but it must only consider alleged facts that are within the scope of the court's review.[91]  The scope of what is reviewable includes the complaint, public record, and documents that are "integral to or explicitly relied upon" by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based.[92]  "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."[93]

## V.    LEGAL DISCUSSION

### A.    Equitable Subordination

Section 510(c)(1) of the Bankruptcy Code provides the Court with authority to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ."  Subordination under this provision is remedial, springing from bankruptcy courts' traditional powers as courts of equity "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results."[94]  It "seeks to re-prioritize the order of allowed claims based on the equities of the case, rather than to allow or disallow the claim in the first instance."[95]

---

[87] *Twombly*, 550 U.S. at 570.

[88] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

[89] *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[90] *Iqbal*, 556 U.S. at 679.

[91] *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[92] *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018); *see also McTernan v. City of York*, Penn., 577 F.3d 521, 526 (3d Cir. 2009); *Davis*, 824 F.3d at 341.

[93] *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001).

[94] *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003) (quoting *Burden v. United States*, 917 F.2d 115, 117 (3d Cir. 1990)).

[95] *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002).

Equitable subordination is a "drastic" and "unusual" remedy that should only be applied in limited circumstances.[96]  The appropriate exercise of such power occurs when three conditions are satisfied:  "(1) [t]he claimant must have engaged in some type of inequitable conduct; (2) '[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].'"[97]

## 1.    Inequitable Conduct

Courts generally recognize three categories of misconduct that constitute inequitable conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.[98]  However, the foregoing categories are not exclusive.[99]  "[T]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act."[100]  This is because the degree of inequitable conduct sufficient to justify the application of equitable subordination is dependent on the creditor's status at the time of the act.

If the creditor is an insider, a plaintiff bears the burden of presenting material evidence of only unfair conduct because "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized."[101]  Because there is no bright-line test for what constitutes unfair conduct, the determination demands that courts examine the particular facts before them.[102]  Examples of unfair conduct have been found "where the insider or fiduciary:  (i) dominated and exploited the debtor; (ii) violated the 'rules of fair play and good conscience;' (iii) engaged in illegal or fraudulent conduct; (iv) breached fiduciary duties owed to the debtor, stockholders, or creditors; (v) used 'the debtor as a mere instrumentality or alter ego;' (vi) breached a contract; or

---

[96] *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 327, 329 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006); *see also Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 175 (D. Del. 2015) ("It is 'an extraordinary remedy which is applied sparingly.'" (quoting *In re Epiq Cap. Corp.*, 307 B.R. 767, 773 (D. Del. 2004))).

[97] *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (alterations in original) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)).

[98] *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 82 (Bankr. D. Del. 2014) (quoting *Mid-Am. Waste*, 284 B.R. at 70).

[99] *Id.*; *accord Lipscomb v. Clairvest Equity Partners LP (In re LMI Legacy Holdings, Inc.)*, No. 15-51069, 2017 WL 1508606, at *13 (Bankr. D. Del. Apr. 27, 2017).

[100] *Off. Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (quoting *Mid-Am.* Waste, 284 B.R. at 69).

[101] *Winstar*, 554 F.3d at 412 (quoting *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)); *accord Mid-Am. Waste Sys.*, 284 B.R. at 70 (collecting cases for the proposition that the standard of required inequitable conduct is much lower for insiders).

[102] *Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re Ashinc Corp.)*, 629 B.R. 154, 217 (Bankr. D. Del. 2021).

(vii) if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt."[103]  If a non-insider, however, "the circumstances supporting [an equitable subordination] claim are few and far between."[104]  "[E]vidence of more egregious conduct such as fraud, spoilation or overreaching is necessary."[105]

To adequately plead that a creditor is an insider, a plaintiff must specifically set forth in its complaint facts supporting such a legal conclusion and not merely allege or label the creditor an insider.[106]  Section 101(31)(B) of the Bankruptcy Code enumerates several categories of insiders, including, as relevant to this proceeding, a "person in control of the debtor[.]"[107]  For a creditor to constitute a person in control, and thus be a statutory insider, a finding of "actual control (or its close equivalent) is necessary."[108]  This requires "day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake."[109]  The creditor must "control the company so as to dictate corporate policy and disposition of corporate assets *without limits*."[110]  In essence, the "day-to-day control" must be over decision making rather than other less significant aspects of the debtor's business and operations.[111]

---

[103] *Id.* at 217-18 (collecting cases).

[104] *State St. Bank*, 520 B.R. at 87.

[105] *Winstar*, 554 F.3d at 412; *accord In re First Alliance Mortg. Co.*, 471 F.3d 977, 1006 (9th Cir. 2006); *Matter of W.T. Grant Co.*, 4 B.R. 53, 75-76 (Bankr. S.D.N.Y. Feb. 20, 1980), *aff'd*, 699 F.2d 599 (2d Cir. 1983); *Fabricators*, 926 F.2d at 1465; *Kham & Nate's Shoes No.2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990).

[106] *See, e.g.*, *Klauder v. Echo/Rt Holdings, LLC (In re Raytrans Holding, Inc.)*, 573 B.R. 121, 132 (Bankr. D. Del. 2017) (finding that plaintiff did not carry its burden because it merely recited the word insider and neither provided facts nor gave evidence to establish whether defendants were statutory or non-statutory insiders).

[107] 11 U.S.C. 101(31)(B)(iii).

[108] *Winstar*, 554 F.3d at 396.

[109] *Id.* at 396 n.5 (citation omitted); *see also Off. Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Cap. Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840-41 (Bankr. D. Del. 2006) (determining that creditor's activities, such as monitoring the debtor's business and attending board meetings, were insufficient to show that the creditor exercised day-to-day control over the debtor's business affairs and dictated the debtor's business); *State St. Bank*, 520 B.R. at 81 (same); *In re Beverages Int'l Ltd.*, 50 B.R. 273, 282 (Bankr. D. Mass. 1985) (monitoring debtor's operations and proffering advice to debtor, "even coupled with a decision to withhold credit," is not tantamount to control for the purposes of equitable subordination." (citing *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599 (2d Cir. 1983))).

[110] *Radnor*, 353 B.R. at 841 (emphasis in original) (quoting *Gray v. Manklow (In re Optical Techs., Inc.)*, 252 B.R. 531, 539 (M.D. Fla. 2000), *aff'd*, 246 F.3d 1332 (11th Cir. 2001)); *see also Off. Comm. of Unsecured Creditors v. Credit Suisse First Bos. (In re Exide Techs., Inc.)*, 299 B.R. 732, 743 (Bankr. D. Del. 2003) ("Lending institutions have been found to be insiders when exerting dominion and control, or, when they exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets." (citation and internal quotation marks omitted)).

[111] *See In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 118–19 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1994) (affirming bankruptcy court determination that secured lender was not an insider where the secured lender did not participate in debtor's management, determine its operating decisions, or have a presence on

In the instances where control is lacking, a creditor can be a non-statutory insider if there is a close relationship between the debtor and the creditor and something other than closeness suggests that their transactions were not conducted an arms' length.[112]  An example can be found in *Schubert v. Lucent Technologies, Inc. (In re Winstar Communications, Inc.)*.  In holding that a creditor qualified as a non-statutory insider, the Third Circuit relied on the extensive findings of the bankruptcy court illustrating the creditor's ability to coerce the debtor into transactions not in its best interest.[113]    The creditor was a major lender and supplier to the debtor, a telecommunications services provider.  The bankruptcy court found that the creditor used the debtor to inflate its own financial appearance.[114]  To do so, it controlled the debtor's decision-making related to a buildout of its telecommunications network, forced it to purchase goods prematurely, unnecessarily, and at above-market value, used the debtor as a captive buyer of unneeded and unidentified goods, and involved the debtor's employees in improper transactions (such as accounting schemes involving improper bill and hold transactions).[115]   The Court disagreed that the creditor was merely driving a hard bargain and exercising its contractual rights, highlighting that the creditor's actions exceeded accepted financial controls incidental to a creditor-debtor relationship, such as compelling payment of debts or other financial concessions.[116]

### 2.    Unfair Advantage or Harm

To satisfy the second element of the equitable subordination test, a plaintiff must establish that the offending conduct "either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors."[117]   Because equitable subordination is remedial, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."[118]  An exact quantification of harm may

---

its board, but rather debtor's principal controlled debtor and made key decisions); *Meeks v. Bank of Rison (In re Armstrong)*, 231 B.R. 746, 750 (Bankr. E.D. Ark. 1999) (finding that bank, which required the debtor to submit frequent reports on receivables, invoices, and operations, received all payments on the receivables, had the power to endorse checks, and obtain concessions from the debtor, was not an insider because there was no control of the day-to-day decision making).

[112] *Winstar*, 554 F.3d at 396-97 (rejecting the notion that non-statutory insiders must have actual control over a debtor); *see also OHC Liquidation Trust v. Credit Suisse First Bos. (In re Oakwood Homes Corp.)*, 389 B.R. 357, 366 (D. Del. 2008), *aff'd*, 356 F. App'x 622 (3d Cir. 2009) ("Courts generally look to the legislative history to determine whether an entity or person qualifies as a non-statutory insider, which states, '[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'" (quoting S.REP. No. 95–989, 95th Cong., 2d Sess., reprinted in 1978 U.S. CODE CONG. & ADMIN. NEWS, pp. 5787, 5810)).

[113] *Winstar*, 554 F.3d at 397-400.

[114] *Id.* at 397.

[115] *Id.* at 397-99.

[116] *Id.* at 399.

[117] *Mid-Am. Waste*, 284 B.R. at 71.

[118] *Winstar*, 554 F.3d at 413 (quoting *Mobile Steel*, 563 F.2d at 701).

be difficult but that should not benefit the wrongdoer.[119]  In these circumstances, the Third Circuit has instructed lower courts "to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination."[120]

### 3.    Consistency with the Bankruptcy Code

Finally, equitable subordination of the claim in question must not be inconsistent with the Bankruptcy Code.  "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code."[121]  In other words, although a court of equity, a bankruptcy court "is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable."[122]  Additionally, creditor claims may not be equitably subordinated to equity interests.[123]

### B.    Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination Against US Bank

US Bank moves to dismiss the Amended Complaint, arguing, as all Defendants have, that the Plaintiffs fail to plausibly allege that it engaged in inequitable conduct.  As an initial matter, US Bank contends that the Plaintiffs have failed to sufficiently allege it was an insider at the time of the alleged wrongful conduct.  The Court agrees.

The Plaintiffs allege that US Bank qualified as a statutory and non-statutory insider.  In support, they contend that US Bank conducted the Zohar I Auction with and at the direction of MBIA and colluded with MBIA to create an uncompetitive auction process that allowed MBIA to purchase the Zohar I Collateral.[124]  None of these facts, however, suggest, or explain how, US Bank possessed the necessary day-to-day control over the Zohar Funds, let alone a relationship

---

[119] *Id.* (alteration in original) (quoting *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998)).

[120] *Id.*; *see also id.* at 414 (holding that the bankruptcy court's findings demonstrated concrete harm to debtor and its creditors and equity holders, and the magnitude of the injuries was at least in a rough proportionality with the value of the subordinated claims).

[121] *Off. Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (quoting *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002)).

[122] *Citicorp*, 160 F.3d at 990 (quoting *United Sates v. Noland*, 517 U.S. 535, 539 (1996)).

[123] *Winstar*, 554 F.3d at 414; *see also In re Perry*, 425 B.R. 323, 380 (Bankr. S.D. Tex. 2010) (citation omitted).

[124] Am. Compl. ¶ 206 (alleging that US Bank was indenture trustee and "ran the Zohar I auction with and at the direction of MBIA."); *id.* ¶¶ 153-66, 211-12 (alleging that MBIA directed, and both parties worked together, to conduct the auction through objectionable means).

14

with them beyond that of its role as indenture trustee for their noteholders. The Amended Complaint is devoid of such explanations.

Additionally, the notion that US Bank controlled or had an inappropriate relationship with the Zohar Funds is belied by the Plaintiffs' own allegations that "MBIA had the right under the Indenture to direct that the [Zohar Fund's] collateral be liquidated",[125] that the Zohar Funds were controlled by MBIA and the Zohar III Controlling Class through AMZM as collateral manager at the time of the Zohar Auction,[126] and that US Bank conducted the Zohar Auction at "MBIA's direction", "behest", and "instruction".[127] If anything, these alleged facts speak to the controlling relationship MBIA purportedly had with US Bank and the Zohar Funds – not to any control US Bank may have had over the Zohar Funds.

Finally, the Plaintiffs argue that US Bank was an insider of the Zohar Funds by virtue of its access to confidential and proprietary information of the Zohar Funds and the Portfolio Companies. Specifics of this confidential and proprietary information are not provided in the Amended Complaint other than a general, passing reference to Portfolio Company "financial information" and other materials uploaded to the data room prepared in aid of the Zohar I Auction.[128] Regardless of this vagueness, access to financial information from a debtor is insufficient to establish insider status without evidence of day-to-day control.[129]

US Bank argues, and the Court agrees, that the cases Plaintiffs cite to support their position that possession of confidential information alone can give rise to insider status are inapposite. In *In re Washington Mutual, Inc.*, to determine the existence of a colorable claim for insider trading, the Delaware Bankruptcy Court examined whether certain parties qualified as temporary insiders under applicable securities law by virtue of their access to information.[130] Insider trading is not at issue here. In *In re Krehl,* the Seventh Circuit determined that a debtor-corporation's sole owner was an insider, even after his resignation as president and director and the appointment of a receiver, due to his historically close and long-standing relationship with the debtor that allowed him to deal with it not at arms-length and obtain information to fraudulently transfer debtor-assets.[131] The circumstances in *Krehl* are not present here with respect to US Bank. Among other things, there are no plausible allegations that US Bank obtained confidential information as a result of a non-arm's length relationship with the Zohar Funds and then used such information to wrongfully act.

---

[125] *Id.* ¶ 154. Notably, the Plaintiffs admit that the Indentures were heavily negotiated by multiple sophisticated parties.

[126] *Id.* ¶ 168.

[127] *Id.* ¶¶ 155, 163-64; *see also infra* note 158.

[128] Am. Compl. ¶¶ 160-63.

[129] *See, e.g.*, *Radnor*, 353 B.R. at 841 (analyzing sufficiency of equitable subordination claim and holding that access to debtors' confidential performance reports and other financial information is insufficient by itself to establish insider status).

[130] 461 B.R. 200, 263 (Bankr. D. Del. 2011).

[131] 86 F.3d 737, 742-43 (7th Cir. 1996).

Having concluded that the Amended Complaint fails to adequately allege that US Bank was an insider, the Court must now determine whether the Plaintiffs' factual allegations concerning US Bank's conduct support their equitable subordination claim in light of the higher standard of inequitable conduct required of non-insiders. The Court concludes that they do not.

The Plaintiffs' US Bank allegations of improper conduct center on the alleged "sham" Zohar I Auction, which US Bank conducted.[132] Namely, Plaintiffs submit that the Zohar I Auction was designed by MBIA and US Bank and conducted in a commercially unreasonable and uncompetitive manner to ensure that MBIA obtained assets of Zohar I and Ms. Tilton at a windfall.[133] In support, the Plaintiffs allege that the Zohar I Auction was originally scheduled (per MBIA's instructions) to occur ten days from public notice and did not permit partial bids for the Zohar I Collateral.[134] Moreover, the Plaintiffs allege that MBIA and US Bank conspired to auction equity of the Portfolio Companies as collateral of the Zohar I noteholders when the equity was rightly owned by Ms. Tilton and not Zohar I.[135] After the Zohar I Auction was challenged in court by Ms. Tilton, the Plaintiffs allege that it was delayed multiple times and its terms were modified either by agreement of US Bank or as ordered by the overseeing court.[136] When the auction date was finally set, Plaintiffs allege that the final auction date was improperly noticed but went forward over their objection.[137] In toto, Plaintiffs contend that the Zohar I Auction was moved repeatedly without adequate explanation or notice, which dampened bidder interest and undermined interested parties' opportunity for asset evaluation.[138] This gave MBIA the opportunity to purchase Ms. Tilton's equity in the Portfolio Companies at under-market value and in violation of contractual and fiduciary obligations of US Bank.[139]

Numerous problems exist with these allegations to make Plaintiffs' claim against US Bank implausible. The most significant is the fact that, as acknowledged in the Amended Complaint, Plaintiffs Patriarch XV (a Zohar I Class A-3 noteholder[140]) and Octaluna I (a Zohar I Class B noteholder and preference shareholder[141]) challenged US Bank's conduct in real time before the United States District Court for the Southern District of New York, which then oversaw the Zohar I Auction.[142] More specifically, in September 2016, Patriarch XV and Octaluna I sought to enjoin the Zohar I Auction by filing a complaint against US Bank and MBIA Insurance, challenging the timeline of the proposed sale, its marketing process, the inability of potential acquirors to make

---

[132] Am. Compl. ¶¶ 153, 155.

[133] *Id.* ¶¶ 153, 155, 212, 217; *see also id.* ¶¶ 155-63 (describing the auction).

[134] *Id.* ¶ 155.

[135] *Id.* ¶¶ 155-56, 164, 166, 212, 217.

[136] *Id.* ¶ 159.

[137] *Id.* ¶¶ 160-61.

[138] *Id.* ¶ 163.

[139] *Id.* ¶ 164-66.

[140] *Id.* ¶¶ 17, 147.

[141] *Id.* ¶ 18.

[142] *Id.* ¶ 156-160.

partial bids, and the inclusion of Ms. Tilton's purported Portfolio Company equity (the "Auction Action").[143]   Similar to the current allegations before the Court, Patriarch XV and Octaluna I argued that the auction was a sham structured in a commercially unreasonable manner to deliver assets (including equity not belonging to Zohar I) to MBIA at below market value.[144]

After the filing of the complaint, the Zohar I Auction was temporarily restrained until a hearing could be held and a determination made on the preliminary injunction request.[145] Following a lengthy hearing and significant briefing, United States District Judge Jed S. Rakoff lifted the injunction and allowed the Zohar I Auction to proceed on certain prescribed terms that included re-noticing, a delayed auction date, and the allowance of partial bids.[146]   Judge Rakoff invited the parties to call on the court if, during the course of the Zohar I Auction, additional problems arose.[147]

Shortly before the re-scheduled Zohar I Auction was to be held, the Plaintiffs requested that Judge Rakoff adjourn it again for another thirty days, reiterating their argument that the auction was commercially unreasonable and designed to steer Ms. Tilton's property and the Zohar I collateral to MBIA.[148]   In doing so, they relied on, among other things, new and voluminous information released to the auction's data room for consideration by potential bidders.[149]   Judge Rakoff further extended the auction closing date to December 21, 2016 but held that "no further extensions [were to] be granted under any set of circumstances whatsoever, . . . that date is firm, fixed and final."[150]   As before, the parties were instructed to bring any material auction changes or disputes to the court for resolution.[151]   The auction occurred on December 21 as required by Judge Rakoff despite a further hearing that same day.[152]

---

[143] *See generally Patriarch Partners XV, LLC v. U.S. Bank N.A.*, No. 16-07128-JSR (S.D.N.Y.), D.I. 1, Ex. A (Verified Complaint).

[144] *Id.*

[145] *Id.*, D.I. 14 (Order to Show Cause).

[146] *Id.*, D.I. 76 (Order).  Judge Rakoff subsequently entered a Memorandum further explaining his rulings on plaintiffs' preliminary injunction motion.  *See Patriarch Partners XV, LLC v. U.S. Bank N.A.*, No. 16-7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017).  In the Memorandum, Judge Rakoff rejected the argument that the Zohar I Auction was an attempt by MBIA to force the sale of equity interests in the Portfolio Companies.  *Id.* **5-6.  Judge Rakoff determined that the Zohar I collateral to be sold did not exceed the scope of the Indenture's definition of collateral.  *Id.*  His Honor also found that, even if the Indenture prohibited Zohar I from holding equity, plaintiffs did not demonstrate that US Bank intended to include in the Zohar I Auction property to which Zohar I had no right or interest.  *Id.*

[147] Auction Action, D.I. 76 (Order).

[148] *Id.*, D.I. 79 (Hr'g Tr. Dec. 7, 2016 at 4:3-8).

[149] *Id.* at 4:21-5:21.

[150] *Id.* at 11:15-20.

[151] *Id.* at 12:2-4.

[152] *See generally* Auction Action (docket minute entry dated December 21, 2016)

Given the facts just described, the Court is hard-pressed to find that the Plaintiffs have set forth any inequitable conduct by US Bank, let alone the sort of egregious behavior required of non-insiders.[153] The Plaintiffs had ample opportunity to challenge the commercial reasonableness and scope of the Zohar I Auction in the Auction Action. They took advantage of those opportunities, achieving a court-supervised auction, governed by terms that met Judge Rakoff's satisfaction. The Zohar I Auction was held; the Amended Complaint contains no allegations that US Bank failed to follow Judge Rakoff's orders; and the Auction Action was dismissed as moot by stipulation of the parties.[154] The Plaintiffs' allegations simply rehash substantially all of their old complaints about the Zohar I Auction[155] in an attempt to repackage and present them in the form of a new claim before this Court. This is the second time the Plaintiffs have done so. They also unsuccessfully pursued claims against MBIA and US Bank arising from the Zohar I Auction in the SDNY Action (as defined and more thoroughly described herein) on allegations substantially similar to those asserted in this proceeding.[156]

To the extent that Plaintiffs are upset with the fact that the original terms of the Zohar I Auction were not to their satisfaction, thus necessitating court intervention, there is no dispute that

---

[153] *See, e.g.*, *In re Yellowstone Mt. Club, LLC*, No. 09-00014, 2009 WL 3094930 (Bankr. D. Mt. May 12, 2009) (subordinating the claims of debtors' secured lender who was found to have overreached and engaged in predatory lending practices); *In re 604 Columbus Ave. Realty Trust*, 119 B.R. 350 (Bankr. D. Mass. Sep. 28, 1990) (subordinating claim of bank that misappropriated loan funds for the payment of kickbacks); *In re Just for the Fun of It of Tenn., Inc.*, 7 B.R. 166 (Bankr. E.D. Tenn. Sep. 12, 1980) (equitably subordinating the claim of a general contractor who filed an inaccurate notice of completion on which other creditors relied in extending additional credit to the debtor).

[154] Auction Action, D.I. 87 (Stipulation and Order).

[155] The Amended Complaint appears to raise two issues with the Zohar I Auction previously unaddressed by Judge Rakoff. First, that Duff & Phelps, Corp., the liquidating agent selected by MBIA to facilitate the auction, failed to properly notice the Zohar I Auction when rescheduled by Judge Rakoff to December 21. Am. Compl. ¶¶ 160-61. The Amended Complaint, however, fails to attribute this behavior to US Bank. *See Off. Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, No 10-50514, 2010 Bankr. LEXIS 2720, at *10 (Bankr. D. Del. Sept. 1. 2010) ("[C]ourts commonly hold that equitable subordination must be based on the claimant's own acts."). Moreover, it is clear from the record of the proceedings before Judge Rakoff, that there were ample opportunities to challenge the noticing, including on the auction day.

The Amended Complaint also alleges that "U.S. Bank … permitted confidential and proprietary Portfolio Company financial information to remain in the open data room after the auction's conclusion." Am. Compl. ¶ 163. This allegation is not accompanied by any specific allegation of harm to the Zohar Funds or the Plaintiffs and alone cannot sustain the equitable subordination claim against a non-insider like US Bank.

[156] In the SDNY Action, Plaintiffs alleged breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the New York Uniform Commercial Code, conversion, and trespass to chattels. Opinion and Order at **13-16. Judge Castel dismissed the claims, holding that the Plaintiffs were foreclosed from attacking the commercial reasonableness of the Zohar I Action as a result of the Auction Action and even if not, that the Plaintiffs failed to plead facts sufficient to state a claim, noting among other things that the Plaintiffs' allegations of unreasonableness were speculative and contradicted by the Plaintiffs' failure to submit a higher bid than MBIA pursuant to its "last look" rights under the Indenture. *Id.* at *14.

MBIA (not US Bank) was the party entitled under the Indentures to direct the liquidation of the Zohar I assets securing its defaulted note obligations,[157] and the Plaintiffs offer no details of the specific actions US Bank took independent of those directed by MBIA, let alone those that were outside of its duties as indenture trustee. Indeed, the totality of the allegations paint a picture that MBIA controlled the manner of the Zohar I Auction, and that US Bank acted as instructed and directed.[158] The Plaintiffs contend in a conclusory fashion that US Bank breached fiduciary and contractual obligations in acting, but do not offer any support for these conclusions outside of their arguments concerning the commercial unreasonableness of the Zohar I Auction.[159]

Finally, putting aside the fact that the Zohar I Auction was court-supervised, there are no details supporting the Plaintiffs' conclusion that the auction depressed the market value of Zohar I's assets and allowed MBIA to obtain them cheaply. The Plaintiffs allege that MBIA's credit bid was "far less than the actual worth of" the assets but never provide the Court with their view of the assets' purported worth or identify any party that was unable to participate in the Zohar I Auction as a result of US Bank's alleged wrongdoing.[160] "Naked assertions devoid of further factual enhancement" will not do.[161] Moreover, as highlighted by US Bank and Judge Castel in the SDNY Action, further negating Plaintiffs' windfall allegations are the terms of the Zohar I Indenture, which provided Octaluna I, as a holder of Class B notes, with a "last look right" enabling it to purchase the auctioned assets at a price equal to or greater than MBIA's offer.[162] A reasonable person would expect Ms. Tilton, a sophisticated party who claimed her collateral and property were being sold against her will at a "fire-sale price", to have exercised such a right through Octaluna I, but she did not.[163]

For these reasons, the Plaintiffs have failed to allege sufficient facts from which the Court can infer that the US Bank acted inequitably.[164]

---

[157] Am. Compl. ¶ 154; *see also* Petrella Decl., Ex. 1 (Zohar I Indenture) §§ 5.4(a)(ii), 5.13, 5.17.

[158] *See* Am. Compl. ¶ 155 (alleging MBIA directed US Bank to sell Zohar I's assets); *id.* ("Had MBIA's instructions been followed to the letter, the auction would have taken place within ten days of public notice"); *id.* ¶ 156 (disclosing that Ms. Tilton alleged in the Auction Action that MBIA directed US Bank to auction her equity); *id.* ¶ 163 ("at MBIA's direction, U.S. Bank repeatedly shifted auction dates without providing adequate explanation or notice", "U.S. Bank, acting at MBIA's behest, made no effort to maximize the value of the collateral"); *id.* ¶ 164 ("At MBIA's direction, the collateral sold at the auction purportedly included equity in the Portfolio Companies that Ms. Tilton in fact ultimately and beneficially owns."); *id.* ¶ 211 ("MBIA directed Defendant U.S. Bank to commence an auction").

[159] *Id.* ¶ 162.

[160] *Id.* ¶ 165.

[161] *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

[162] Petrella Decl., Ex. 1 (Zohar I Indenture) § 5.4(a)(v)(A); *see also supra* note 156.

[163] Am. Compl. ¶ 165.

[164] US Bank also highlights, and the Plaintiffs do not contest, that none of US Bank's alleged conduct relates to Zohar II and Zohar III and therefore, it would be inappropriate to subordinate its claims asserted against them.

C.    **Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination Against AMZM**

The Plaintiffs also seek to equitably subordinate AMZM's claims for conduct it allegedly took as collateral manager for the Zohar Funds at the behest of MBIA and the Zohar III Controlling Class. Plaintiffs assert that AMZM was an insider of the Zohar Funds at the time of the challenged conduct because it possessed significant authority to manage and control the Zohar Funds and their loans to the Portfolio Companies as the Zohar Funds' collateral manager.[165] AMZM does not dispute the adequacy of Plaintiffs' insider allegations.

As for inequitable conduct, Plaintiffs assert that AMZM, at the direction of MBIA and the Zohar III Controlling Class, spent multiple years pursuing "sham" litigation against them – namely the B&R Action, the 225 Action and subsequent similar litigation (based upon the purported improper Written Consents), and the RICO Action. Plaintiffs do not dispute AMZM's authority to act on behalf of the Zohar Funds[166] but argue that it acted to "bleed [Ms. Tilton] dry, wrest control of the Portfolio Companies from Plaintiffs, and seize valuable Portfolio Company equity."[167] The Plaintiffs contend that the B&R Action was motivated not by a need to obtain documents and information necessary to understand and manage the Zohar Funds but rather to take control of the Portfolio Companies away from Ms. Tilton;[168] that the Written Consents and subsequent 225 Action were contradictory to MBIA's previous acknowledgement that Ms. Tilton beneficially owned the Portfolio Company equity;[169] and that the RICO Action was meritless.[170] They allege that AMZM pursued the wasteful litigation and failed to perform its monthly and quarterly duty under the Indentures and CMAs to facilitate the creation of trustee reports detailing cash flows, expenditures, and other financial information of the Zohar Funds.[171]

As a threshold matter, AMZM argues that Plaintiffs are collaterally estopped from pursuing an equitable subordination claim on the basis of the purported "sham" litigation and missing trustee reports because of the Opinion and Order issued on September 29, 2021 by Judge P. Kevin Castel of the United States District Court for the Southern District of New York in the matter *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-00307-PKC (the "SDNY Action").[172]

---

[165] *See, e.g., id.* ¶¶ 168, 209, 215 (asserting that control of the Zohar Funds lay with the collateral managers and explaining that AMZM yielded such authority by, among other things, executing the Written Consents and then commencing the 225 Action on behalf of the Zohar Funds).

[166] *See, e.g.*, Petrella Decl. 6-8 (Zohar Funds' CMAs) § 2.2(c).

[167] Am. Compl. ¶¶ 169-71, 175, 209, 213.

[168] *Id.* ¶¶ 170-71.

[169] *Id.* ¶¶ 175-77.

[170] *Id.* ¶ 217.

[171] *Id.* ¶ 169.

[172] *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-00307-PKC, 2021 WL 4460547 (S.D.N.Y. Sept. 29, 2021) (the "Opinion and Order").

The SDNY Action was commenced by the Zohar Funds in January 2017.[173]  In November 2017, the Plaintiffs in this action[174] filed a third-party complaint against AMZM, MBIA, US Bank, Credit Value Partners, LP, Halcyon Capital Management LP, Coöperative Rabobank U.A., and Värde Partners, Inc.[175]   These third-party defendants are defendants in this proceeding.   In the SDNY Action, the Plaintiffs alleged, among other things, that AMZM breached the express and implied terms of the Indentures, CMAs, and CAAs by failing to issue regular financial reports.[176]  Judge Castel analyzed the relevant provisions of the Indentures, CMAs, and CAAs and dismissed the claims, determining that AMZM was not required to create and issue such reports.[177]   Judge Castel concluded that US Bank "was required to prepare and arrange for delivery of the reports, and the Zohar Funds were required to deliver such reports[.]"[178]

Judge Castel also analyzed whether "AMZM breached its duties by aiding MBIA, including through prosecuting various 'sham' litigations, attempting to remove Tilton from her positions at the Portfolio Companies, and participating in MBIA's 'scheme' to steal the Portfolio Companies' equity for itself."[179]   The "sham" litigations at issue in the SDNY Actions were the same as those challenged here – the B&R Action, 225 Action, and RICO Action.   Judge Castel determined that the Plaintiffs did not plausibly allege that they were "sham" litigations.[180]   In doing so, he correctly highlighted that:

---

[173] *See* SDNY Action, D.I. 1 (Complaint).

[174] Ms. Tilton's affiliates, Ark II CLO 2001-1 and Ark Investment Partners II, L.P., were also third-party plaintiffs.  SDNY Action, D.I. 88 (Answer, Counterclaims, and Third Party Complaint).

[175] *Id.*

[176] Opinion and Order, at **16, 18.

[177] *Id.* at **16-17.

[178] *Id.* at *16.

[179] *Id.* at *18.

[180] *Id.*

> AMZM and the Zohar Funds were successful in both the books and
> records suit[181] and the Delaware 225 Action.[182] . . . A party
> successfully vindicating its rights can hardly be considered frivolous
> or a "sham."[183]

Moreover, Judge Castel noted that the RICO Action was dismissed due to a lack of subject matter jurisdiction and not because the claim was "immaterial, insubstantial, or frivolous."[184] Finally, he determined that "[a]s alleged, Tilton was never removed by AMZM's actions" and that "AMZM's alleged 'participat[ion]' in MBIA's 'scheme' amounts to no more than AMZM pursuing litigation with the Patriarch Parties over the ownership of the Portfolio Company equity and attempting to

---

[181] In the B&R Action, the Zohar Funds alleged that the Patriarch Entities, among others, breached their contractual obligations by failing to turn over certain documents to AMZM to assist with the collateral manager transition. Vice Chancellor Joseph R. Slights III of the Delaware Chancery Court conducted a trial and determined that the clear and unambiguous terms of the collateral management agreements required the production of the subject documents so that AMZM could function as the successor collateral manager for the Zohar Funds. *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, C.A. No. 12247-VCS, 2016 WL 6248461, at *7 (Del. Ch. Oct. 26, 2016). The decision was affirmed on appeal. *Patriarch Partners, LLC v. Zohar CDO 2003-1, LLC*, 165 A.3d 288 (Del. 2017). Similar to the theme of this proceeding, Ms. Tilton argued in the B&R Action that she owned the equity of the Portfolio Companies (referred to as the "equity upside interests"). Vice Chancellor Slights did not decide the issue but noted that "Patriarch's attempt at trial to explain or describe equity upside interests was, at best, confusing and, at worst, codswallop." *Zohar CDO 2003-1, LLC*, C.A. No. 12247-VCS, 2016 WL 6248461, at *14 n.128.

[182] Similar to this proceeding, Ms. Tilton argued to the Delaware Chancery Court that the 225 Action was brought as part of MBIA's "larger plan to seize control of and sell the Portfolio Companies (or their assets) . . . to recover money that MBIA was forced to pay out as Credit Enhancer". *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, C.A. No. 12946-VCS, 2017 WL 5956877, at *4 (Del. Ch. Nov. 30, 2017). In rendering a ruling in favor of the Zohar Funds following extensive discovery, a six-day trial, and "voluminous briefing on myriad of issues", Vice Chancellor Slights found that the Zohar Funds were the beneficial owners of 225 Companies' equity based on the clear, unambiguous language of the relevant transaction documents. *Id.* at **3, 19, 28. The Court also determined that AMZM's Written Consents, executed on behalf of the Zohar Funds, were valid, effectively removed Ms. Tilton from the boards of the 225 Companies, and properly elected new directors. *Id.* at **2-3.

   The Chancery Court decision was appealed. The appeal, however, was dismissed with prejudice after the parties agreed it was moot following Ms. Tilton's March 2020 voluntary resignation from her positions at the Portfolio Companies and agreement to withdrawal her objections to the consents and to the Zohar Funds' claim of beneficial ownership of the equity in the Portfolio Companies. *See generally Order*, *FSAR Holdings, Inc. v. Zohar II 2005-1 Ltd.*, C.A. No. 12946, D.I. 151 (Del. Oct. 13, 2020); *Order Granting in Part Debtors' and Independent Director's Joint Emergency Motion for an Order Declaring That the Debtors Control the Portfolio Companies and Granting Related Relief*, Case No. 18-10512, D.I. 1542 (Mar. 30, 2020).

[183] Opinion and Order, at *18.

[184] *Id.* (quoting *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 652, n.9 (S.D.N.Y. 2017)).

remove Tilton from her positions at the Portfolio Companies."[185]   The Plaintiffs were given permission to seek leave to amend the third-party complaint, but they did not do so.[186]

"Collateral estoppel prohibits the relitigation of issues that have been adjudicated in a prior lawsuit."[187]   Because the Opinion and Order was issued by a federal court, federal principles of collateral estoppel apply.[188]   Under those principles, four elements must be found present to estop a party from relitigating an issue:   "(1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment."[189] !

All four elements exist with respect to Plaintiffs' subordination claim based on AMZM's "sham" litigation and missing trustee reports.   It presents the same issues, allegations, and conclusions relied upon by the Plaintiffs in the SDNY Action to support their third-party claims against AMZM.   The parties presented the issues to Judge Castel who thoroughly considered and rejected the Plaintiffs' contentions that AMZM was responsible for trustee reports and that the B&R Action, 225 Action, and the RICO Action were sham litigations pursued for the purpose of removing Ms. Tilton from the Portfolio Companies and stealing her equity.[190]

Plaintiffs argue that the Opinion and Order do not give rise to preclusion because it did not dispose of all the claims in the SDNY Action, resulting in an appealable judgment ending the litigation on the merits.   However, the Third Circuit has rejected the contention that a decision must be appealable to satisfy the finality element of collateral estoppel.[191]   In *In re Docteroff*, the

---

[185] *Id.*

[186] SDNY Action, D.I. 220.

[187] *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997).

[188] *Id.*

[189] *Id.*

[190] Plaintiffs argue that Judge Castel did not determine the fundamental motivations of AMZM – only that there were nonfrivolous legal grounds for AMZM's litigation.  Judge Castel determined the issue that this Court would be tasked with deciding here if the proceeding were to continue – namely, whether the litigation pursued by AMZM was a sham; in other words, whether it was brought for a legitimate purpose or to abuse or for some other improper purpose.  Faced with Plaintiffs' same arguments regarding the Defendants' motivations, His Honor answered that question based on the objective merits of the litigations and determined that nothing was a sham.  Opinion and Order, at *18; *see also Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, 620 B.R. 456, 464 (S.D.N.Y. 2020) (denying Zohar Funds' request to transfer venue of SDNY Action to this Court and noting that "paragraphs in the Subordination Complaint are grafted verbatim from the Patriarch Complaint.  . . .  [T]he "steal the equity" themes that pervade the Patriarch Complaint are infused in the Subordination Complaint.").

[191] *Docteroff*, 133 F.3d at 216; *see also First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 569 (3d Cir. 1991) ("In this case, the order of the state court granting summary judgment on liability was not final for purposes of appeal, but that does not deny its preclusive effect in the bankruptcy court.  Unlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable.").

Court explained that "for purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."[192]  The factors relied upon by the circuit court in *Docteroff* to determine finality for purpose of issue preclusion apply equally here:  there is nothing suggesting that Judge Castel intends to revisit the issues concerning the "sham" litigation or the trustee reports, that the findings are unreliable, that the Plaintiffs did not have sufficient opportunity to be heard, or that Judge Castel gave insufficient consideration to the issues.[193]   The Opinion and Order are sufficiently final, and re-litigation of the issues already decided would be wasteful for all involved.  Accordingly, the Court agrees that the Plaintiffs are collaterally estopped from seeking equitable subordination against AMZM on the alleged "sham" litigation and failure to issue trustee reports.

Although AMZM's pursuit of litigation is the primary basis for Plaintiffs' equitable subordination claim,[194] they have also argued that AMZM's Written Consents were wrongful and that it was not qualified to be appointed as collateral manager.  The Delaware Chancery Court determined that the Written Consents were valid.[195]  AMZM's subsequent written consents and enforcement actions spring from that determination.  No specifics regarding AMZM's lack of qualifications have been alleged but, even so, AMZM did not control its own appointment, and any lack of qualification cannot alone justify the extreme remedy of subordination, even against an insider like AMZM.

Because the facts alleged by the Plaintiffs are not sufficient to allow this Court to infer that AMZM acted inequitably, the Court will dismiss the claim.

### D.    Plaintiffs Have Not Stated A Plausible Claim For Equitable Subordination Against MBIA And The Zohar III Controlling Class

#### 1.    MBIA, Inc. and Värde Partners, Inc.

MBIA Inc. and Värde Partners, Inc. request dismissal from the proceeding because they did not file claims against the Zohar Funds.[196]  Plaintiffs argue that the entities should remain Defendants in the event that they submit a claim.   The law supports dismissal of equitable

---

[192] *Docteroff*, 133 F.3d at 216 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982)).

[193] *Id.*

[194] Plaintiffs admitted in briefing that AMZM's failure to issue trustee reports is not an independent basis for equitable subordination.  *See* Adv. D.I. 192 ¶ 85.

[195] *See supra* note 182.

[196] The Court independently reviewed the claims register and did not find any claims filed by MBIA Inc. The time to file claims against the Zohar Funds has passed.  *See* Case No. 18-10512, D.I. 2778 (establishing October 25, 2021 as the general bar date).  US Bank submitted a claim on behalf of the Zohar III noteholders but did not identify the noteholders.  Regardless, Plaintiffs do not dispute that Värde Partners, Inc. has not asserted a claim.

subordination claims against entities that have not filed claims against a debtor.[197]  Accordingly, the Court will dismiss the claim against MBIA Inc. and Värde Partners, Inc.

### 2.       The Amended Complaint's Group Pleading Targeted at the Zohar III Controlling Class is Permissible

The members of the Zohar III Controlling Class argue that the equitable subordination claim against them must be dismissed because the Plaintiffs' allegations are directed at them as a group and do not differentiate between them as separate entities.  Plaintiffs defend the adequacy of their pleading, highlighting that the Amended Complaint alleges that the entities of the Zohar III Controlling Class formed a unified group that exercised power together under the governing Indenture through a common interest agreement.[198]  The Court agrees that the Plaintiffs' pleading is permissible under these circumstances and that the members of the Zohar III Controlling Class have been placed on sufficient notice of the nature of the claims asserted against them.[199]

### 3.       The Amended Complaint Sufficiently Alleges that MBIA and the Zohar III Controlling Class Were Insiders Upon the Appointment of AMZM Through the Petition Date

The challenged conduct of the Amended Complaint is alleged to have spanned from 2012 to today, approximately ten years.  Because a creditor's status as an insider is an important factor in determining whether the creditor acted inequitably, the Court must carefully examine whether the Amended Complaint sufficiently alleges that MBIA and the Zohar III Controlling Class qualified as insiders when taking each complained-of act.

Plaintiffs allege that MBIA and Zohar III Controlling Class have been insiders of the Zohar Funds since the funds inception because, as "Controlling Party" and "Controlling Class", they consistently exercised control over the day-to-day activities of the Zohar Funds.[200]  This is not a plausible allegation given other conflicting allegations in the Amended Complaint that Ms. Tilton, through the Patriarch Entities as collateral manager, controlled the Zohar Funds until AMZM was

---

[197] *See, e.g.*, *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010) (collecting cases and holding that "[t]he great weight of authority is that 'Section 510(c) does not permit subordination absent an allowed claim.'" (quoting *In re Fox Hill Office Invs., Ltd.*, 101 B.R. 1007, 1022 (Bankr. W.D. Mo. 1989)); *accord Miller v. McDonald (In re World Health Alternatives, Inc.)*, 385 B.R. 576, 597 (Bankr. D. Del. 2008) (dismissing trustee's equitable subordination claim when he failed to allege that defendants filed claims).

[198] *See* Am. Compl. at 3 n.3 (alleging that the members of the Zohar III Controlling Class entered into a common interest agreement to work together as the controlling party of Zohar III).

[199] *See Hawk Mt. LLC v. Mirra*, No. 13-2083, 2016 WL 4541032, at *2 (D. Del. Aug. 31, 2016) (permitting group pleading where defendants were alleged to have acted together to facilitate a general scheme).

[200] Am. Compl. ¶¶ 205-06.

appointed as collateral manager in March 2016.[201]  At this point in time, however, it is sufficiently pled that MBIA and the Zohar III Controlling Class became insiders of the Zohar Funds as persons in control.  AMZM does not contest that it was an insider of the Zohar Funds; and the Plaintiffs allege that MBIA and the Zohar III Controlling Class appointed AMZM and then controlled it as they retained the right to remove and replace AMZM if it failed to do as they pleased.[202]  Plaintiffs further allege that AMZM did in fact take direction from MBIA and the Zohar III Controlling Class by commencing litigation and executing the Written Consents.[203]

MBIA and the Zohar III Controlling Class do not dispute that they selected AMZM and were able to direct it but argue that they were merely exercising post-default rights given to them under the Indentures to recover on their claims.  Courts consistently hold that a creditor's exercise of normal and reasonable financial controls over a debtor that are incident to the creditor-debtor relationship does not, by itself, make the creditor an insider.[204]  However, the purported influence of MBIA and the Zohar III Controlling Class over AMZM pushes the parties' relationship further and is sufficient to support the Plaintiffs' insider allegation, especially in light of the admissions of MBIA and the Zohar III Controlling Class that the Zohar Funds have no employees or operating business and exist for one singular purpose – to satisfy their payment obligations to the noteholders in accordance with the Indentures.[205]  Whether or not AMZM exercised its own day-today independent decision-making and authority over the Zohar Funds in pursuing that purpose, as

---

[201] *Id.* ¶¶ 60, 66; *see also id.* ¶ 168 (alleging that MBIA and the Zohar III Controlling Class obtained day-to-day control over the Zohar Funds' actions from the appointment of AMZM through the commencement of the bankruptcy cases).

[202] *Id.* ¶¶ 207-09.

[203] *Id.* ¶¶ 175, 177, 182, 185.

[204] *See, e.g.*, *Champion*, No. 10-50514, 2010 Bankr. LEXIS 2720, at *18 ("[W]here a lender's influence on a debtor's actions merely arises by operating of bargained-for rights under a credit agreement, those 'reasonable financial controls negotiated at arms'-length between a lender and a borrower do not transform a lender into an insider.'" (quoting *Radnor*, 353 B.R. at 847)); *id.* at **22-23 (determining that complaint's allegations were insufficient to allow the court to infer insider status where they indicated nothing more than a normal distressed-borrower/lender relationship in which debtor managed its own affairs and used its own judgment); *Radnor*, 353 B.R. at 840-41 (finding that monitoring the business, attending board meetings, and accessing confidential information did not give rise to insider status); *Atl. Builders Group, Inc. v. Old Line Bank (In re Prince Fredrick Inv., LLC)*, 516 B.R. 778, 784-85 (Bankr. D. Md. 2014) (reviewing and approving all payment applications and change orders on a construction project did not give the lender control as such rights sprung from a contract, did not evince any actual control, and were reasonable lender protections).

[205] *See, e.g.*, *Exide*, 299 B.R. at 743 (finding sufficient allegations of control where lenders dictated timing and scope of bankruptcy and influenced key decision-making of the board of directors, including causing the replacement of the chief financial officer, all for their benefit); *Broadstripe*, 444 B.R. at 79-80 ("The insider creditor is typically in a position to exert control over the debtor. . . . Courts have looked at various factors in determining a creditor's insider status, including whether the creditor:  (1) attempted to influence decisions made by the debtor; (2) selected new management for the debtor . . .; (7) managerial control . . . ."); *Champion*, No. 10-50514, 2010 Bankr. LEXIS 2720, at *18 ("Control sufficient to merit insider status may be established by facts showing that the lender dictated day-to-day management and operation of the debtor or made decisions for the debtor regarding replacement of management or filing for bankruptcy.").

alleged by MBIA and the Zohar III Controlling Class, is a factual matter that the Court cannot decide now.

Nonetheless, the Amended Complaint fails to plausibly allege that MBIA and the Zohar III Controlling Class retained their alleged control of the Zohar Funds following the commencement of the bankruptcy cases and the approval of the Settlement Agreement. No specifics are alleged in the Amended Complaint that would support such a finding. Moreover, the Settlement Agreement that was approved shortly after the commencement of the Zohar Funds' bankruptcy cases allowed former Bankruptcy Judge Gross as mediator to appoint The Honorable Joseph J. Farnan, Jr., former United States Judge for the District of Delaware, as independent director for each of the Zohar Funds.[206]    At the time of his appointment, the Independent Director was unaffiliated with the Zohar Funds and the parties to this proceeding and had played no role in connection with and held no claim against or interest in any of the Zohar Funds. The Settlement Agreement also provided for the replacement of AMZM as collateral manager of the Zohar Funds. The Plaintiffs in the Amended Complaint admit these facts[207] and fail to allege anything that would overcome the Debtors' post-petition independence.

Accordingly, for purposes of analyzing whether the Plaintiffs have sufficiently alleged that MBIA and the Zohar III Controlling Class have acted inequitably, the Court will consider MBIA and the Zohar III Controlling Class as insiders of the Zohar Funds from March 2016 until the commencement of the Zohar Funds' bankruptcy cases.

> ### 4.    The Amended Complaint Does Not Sufficiently Allege a Plausible Claim that MBIA and the Zohar III Controlling Class Acted Inequitably
>
> #### a.    The Zohar III Controlling Class

The Amended Complaint challenges four acts of the Zohar III Controlling Class, all taken when purportedly an insider.[208]    First, the Zohar III Controlling Class selected AMZM as collateral manager without consulting the Plaintiffs as previously promised.[209]    Second, the Zohar III

---

[206] *See* Case No. 18-10512, D.I. 266; *see also* Am. Compl. ¶ 50.

[207] Am. Compl. ¶ 11 ("From 2016 to the filing of the Chapter 11 Cases, AMZM was the Collateral Manager of each of the Zohar Funds."); *id.* ¶ 46 ("AMZM was terminated as collateral manager under the Settlement Agreement"); *id.* ¶ 47 ("Ms. Tilton was previously the sole director of each of the Zohar Funds; under the Settlement Agreement, she was replaced with a new independent director").

[208] *Id.* ¶ 217.

[209] *Id.* Plaintiffs' exact position regarding the actions of the Zohar III Controlling Class and its role within MBIA's scheme is less than clear. At several points in the Amended Complaint, Plaintiffs allege that MBIA controlled AMZM's appointment and subsequent behavior and that the Zohar III Controlling Class merely consented and assented to the actions. *See, e.g., id.* ¶¶ 143, 175, 177, 185, 188. However, at other points, Plaintiffs accuse the Zohar III Controlling Class of taking a proactive role with respect to the appointment of AMZM and its actions as collateral manager. *Id.* ¶ 169 ("MBIA and the Zohar III Controlling Class used their control of AMZM to direct AMZM to pursue, on behalf of the Zohar Funds, a campaign of unnecessary, frivolous, and costly litigations against Ms. Tilton . . . ."); ¶ 182 ("MBIA and the Zohar III

Controlling Class directed AMZM to pursue a baseless litigation campaign against the Plaintiffs through AMZM.[210] Third, the Zohar III Controlling Class directed AMZM to execute the Written Consents, exercising Ms. Tilton's shares in the 225 Companies and removing her as director.[211] Fourth, the Zohar III Controlling Class moved to dismiss the Zohar Funds' bankruptcy cases[212] and wrongfully interfered with the monetization process and sought to undermine its success.[213]

The Zohar III Controlling Class argues, and the Plaintiffs do not dispute, that their prepetition actions were, in fact, authorized by the plain language of the Indenture. Indeed, section 5.4(a) of the Zohar III Indenture, which addresses remedies upon an event of default, provides that "the Trustee may after notice to the Noteholders (and with the consent of the Controlling Class), and shall, upon direction by the Controlling Class . . . (v) exercise any other rights and remedies that may be available at law or in equity."[214] Moreover, section 5.13 provides the Controlling Class with "the right to cause the institution of . . . and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee . . . ."[215] Finally, section 14.4(d) provides that "neither the Issuer nor the Collateral Manager will enter into any agreement . . . selecting or consenting to a successor Collateral Manager . . . (iv) if . . . a Majority of each Class of Notes . . . object to such successor Collateral Manager . . . ."[216]

Moreover, as explained with respect to AMZM, Judge Castel has already determined that the B&R Action, the RICO Action, and the 225 Action were not sham litigations, and the Written Consents were determined by the Delaware Chancery Court to be valid. With respect to the appointment of AMZM, there are no allegations that the Zohar III Controlling Class made any

---

Controlling Class escalated their campaign against Ms. Tilton by approving AMZM's filing of a civil RICO action . . . ."). For purposes of this decision, the Court will analyze the latter allegations.

[210] *Id.* ¶¶ 169, 217; *see also id.* ¶¶ 170-71 (describing the B&R Action); *id.* ¶¶ 177-81 (describing the 225 Action); *id.* ¶ 182-83 (describing the RICO Action).

[211] *Id.* ¶¶ 177, 217.

[212] *Id.* ¶ 8.

[213] *Id.* ¶¶ 203, 217.

[214] *See* Appendix, Ex. 1 § 5.4(a).

[215] *Id.* § 5.13.

[216] *Id.* § 14.4(d).

28

purported promises to consult Ms. Tilton during such process,[217] and it was permitted to control the selection of a successor collateral manager under the transaction documents.[218]

Finally, Plaintiffs fail to sufficiently allege that the Zohar III Controlling Class engaged in any inequitable post-petition conduct. Specific conduct alleged to support purported interference with the monetization process has been struck and cannot be considered by the Court.[219] That then leaves the allegations that the Zohar III Controlling Class filed a motion to dismiss the Zohar Funds' bankruptcy cases, which the Court cannot agree is inequitable.

In sum, the Plaintiffs have failed to allege sufficient facts from which the Court can infer that the Zohar III Controlling Class acted inequitably.

### b.    MBIA Insurance

As already mentioned, the real target of Plaintiffs' ire is MBIA. Plaintiffs allege that its scheme to steal the Portfolio Company equity and damage the Plaintiffs has played out over the course of about ten years, starting with efforts between 2012 and 2015 to prevent a global restructuring of the Zohar Funds and ending with bad faith conduct in these cases. As previously summarized, MBIA's alleged inequitable conduct relates to: (1) the 2012-2015 negotiations surrounding extending the maturity date of the Zohar I notes and consensually restructuring the Zohar Funds' note obligations; (2) the SEC; (3) the Zohar I Auction; (4) the resignation of the Patriarch Entities as the Zohar Funds' collateral managers; (5) the appointment of AMZM as replacement manager; (6) AMZM's litigation on behalf of the Zohar Funds; (7) AMZM's execution of the Written Consents; and (8) MBIA's post-petition actions.

Like the challenged actions of the other Defendants, the plausibility of most of the supposed inequities committed by MBIA is undermined by governing documents and past litigation results. The Court has addressed the lack of inequitable conduct related to the Zohar I

---

[217] *See, e.g.*, Am. Compl. ¶ 167 ("MBIA seized the opportunity to hire AMZM as the successor collateral manager of Zohar I and II. Ms. Tilton had no role or input in MBIA's decision to hire AMZM, even though the parties agreed that she would participate in the process of hiring the new collateral manager, and she had made herself available to interview possible successors and provide guidance about the transition. MBIA instead reneged on its promises and sidelined her. Upon information and belief, MBIA conspired with the Zohar III Controlling Class to appoint AMZM as that fund's collateral manager, again without Ms. Tilton's input . . . ."); *id.* ¶ 175 ("This action was entirely contrary to MBIA's representations to Ms. Tilton that it would not interfere with her directorship positions post-resignation as collateral manager . . . ."); *id.* ¶ 209 ("Ms. Tilton had no role or input in the decision to hire AMZM, even though MBIA had previously agreed that she would participate in the process . . . .").

[218] Petrella Decl., Ex. 5 § 5.4; Appendix, Ex. 1 § 14.4(d).

[219] *See supra* note 11.

Auction,[220] AMZM's litigation, and the Written Consents.[221] For the same reasons discussed with respect to the Zohar III Controlling Class, the alleged inequitable post-petition conduct of MBIA is unsupported.[222] That leaves MBIA's conduct related to the 2012-2015 negotiations, the SEC, and the resignation of the Patriarch Entities and appointment of AMZM. For the former two swaths of conduct, the starting and ending point of the analysis is the Amended Complaint's allegations. For the last, the Court can look substantially to Judge Castel's Opinion and Order.

### i.    The Extension and Restructuring Negotiations

Plaintiffs allege the following with respect to the extension and restructuring negotiations: The 2008 and 2009 financial crisis jeopardized Zohar I's ability to repay its noteholders at maturity on November 20, 2015.[223] Ms. Tilton foresaw this result and started discussions with the Zohar I noteholders over extending and aligning the notes' maturity date with the January 2017 maturity date of the Zohar II notes.[224] MBIA actively participated in these discussions. A meeting between Ms. Tilton and the Zohar I noteholders took place on October 5, 2012.[225] A representative of MBIA, Mr. McKiernan, attended.[226] At that meeting, Mr. McKiernan expressed interest in extending Zohar I's maturity date.[227] It is then alleged that on March 8, 2013, Mr. McKiernan and Ms. Tilton discussed possible terms of an extension that could be presented to all of the Zohar I noteholders, as all noteholders needed to consent.[228] At this time, the Plaintiffs allege that MBIA provided Ms. Tilton with the terms it needed to consent to an extension.[229] A week later, on March

---

[220] As noted, Plaintiffs allege MBIA dictated the terms of the Zohar I Auction. But even if MBIA tried to pursue a commercially unreasonable auction process so that it could depress bidding for the Zohar I collateral, Judge Rakoff prevented that result through his oversight. Accordingly, there was no harm except for the incurrence of legal fees.

[221] *See also* Petrella Decl., Exs. 1-2 (Zohar I and Zohar II Indentures) § 5.4 (providing for, among other things, the right to direct the trustee to sell collateral, institute proceedings for the collection of all amounts payable on the notes or under the Indenture, and exercise any other rights and remedies available at law or in equity); *id.* § 5.13 (providing the Controlling Party with the right to cause the institution of any proceeding for any remedy available to the trustee for exercising any trust, right, remedy, or power conferred on the trustee); *id.* § 5.17 (discussing collateral sales and providing the Controlling Party with the right to direct the trustee to postpone any sale of collateral); *id.* § 7.5 (obligating the issuer, Zohar subsidiary, and the collateral manager to take actions as necessary or may be directed by the Controlling Party to secure the rights and remedies of the secured parties).

[222] In addition to seeking dismissal of the bankruptcy cases, MBIA is also alleged to have had second thoughts about its entry into the Settlement Agreement, but the Court approved it nonetheless. Accordingly, there was no harm.

[223] Am. Compl. ¶¶ 95-96.

[224] *Id.* ¶ 97.

[225] *Id.* ¶ 99.

[226] *Id.*

[227] *Id.*

[228] *Id.* ¶¶ 99, 103.

[229] *Id.* ¶ 103.

15, 2013, Ms. Tilton proposed a term sheet to Mr. McKiernan that included many of MBIA's terms.[230]

In late May, Mr. McKiernan sent a counter-proposal but made it clear that the class A-3 noteholder had not yet agreed.[231]  Details of the events between May and October 2013 are not provided but Plaintiffs admit that it was clear to them by October 2013, that MBIA would not agree to Ms. Tilton's March 15 term sheet.[232]  Ms. Tilton then pivoted and hired an investment bank, Moelis & Company ("Moelis"), to help develop a global restructuring of the Zohar Funds.[233]

Between the end of 2013 through 2015, MBIA, Moelis, and Patriarch[234] discussed an overall restructuring but could not obtain the consent of the class A-3 noteholder to extend the Zohar I maturity date.[235]  Plaintiffs admit that Mr. McKiernan devoted considerable time to the restructuring efforts, meeting monthly and speaking weekly with Ms. Tilton as well as making "countless" diligence requests to aid in MBIA's evaluation of a possible restructuring.[236]  Ultimately, Ms. Tilton and Moelis developed a restructuring term sheet that was presented to MBIA.[237]  MBIA engaged with Patriarch after receiving the term sheet and even negotiated directly with Moelis.[238]  In mid-February 2015, Mr. McKiernan, Ms. Tilton, and representatives of MBIA's advisors and Moelis met in person to discuss the current state of negotiations concerning both the maturity date extension and the restructuring.[239]  At this time, it is alleged that MBIA still supported a global restructuring and remained supportive.[240]

The Plaintiffs then claim that, in March, Moody's put MBIA Insurance's financial strength rating on a "negative" outlook given the meaningful strain MBIA's exposure on the Zohar I and II notes had on its capital and liquidity profiles.[241]  In April, the negotiations allegedly started to break-down.  On April 13, 2015, MBIA informed Ms. Tilton that it would not consent to an extension of the Zohar I maturity date without additional concessions.[242]  It also requested more

---

[230] *Id.* ¶ 105.

[231] *Id.* ¶ 106.

[232] *Id.* ¶ 107.

[233] *Id.*

[234] The term "Patriarch" is undefined in the Amended Complaint.  The Court assumes it refers collectively to Ms. Tilton and her relevant affiliates.

[235] *Id.* ¶ 108.

[236] *Id.* ¶¶ 108-09.

[237] *Id.* ¶ 110-11.

[238] *Id.* ¶ 112.

[239] *Id.* ¶¶ 114-15.

[240] *Id.* ¶¶ 116, 119.

[241] *Id.* ¶ 117.

[242] *Id.* ¶ 120.

financial information about the Portfolio Companies.[243]  By August 2015, MBIA Inc. publicly expressed support for a restructuring but noted that "a proposal to that end has not materialized at this point . . . ."[244]  No facts regarding further restructuring negotiations are provided except that negotiations continued into October 2015 with MBIA sending a proposal to Ms. Tilton.[245]  Zohar I then defaulted the next month on its notes.  As credit enhancer, MBIA Insurance paid off Zohar I's obligations to the Class A-1 and A-2 notes.  MBIA Insurance did the same with respect to Zohar II's Class A-1 and A-2 notes when it defaulted in 2017.

After considering the foregoing factual allegations in a light most favorable to the Plaintiffs, the Court cannot conclude that they indicate any untoward behavior on the part of MBIA or support the conclusion that it acted with an improper purpose.  Plaintiffs admit that MBIA represented to Ms. Tilton and her advisors over and over again that they supported a maturity date extension and global restructuring.  Plaintiffs further tell a detailed story of the significant efforts made by all parties to reach agreement that spanned three years and ended one month before Zohar I's maturity date.  There is no dispute that final terms for an extension and restructuring were never agreed upon.[246]  From these facts the Plaintiffs ask this Court to infer that MBIA, when faced with serious financial distress, was intentionally "stringing [Ms. Tilton] along"[247] for three years with the false promise of a maturity extension and global restructuring in order to cause the Zohar I default and allow it to implement a plan to steal and sell her assets.  Reaching such a conclusion from the facts presented would be unreasonable.[248]

In fact, the Amended Complaint's own allegations surmise a conflicting theory for MBIA's behavior - that MBIA believed it would be in a better position to achieve a consensual global restructuring of the Zohar Fund note obligations after Zohar I defaulted and MBIA paid the claims of the Class A-1 and A-2 notes and became subrogated to the insured noteholders.[249]  Of course, the parties were never able to consensually agree on a restructuring and the Amended Complaint sheds no light on the reasons why.

Moreover, it defies logic that MBIA would intentionally cause the Zohar Funds to default and allow itself to incur major losses that it allegedly knew it could not afford when facing its own liquidity crisis, only to voluntarily embark in a war against Ms. Tilton and her affiliates to try and steal her assets and save themselves.  Why not agree to a consensual restructuring of the Zohar Fund note obligations so as not to incur further losses in the first place?  And, if Ms. Tilton's claims surrounding ownership of the Portfolio Company equity are true (including that MBIA knew all

---

[243] *Id.* ¶ 121-22.

[244] *Id.* ¶ 123.  Plaintiffs believe that this statement was MBIA's denial that it received a restructuring proposal from Patriarch.  The Court does not draw the same conclusion.

[245] *Id.* ¶ 145.

[246] *See also* Opinion & Order at *8 (finding that an agreement was never consummated).

[247] Am. Compl. ¶ 128.

[248] *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[249] Am. Compl. ¶¶ 125-26.

along that she owned the equity), why would MBIA chose such a lengthy path that presented certain and arduous litigation, with an uncertain outcome on an uncertain timeline, when MBIA "needed money and needed it fast?"[250]  No facts have been provided to answer these obvious questions and to support such a seemingly irrational business decision as advanced by the Plaintiffs.[251]

### ii.    The SEC

Plaintiffs' allegations regarding MBIA's interactions with the SEC are equally flawed. They allege that, while MBIA was negotiating an extended maturity date with Ms. Tilton, it secretly communicated on a regular basis with the SEC to feed the agency misinformation to provoke an investigation into, and enforcement action against, Ms. Tilton and the Patriarch Entities.[252]  Plaintiffs, however, do not provide any details regarding these interactions and the specific misinformation provided.  Later in the Amended Complaint, the Plaintiffs even categorize the communications simply as MBIA's "self-serving version of events."[253]  A self-serving version of events does not necessarily mean that the information tendered to the SEC was false.  And even if it was, there is no explanation that would suggest a causal connection between MBIA's actions and the SEC's independent judgment to commence an investigation and pursue an enforcement action.  In sum, there are insufficient factual allegations to allow this Court to make a reasonable inference that MBIA acted inequitable in any interaction if may have had with the SEC.[254]

Plaintiffs further allege that MBIA and the SEC entered into a "secret deal" pursuant to which the SEC agreed to provide MBIA with nonpublic Portfolio Company financial information subpoenaed from Ms. Tilton.[255]  According to the Plaintiffs, email correspondence reveals that "the agency allowed MBIA to 'freely commence litigation against Ms. Tilton' and her 'related entities' using the confidential 'information MBIA learn[ed] in the documents,' while MBIA insisted that the SEC 'not inform Ms. Tilton . . . that the documents and information have been provided to MBIA' without first apprising MBIA."[256]

---

[250] *Id.* ¶ 132.  Even if MBIA was able to obtain all of the Portfolio Company equity, monetization would still require material time which MBIA allegedly did not have.

[251] If MBIA did indeed pursue such a plan, its mistake in doing so cannot be debated.  MBIA is facing enormous losses on account of its claims against the Zohar Funds given the lackluster results of the Portfolio Company monetization process, not to mention enormous legal bills.

[252] *Id.* ¶¶ 135-36.  The Plaintiffs try to use this fact in support of their theory that MBIA had no intention of completing a restructuring with Ms. Tilton.  However, there are no facts alleged to support such a conclusion.

[253] *Id.* ¶ 138.

[254] *Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

[255] Am. Compl. ¶ 138.

[256] *Id.*

First, Plaintiffs' own allegation of a secret deal is contradicted by their admission that the SEC was permitted to inform Ms. Tilton of the information sharing arrangement so long as MBIA was given advance notice. There is no allegation that MBIA was able and did, in fact, prevent the SEC from revealing the arrangement with Ms. Tilton. Second, the exact nature of the information received by MBIA from the SEC and how MBIA actually used it to harm Ms. Tilton or advance its own interests are unexplained except for Plaintiffs' allegation that the material confirmed the value of certain Portfolio Companies and solidified MBIA's resolve to steal Ms. Tilton's equity. However, given that the Plaintiffs contend that substantial sensitive financial information about the Portfolio Companies and their significant value was already given to MBIA during the restructuring negotiations with Patriarch, it is difficult to understand how MBIA's receipt of further information would be inequitable.[257]

### iii.    The Collateral Managers' Resignation and Appointment Process

The final conduct challenged by the Plaintiffs relates to the circumstances of the Patriarch Entities' resignation as collateral manager and AMZM's appointment as successor. Plaintiffs contend that Ms. Tilton was induced by MBIA to cause the Patriarch Entities to resign by false assurances that she would retain her ownership and control of the Portfolio Companies.[258] They allege that in October 2015 during the restructuring negotiations, Mr. McKiernan sent a proposal to Ms. Tilton stating that, "even if Ms. Tilton were to 'resign from all of [her] roles in relation to Zohar I and II,' MBIA recognized that she would 'retain [her] rights . . . in underlying Portfolio Companies."[259] Then, following the Zohar I maturity date, Ms. Tilton and Patriarch Partners XV commenced an involuntary bankruptcy proceeding against Zohar I.[260] Plaintiffs allege that Ms. Tilton resolved the proceeding "based on the . . . understanding" that MBIA agreed that Ms. Tilton would step down as collateral manager, a replacement collateral manager would be appointed, and, as noted on the record by United States Bankruptcy Judge Robert D. Drain, she would "remain in her positions with the underlying portfolio companies[.]"[261]

Similar to the propriety of AMZM's litigation, the Plaintiffs are estopped from relying on the foregoing representations to support their equitable subordination claim. They have already unsuccessfully pursued in the SDNY Action claims of fraud, negligent misrepresentation, and promissory estoppel against MBIA on the same "series of misrepresentations and omissions that ultimately caused the Patriarch Parties to resign as collateral manager of the Zohar Funds."[262]

---

[257] *Id.* ¶¶ 113, 122; *see Iqbal*, 556 U.S. 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" (quoting FED. R. CIV. P. 8(a)(2))).

[258] Am. Compl. ¶¶ 145, 148-52.

[259] *Id.* ¶ 145.

[260] *Id.* ¶ 149; *see also In re Zohar CDO 2003-1, Ltd.*, Case No. 15-23680 (RDD) (Bankr. S.D.N.Y.) ("Involuntary Bankruptcy").

[261] Am. Compl. ¶ 148.

[262] Opinion and Order, at **8-10.

After reviewing the alleged misstatements and dismissing the claims as implausibly stated, Judge Castel noted that "[t]he Patriarch Parties have made significant use of creative license in characterizing the statements" and that "[w]hen viewed under the bright light of context, however, the Patriarch Parties' purported misstatements and omissions reveal themselves as nothing more than a smoke-and-mirrors attempt to evade the particularity requirements of Rule 9(b)."[263]

In particular, Judge Castel determined that the October 2015 proposal of Mr. McKiernan did not include the representation that Ms. Tilton would retain her rights in the Portfolio Companies: "Nothing in the proposal contemplates the Patriarch Parties retaining ownership rights if they resign as collateral manager. And any representation related to the Patriarch Parties' ownership interest was conditioned on compliance with an agreement that was never consummated."[264] With respect to Plaintiffs' argument that it possessed a claim as evinced by Judge Drain's statement during the involuntary bankruptcy proceeding, Judge Castel dismissed it, finding that the argument ignored the context of Judge Drain's understanding of what would happen following the Patriarch Entities' resignation, which was "clearly conditional on [the parties] reaching a final agreement. As the Patriarch Parties do not allege that a final agreement was ever reached, they fail to state a claim."[265]

Thus, after a thorough analysis of Plaintiffs' 230-paragraph Amended Complaint, the only remaining conduct to support subordination of MBIA's near $1 billion claim is the allegation that MBIA reneged on a promise to Ms. Tilton that she could participate in the process of hiring a new collateral manager.[266] There are no specifics provided for this purported promise; however, assuming it was made,[267] the Court does not find it sufficient to justify subordination of MBIA's claims especially because MBIA had the right to select AMZM as successor collateral manager.[268]

### c.    Improper Purpose

The Plaintiffs ask the Court to ignore the objective realities (including the parties' contractual rights and successful litigation of those rights), arguing that the Zohar III Controlling Class and MBIA (as well as AMZM) acted with an improper purpose – to take and sell Ms. Tilton's equity for their benefit and to harm her. The likelihood of such a scheme's existence is dubious for the reasons already explained and, without the ability to rely on Defendants' purported inequitable conduct, there are insufficient factual allegations in the Amended Complaint to suggest

---

[263] *Id.* at *8.

[264] *Id.*

[265] *Id.* at *9.

[266] Am. Compl. ¶ 167.

[267] The Court notes that Ms. Tilton made no mention of this promise when advising Judge Drain that she was directing the Patriarch Entities to resign as the Zohar Funds' collateral managers. Involuntary Bankruptcy, D.I. 46. Her purported reason for causing the resignations was to avoid "continuing damage [on the businesses of the Portfolio Companies] arising from protracted unproductive negotiations and battle." *Id.*

[268] Petrella Decl., Exs 3-4 (Zohar I and Zohar II CMAs § 5.5).

such a scheme.[269]  Nonetheless, even if a scheme did exist, "[t]he real issue is whether Defendants did anything wrong in pursuit of their 'scheme' and can be held liable on the claims asserted."[270] But as a general matter, the pursuit of one's legal rights, including the exercise of contractual rights, may not be grounds for equitable subordination "even if the rights are exercised harshly and cause harm to other creditors."[271]

Notwithstanding, some cases have held that such a pursuit can inch over to inequitable conduct. They present facts distinct from those here. For instance, in *Citicorp Venture Capital, Ltd. v. Committee of Unsecured Creditors Holding Unsecured Claims*, the Third Circuit found inequitable protracted and unjustified litigation tactics that harmed the estate by causing it to incur fees.[272] There it was determined that the misbehaving creditor repeatedly litigated issues that were decided against it by earlier court decisions in order to prevent a reorganized debtor from engaging in a value-enhancing sale transaction.[273]  In *O'Halloran v. Prudential Savings Bank (In re Island View Crossing II, L.P.)*, the United States Bankruptcy Court for the Eastern District of Pennsylvania determined an equitable subordination claim was sufficiently pled in light of allegations that a lender intentionally breached lending agreements by making bad faith demands for documents, which then caused debtor's construction project to fail after its suppliers and subcontractors ceased to work.[274]  In refusing to dismiss the claim, the court observed that "[i]f proven, [the lender's] conduct went beyond enforcing the contract to the letter."[275]  Finally, the previously described conduct of the lender in *Winstar* that gave rise to a finding of insider status

---

[269] *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Plaintiffs selectively quote snippets of Mr. McKiernan's deposition testimony from the 225 Action and SEC enforcement proceeding as well as certain words and phrases from the SEC's investigative notes to support their conclusion that a strategy existed to steal Ms. Tilton's equity.  Am. Compl. ¶ 147.  These few phrases alone do not support a reasonable inference of an improper purpose. If anything, they indicate that MBIA developed an understanding of various rights and remedies it could utilize to remove Ms. Tilton from control and obtain repayment of its claim.

[270] *Tronox*, 429 B.R. at 90; *see also Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001) ("The fact that Bayer perceives the defendants' legitimate actions to be inequitable as to Bayer is not sufficient. . . . Although the defendants' actions were to Bayer's detriment, there is no evidence that the defendants used their power to control in such a way that they engaged in inequitable conduct.").

[271] *O'Halloran v. Prudential Savs. Bank (In re Island View Crossing II, L.P.)*, 604 B.R. 181, 203 (Bankr. E.D. Pa. 2019) (citing *M. Paolella*, 161 B.R at 120); *accord Citicorp*, 323 F.3d at 235 ("[T]he pursuit of one's legal rights may not be grounds for equitable subordination[.]"); *see also M. Paolella*, 161 B.R. at 120-21 (holding that lender did not act inequitably in monitoring the debtor closely and exercising its contractual rights to withhold funds at a propitious time relative to other creditors); *see also Burtch v. Seaport Cap., LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 661 (Bankr. D. Del. 2012) (dismissing equitable subordination count where alleged facts suggested that creditor merely exercised its rights under the applicable loan).

[272] *Citicorp*, 323 F.3d at 235.

[273] *Id.*

[274] 604 B.R. at 204.

[275] *Id.* (internal quotations omitted).

also supported a finding that it acted inequitably.[276]  Among other things, the lender abused its contractual authority to use its "sole discretion" in order to deliberately delay issuing a refinancing notice under the governing credit agreement to prevent the public disclosure of the debtor's poor financial health and thereby inducing other creditors to provide it funds.[277]

By contrast to these instances where "the creditor 'exceeded its authority under the loan agreement or . . . acted inequitably in exercising its rights under that agreement[,]'"[278] history has shown that MBIA and the Zohar III Controlling Class have diligently and successfully enforced (and caused the Zohar Funds to enforce) their rights under the governing transaction documents. As courts and the parties have consistently observed, the documents at issue sprung from arms-length bargaining between highly sophisticated parties.[279]  "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for their lack of 'good faith.'"[280]  Indeed, "[p]arties have a right to enter into good and bad contracts, the law enforces both."[281]  Upholding that principle here is even more critical given the commitments of the parties in the Indentures that, absent non-compliance with the Indentures, MBIA, as credit enhancer, and the Zohar Funds' noteholders were free to exercise their rights freely and without fear of liability:

> [Zohar I and II Indenture:]
>
> (a)    In exercising any of the Credit Enhancer's or (without duplication) the Controlling Party's voting rights, rights to direct and consent or any other rights as a Secured Party, as the Credit Enhancer or as the Controlling Party under this Indenture . . . the Credit Enhancer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

---

[276] *See supra* notes 113-116 and accompanying text.

[277] *Winstar*, 554 F.3d at 412-13.

[278] *M. Paolella*, 161 B.R. at 120 (quoting *Smith v. Assoc. Com. Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 700 (5th Cir. 1990)).

[279] *See, e.g.*, *Zohar CDO 2003-1, LLC*, C.A. No. 12247-VCS, 2016 WL 6248461, at *7 (analyzing the CMAs and noting that "[t]he contracts at issue here are the products of arms-length bargaining between highly sophisticated parties."); *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, C.A. No. 12946-VCS, 2017 WL 5956877, at *1 ("The words parties use to bind themselves together in a contractual relationship matter. This is especially so when sophisticated parties have engaged in extensive negotiations that produce a bespoke contract.").

[280] *M. Paolella*, 161 B.R. at 120 (quoting *Kham*, 908 F.2d at 1357).

[281] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

(b)  In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture . . . a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.[282]

[Zohar III Indenture:]

(b)  In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture . . . a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct than an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.[283]

While, as the Plaintiffs allege, the parties' long-standing battles may have harmed the value of the Portfolio Companies (and thus, the parties' ultimate recoveries on account of the Zohar Funds notes), avoidance of this result would have required MBIA, the Zohar III Controlling Class, and AMZM to abandon their rights and claims to control the Zohar Funds and the Portfolio Companies.  The Court will not punish them with the extreme and harsh remedy of subordination for electing not to do so under the circumstances presented.[284]

---

[282] Petrella Decl., Ex. 1-2 § 13.2 (Standard of Conduct).

[283] Appendix, Ex. 1 § 13.2 (Standard of Conduct).

[284] Another problem for the Plaintiffs' equitable subordination claim is the sufficiency of the allegations supporting the conclusions that Defendants achieved an unfair advantage or caused a particularized injury to the Plaintiffs as creditors of the Zohar Funds.

For instance, there is no debate that the Zohar Funds defaulted on their payment obligations to their secured noteholders, triggering MBIA's and the Zohar III Controlling Class's rights and remedies under the transaction documents.  Thus, obtaining repayment on account of the obligations pursuant to the Indenture's priority of payment provisions cannot be an unfair advantage.  Moreover, although the monetization process has not yet concluded, the proceeds obtained to date are significantly less than what is necessary to pay the noteholder claims in full.

Moreover, the argument that Defendants' actions caused premature sales of the Portfolio Companies that failed to maximize their value and thus indirectly reduced the value of the Zohar Funds gives rise to an estate cause of action that Plaintiffs do not have standing to raise.  *See, e.g., Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) (holding that secured creditor lacked standing to pursue an equitable subordination claim because it likened its injury to that suffered by all creditors).  Even if Plaintiffs possess direct claims, any argument reliant upon the theory that the noteholders

### E.        Leave to Amend Will Not Be Granted

Plaintiffs request that the Court grant them leave to amend the Amended Complaint.  The Court will deny the request.  Federal Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."[285]  Grant or denial of leave to amend is in the discretion of the Court.[286]  Among the grounds that could justify a denial of leave to amend are: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowing the amendment; and (5) futility.[287]  Futility means that "the complaint, as amended, would fail to state a claim upon which relief could be granted."[288]  In assessing "futility," a court applies the same standard of legal sufficiency under Federal Rule 12(b)(6) and may properly deny leave to amend where the amendment would not withstand a motion to dismiss.[289]

---

were required under the documents to withhold enforcing their rights until some unknown time when the Portfolio Companies were rehabilitated to Ms. Tilton's satisfaction is unsupported.  And even if the noteholders were required to hold off pursuing repayment, Ms. Tilton caused the bankruptcy filing of the Zohar Funds and then voluntarily agreed to monetize the Portfolio Companies under the oversight of this Court to repay the outstanding note obligations to MBIA and the Zohar III Controlling Class in accordance with the Indenture's priority of payment provisions and the Settlement Agreement.  Until that time, Defendants' actions did not cause any sales of the Portfolio Companies.

Furthermore, the Defendants' prepetition efforts to secure the Zohar Funds' ownership and control rights proved successful and served to gather and preserve assets of the Zohar Funds for the benefit of all of their creditors.  The decade long battles of the parties may have indirectly harmed the Portfolio Companies but for reasons discussed, the Defendants should not be punished for ensuring that the contractual rights and remedies of the Zohar Funds and themselves were enforced.  Furthermore, Ms. Tilton decided to cease litigating the ownership issue and resigned from her positions of control over substantially all of the Portfolio Companies in March 2020.  *See* Case No. 18-10512, D.I. 1542.  The idea of now holding the Defendants accountable for harm to those abandoned interests – the gravamen of the Amended Complaint – is a difficult one for the Court to accept.

Finally, reputational harm, litigation costs, and harm to Ms. Tilton's control rights and debt and equity positions in the Portfolio Companies are not sufficient to justify equitable subordination as, among other things, the harm does not relate to Plaintiffs' position as creditors of the Debtors.  *See, e.g.*, *Citicorp*, 323 F.3d at 234 ("The inequitable conduct may arise out of any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors."); *Knox v. Lion/Hendrix Cayman Ltd. (In re John Varvatos Enters., Inc.)*, No. 20-50623, 2021 WL 4133656, at **5-7 (D. Del. Sept. 10, 2021) (affirming dismissal of equitable subordination claim where movant failed to allege a connection between the inequitable conduct and the ordering of creditors in the bankruptcy estate).

[285] FED. R. CIV. P. 15(a).

[286] *See Dole v. Arco Chem. Co.*, 921, F.2d 484, 486 (3d Cir. 1990).

[287] *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.").

[288] *Burlington*, 114 F.3d at 1434; *Stanziale v. Richards, Layton & Finger, P.A. (In re EP Liquidation, LLC)*, 583 B.R. 304, 313 (Bankr. D. Del. Apr. 9, 2018).

[289] *See id*.; *Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co., Inc.)*, 443 B.R. 638, 643 (Bankr. D. Del. Jan. 20, 2011).

The alleged motives and actions of the Defendants that underly the Plaintiffs' equitable subordination claim have been advanced and litigated in various court-proceedings for almost ten years. Significant time, effort, and resources of not only the Defendants but of numerous courts have been expended on Plaintiffs' allegations that have been rehashed over and over. Plaintiffs have not specified how they intend to further amend the Amended Complaint to allege a viable equitable subordination claim, and it is difficult to imagine them bringing forth any information that has not already been (or should have been) included. Moreover, the Court already granted the Plaintiffs leave to amend their original Complaint. They made minimal changes to its substance outside of adding additional allegations that have since been struck[290] despite having the benefit of the Defendants' previous dismissal briefing and the relevant decisions of the courts that have already opined on issues fundamental to the Amended Complaint. While leave to amend is typically granted liberally, the Court believes that doing so here is futile and potentially abusive to the Defendants and this Court.[291]

## VI.    CONCLUSION

Accordingly, for the foregoing reasons, the Court hereby **DISMISSES** the Amended Complaint against all Defendants without leave to amend.

Dated: March 25, 2022

Karen B. Owens
United States Bankruptcy Judge

---

[290] *See infra* note 11.

[291] *See, e.g., Woodend v. Lenape Reg'l High School Dist.*, 535 Fed. Appx. 164, 168 (3d Cir. 2013) (affirming decision to deny leave to amend on the grounds that "there is no indication that additional factual support could raise [plaintiff's] claims above speculation or conclusion."); *Jones v. ABN Amro Mort. Group, Inc.*, 606 F.3d 119, 125-26 (3d Cir. 2010) (affirming denial of leave to amend because plaintiff did not submit a proposed third amended complaint and did not otherwise explain how they would plead differently); *Kanter v. Barella*, 489 F.3d 170, 181-82 (3d Cir. 2007) (noting that futility alone is sufficient ground to deny leave to amend and affirming district court's denial of leave to amend because plaintiff offered no new facts to support his claim); *EP Liquidation*, 583 B.R. at 313-15 (denying leave to amend on futility grounds in light of claim preclusion).