# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ZOHAR III, CORP., *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | Case No. 18-10512-KBO |

| | | |
|---|---|---|
| LYNN TILTON, *et al.*, | : | |
| | : | |
| Appellants, | : | Civ. No. 22-400-TLA |
| v. | : | |
| | : | |
| MBIA INC., *et al.*, | : | |
| | : | |
| Appellees. | : | |

## MEMORANDUM OPINION

August 11, 2022
Wilmington, Delaware

AMBRO, *Circuit Judge*, sitting by designation

Lynn Tilton, the Patriarch Entities, and the Octaluna Entities (collectively, "Plaintiffs") appeal from the Bankruptcy Court's order dismissing their equitable subordination complaint. The Court, in a comprehensive and thoroughly reasoned decision, held that they failed to allege inequitable conduct and, moreover, were collaterally estopped from pursuing certain of their allegations. For the following reasons, I affirm.

I. Background

This appeal involves the Zohar Funds, three investment vehicles (known separately as "Zohar I," "Zohar II," and "Zohar III") created by Tilton.[1] Structured as collateralized loan obligations, the Funds used collateral from investors to make loans to distressed companies in exchange for repayment obligations and equity in those companies (the "Portfolio Companies"). In return, investors were issued notes entitling them to interest over time and the return of their principal on scheduled maturity dates. Tilton was, via the Octaluna Entities, the Funds' preferred shareholder, and any excess value generated by them would go to her. Also, because ratings agencies insisted the Funds not own equity due to the tax consequences, Tilton allegedly owned and controlled the Portfolio Companies' equity herself (again, via the Octaluna Entities).

---

[1] This factual background is drawn from Plaintiffs' equitable subordination complaint as well as documents integral to that complaint and matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Because the Bankruptcy Court closely detailed Plaintiffs' allegations, I summarize only what is necessary to the analysis below.

Defendant MBIA Insurance Corporation ("MBIA") was the "credit enhancer" for Zohar I and Zohar II. It provided an insurance guaranty for holders of those Funds' senior notes, requiring it to step in and make interest and principal payments should the Funds be unable to do so. In return, MBIA had certain rights under the agreements governing those Funds. Most relevant here, in the event Zohar I or Zohar II defaulted on its payment obligations, MBIA would become the senior secured creditor, with payment rights higher in priority than each class of notes. A default would also enable MBIA to monetize the Funds' collateral to recoup its insurance payouts.

In 2012, Tilton determined that Zohar I might default on its repayment obligations. Throughout 2013 and 2014, she and MBIA discussed the possibility of extending Zohar I's maturity date and globally restructuring the Funds but did not reach an agreement.

Meanwhile, as the restructuring talks were ongoing, MBIA was allegedly communicating with the U.S. Securities and Exchange Commission ("SEC") about Tilton and the Patriarch Entities. The SEC began a fraud investigation and administrative enforcement action, and MBIA purportedly entered into an agreement with the agency to obtain confidential, nonpublic information about the Portfolio Companies. Ultimately, the enforcement action was resolved in Tilton and the Patriarch Entities' favor.

The parties continued to discuss a global restructuring of the Funds throughout 2015, but to no avail: Zohar I defaulted in November of that year. Shortly thereafter, Tilton filed an involuntary bankruptcy proceeding against Zohar I. The parties discussed a resolution whereby the Funds' collective collateral manager—three Tilton-controlled entities (the "Patriarch Managers")—would resign. Plaintiffs allege that during these talks

2

MBIA falsely assured Tilton that, if the Patriarch Managers were to resign, she would be able to pick a new collateral manager and remain in control of the Portfolio Companies. In March 2016, Tilton voluntarily caused the Patriarch Managers to resign and the bankruptcy petition was withdrawn. Without any input from her, MBIA and certain Zohar III investors (the Defendant "Zohar III Controlling Class") appointed Defendant Alvarez & Marsal Zohar Management ("AMZM") as the Funds' new collateral manager.

Following Zohar I's default, MBIA made insurance payments to that Fund's senior noteholders. It then directed the Fund's Trustee—Defendant U.S. Bank National Association—to sell Zohar I's assets. U.S. Bank scheduled a public auction for September 15, 2016, which Plaintiffs sued to enjoin. They argued that the sale was commercially unreasonable and improperly included equity in several Portfolio Companies claimed to be owned by Tilton.

U.S. Bank removed the suit to the United States District Court for the Southern District of New York (the "SDNY"), and Judge Sidney Stein issued a temporary restraining order. The Bank then proposed certain changes to the auction's schedule and terms (although it did not adjust its position that the Zohar I collateral included Tilton's purported equity interests in the Portfolio Companies). Following an evidentiary hearing, Judge Jed Rakoff rejected Plaintiffs' contention that the auction was commercially unreasonable and ordered it to move forward under procedures approved by the Court.

The auction was held on December 21, 2016. MBIA won with a credit bid of approximately $149 million. Tilton had, under the Fund's governing documents, a right to match that bid but did not exercise it; thus all of Zohar I's assets transferred to MBIA.

3

During that period, more disputes were afoot. Following its appointment as collateral manager, AMZM caused the Funds to begin the "Zohar Litigation," consisting of three separate actions. The first, filed in April 2016 in the Delaware Chancery Court, alleged the Patriarch Managers violated their contractual obligation to turn over certain books and records to AMZM. That action was resolved in AMZM's favor. The second, also filed in the Chancery Court, arose from written consents executed by AMZM removing Tilton from the boards of three Portfolio Companies and electing new directors in her place. AMZM, via the Zohar Funds, brought suit seeking a determination that the Funds, and not Tilton, owned the equity in those Portfolio Companies and had the authority to name their directors. That action too was resolved in AMZM's favor. Tilton appealed, but the case was dismissed as moot after she agreed to withdraw her objection to the Funds' ownership of those Companies.

The third action was filed in January 2017, asserting claims under the civil RICO statute, 18 U.S.C. § 1961 *et seq.*, and New York common law (the "SDNY action"). Plaintiffs filed a third-party complaint in which they alleged that MBIA and AMZM breached their contractual and fiduciary duties. The RICO and common-law claims were dismissed. *Zohar CDO 2003-1, LTD v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 651, 655 (S.D.N.Y. 2017). Judge P. Kevin Castel then dismissed Plaintiffs' third-party complaint. *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, No. 17-cv-307, 2021 WL 4460547, at *21 (S.D.N.Y. Sept. 29, 2021).

Following Zohar I's default, Zohar II and Zohar III were also unable to fulfill their repayment obligations. The Funds filed for bankruptcy in March of 2018. The next year,

4

Plaintiffs filed a complaint seeking to equitably subordinate Defendants' claims against the estate to their own under Bankruptcy Code § 510(c)(1) (permitting bankruptcy courts to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another claim"). They alleged a long-running scheme: first, MBIA—desperate for cash following the 2008 financial crisis—devised a plan to take control of and sell the Portfolio Companies. To execute that plan, it allegedly engaged Plaintiffs in extension and restructuring negotiations with no intent of reaching a resolution; instead, it wanted Zohar I to default, which would trigger its right to sell that Fund's collateral. It allegedly colluded with the SEC and fed it lies about Tilton and the Portfolio Companies so it could learn confidential information about those Companies and further its efforts to capture their equity. Along with the Zohar III Controlling Class, MBIA purportedly used misrepresentations to induce the Patriarch Managers to resign as the Funds' collective collateral manager. And, through the Funds' new manager, it filed the Zohar Litigation with the goal of "bleed[ing] Tilton] dry" and "wrest[ing] control" of the Portfolio Companies. Appx. 51 ¶ 169. Finally, MBIA and U.S. Bank planned a commercially unreasonable auction so the former could obtain Zohar I's assets for itself.

The Bankruptcy Court dismissed the complaint with prejudice on Defendants' Rule 12(b)(6) motions, holding that it failed to allege facts sufficient to raise a plausible inference of inequitable conduct. Plaintiffs appeal.[2]

---

[2] Jurisdiction over this appeal is under 28 U.S.C. § 158(a)(1), which provides for appellate review of "final judgments, orders, and decrees" entered by a bankruptcy court "in cases and proceedings." An "order ending a separate adversary proceeding is appealable as a final order even though that order does not conclude the entire bankruptcy case." *In re*

5

II. Discussion

Generally, claims against a bankrupt's estate are paid out per a priority scheme, with higher priority creditors recovering before lower priority creditors. But bankruptcy courts may, under 11 U.S.C. § 510(c)(1), subordinate all or part of a higher priority creditor's claim if equity so requires. *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009). Plaintiffs rely on this doctrine, called "equitable subordination," to argue that their claims against the Zohar Funds' estate should be paid before Defendants' claims.

To survive a motion to dismiss, an equitable subordination complaint must plausibly allege that (1) a creditor engaged in inequitable conduct, (2) the conduct injured a lower priority creditor or unfairly advantaged the misbehaving creditor, and (3) subordination would not be inconsistent with the provisions of the Bankruptcy Code. *Id.* If the misbehaving creditor is a non-insider, the plaintiff must generally allege gross misconduct. *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 119 (E.D. Pa. 1993). If it is an insider, the "standard for finding inequitable conduct is much lower," though there still needs to be some plausible allegation of "unfair conduct." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (D. Del. 2002). The Bankruptcy Court held U.S. Bank to be a non-insider and MBIA, AMZM, and the Zohar III Controlling Class to be insiders. Those determinations are not challenged on appeal.

Plaintiffs do challenge four other conclusions of the Court: (1) MBIA's alleged

---

*Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019) (quoting *In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 281 (3d Cir. 2002)). Review is *de novo*. *In re Epic Capital Corp.*, 307 B.R. 767, 771 (D. Del. 2004).

conduct in the Zohar I restructuring negotiations was not plausibly inequitable; (2) its alleged communications with the SEC were not plausibly inequitable; (3) collateral estoppel bars Plaintiffs from alleging that the Zohar Litigation and purported inducement of the Patriarch Managers' resignation were inequitable; and (4) MBIA and U.S. Bank's conduct with respect to the sale of Zohar I was not plausibly inequitable.

### a. The Extension and Restructuring Negotiations

Starting with the Zohar I extension and restructuring talks, the Bankruptcy Court held that Plaintiffs' factual allegations did not support a reasonable inference that the parties' negotiations failed because MBIA secretly wanted to capture the Portfolio Company equity for itself. Plaintiffs contend it did not draw all reasonable inferences in their favor as required on a motion to dismiss. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

I disagree. As the Court explained, the complaint details significant efforts by MBIA to discuss a resolution with Plaintiffs, including a joint (and unsuccessful) attempt to "win the support of the A-3 Noteholder." Appx. 33 ¶ 108. These allegations are inconsistent with Plaintiffs' theory that MBIA deliberately misled them and thereby "prevent[ed] a global restructuring of Zohar I and II." Appx. 68 ¶ 217. And though they assert that MBIA acted unfairly by "reneg[ing] on its commitment to extend the Zohar I maturity date," Appx. 44 ¶ 146, the complaint contains no allegations suggesting that MBIA ever committed to an extension or restructuring. Plaintiffs needed to allege facts showing "more than a sheer possibility" that MBIA acted inequitably and failed to do so. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

7

Plaintiffs posit it's plausible MBIA would engage in a years-long scheme to string them along because it had an interest in ensuring Tilton continued to manage the Funds during that period and increase their value. But the complaint contains no factual allegations that would plausibly support such a theory; indeed, Plaintiffs themselves allege that MBIA purportedly induced the Patriarch Managers (Tilton-affiliated entities) to resign prematurely as the Funds' collective collateral manager. They also point to a statement by MBIA indicating that a Zohar I default would allow it to leverage its post-default rights to negotiate a more favorable global restructuring prior to the Zohar II maturity date. There is nothing inequitable, however, about using contractual rights to a strategic advantage, nor does such a strategy support the inference that MBIA was deliberately misleading Plaintiffs for years about its willingness to negotiate a maturity extension. Even considered in the light most favorable to Plaintiffs, their allegations are insufficient to support a reasonable inference that MBIA acted inequitably with respect to the parties' extension and restructuring negotiations.

b. *The SEC Communications*

The allegations of unfair conduct involving MBIA's communications with the SEC are similarly implausible. Plaintiffs broadly allege that MBIA supplied the SEC with misinformation to induce an enforcement action against Tilton and the Patriarch Entities but offer no specific factual allegations that would reasonably support such a theory. They protest on appeal that this information was by its "very nature confidential and uniquely in the possession of MBIA." Appellant Br. 36. But their own complaint indicates that they possess email correspondence between MBIA and the SEC, as well as "internal

8

handwritten notes" documenting their meetings. Appx. 41 ¶ 137. Even with those records, Plaintiffs fail to allege a single piece of actual misinformation given to the SEC by MBIA. Without more, it is unreasonable to infer that MBIA would lie to a federal agency just to increase the likelihood of a Zohar I default or gain some unspecified litigation advantage over Tilton. It is also unreasonable to infer that MBIA's communications with the SEC were false merely because the latter's enforcement action against Tilton and the Patriarch Entities was ultimately unsuccessful.

Plaintiffs further contend that MBIA acted unfairly by entering into a "secret deal" with the SEC to obtain confidential financial information about the Portfolio Companies. Appx. 41 ¶ 138. But, as the Bankruptcy Court noted, the complaint itself confirms that whatever information-sharing agreement existed between MBIA and the SEC was not "secret." Rather, it permitted the SEC to inform Tilton of the arrangement upon first giving notice to MBIA. Plaintiffs fail, moreover, to explain how they were harmed by MBIA's receipt of the allegedly nonpublic information. In sum, they do not state a plausible equitable subordination claim as to MBIA's communications with the SEC.

### c. The Patriarch Managers' Resignation and the AMZM Litigation

The Bankruptcy Court determined that Plaintiffs were collaterally estopped from pursuing an equitable subordination claim premised on either the Patriarch Managers' resignation as the Funds' collective collateral manager or the litigation initiated against Plaintiffs by the Funds' new collateral manager, AMZM. Collateral estoppel means you can't relitigate issues already decided in a prior lawsuit. *In re Doctoroff*, 133 F.3d 210, 214 (3d Cir. 1997). It applies where (1) the issue sought to be precluded is the same as the

one involved in the prior action, (2) it was actually litigated, (3) it was determined by a valid and final judgment, and (4) that determination was essential to the prior judgment. *Id.* The Bankruptcy Court held these factors met by Judge Castel's opinion dismissing Plaintiffs' third-party complaint in the SDNY action.

Plaintiffs challenge that holding on two grounds. First, they dispute that Judge Castel decided the same issue as the one before the Bankruptcy Court. They contend that an equitable subordination claim may be premised on a broader array of conduct than the fraud, negligent misrepresentation, breach of contract, and other claims ruled on by Judge Castel. But Plaintiffs' claims in both proceedings were premised on the same alleged misconduct: that MBIA relied on misrepresentations to induce the Patriarch Managers to resign as the Funds' collateral manager, and that it and AMZM undertook a campaign of meritless litigation to drain Tilton's resources. Judge Castel reviewed these allegations under a motion-to-dismiss standard—the same standard applied by the Bankruptcy Court to Plaintiffs' equitable subordination complaint—and expressly held them implausible. *Zohar*, 2021 WL 4460547, at *8, *18. There was sufficient identity between the issues in these litigations to warrant applying the collateral estoppel doctrine.[3] *See In re 9281 Shore Road Owners Corp.*, 214 B.R. 676, 690 (Bankr. E.D.N.Y. 1997) ("[W]here the same allegations of misconduct were raised in the first action and decided against a debtor, the

---

[3] Plaintiffs offer *In re Astroline Communications Co.*, 226 B.R. 324 (Bankr. D. Conn. 1998), in support of their position, but that case is not on point. It held only that a prior ruling—that the defendant's exercise of control over a debtor was insufficient for it to be deemed a general partner—could not stop a chapter 7 trustee from offering other bases for holding the defendant to be an insider for equitable subordination purposes. *Id.* at 327–28.

same factual allegations cannot be used in a subsequent proceeding in Bankruptcy Court to subordinate the creditor's claim.").

Second, Plaintiffs submit that the above determinations were not essential to Judge Castel's judgment. They say he "did not address, much less determine, [their] allegations that AMZM's purposes in pursuing its litigation campaign against [them] were illegitimate." Appellant Br. 44–45. But that isn't true: Judge Castel specifically explained that Plaintiffs did not "plausibly allege[] that the litigations brought on behalf of the Zohar Funds [were] 'sham' litigations." *Zohar*, 2021 WL 4460547, at *18. The same exists for their allegations concerning the removal of the Patriarch Managers. *Id.* at *8. Plaintiffs were not entitled to a second shot in the Bankruptcy Court.

### d. The Foreclosure Auction

Finally, Plaintiffs contend that MBIA and U.S. Bank's conduct with respect to the Zohar I auction was inequitable. They call the auction "commercially unreasonable" and allege it was designed to "provide a windfall to MBIA" at Tilton's expense. Appx. 46 ¶ 153. The Bankruptcy Court found these allegations implausible for several reasons, including: the auction was closely supervised by Judge Rakoff, who approved its terms; Plaintiffs failed to provide any factual allegations to support an inference that MBIA's winning credit bid of approximately $149 million was a "windfall"; and if it was such a windfall, Tilton possessed a "last look right" to purchase the Zohar I assets for the same price but did not do so.

Plaintiffs do not dispute on appeal that the Zohar I auction was conducted with Judge Rakoff's oversight. Nor do they dispute that they challenged the reasonableness of the

11

auction procedures before the Judge, who reviewed their arguments and still ordered the auction to move forward. *Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*, No. 16 Civ. 7128, 2017 WL 3822603, at *4–7 (S.D.N.Y. 2017). Rather, they contend that MBIA and U.S. Bank acted unfairly by attempting to conduct the sale on allegedly unreasonable terms, thus forcing Plaintiffs to seek a court's intervention. That is not, however, the theory in their complaint. *See* Appx. 68 (alleging inequitable conduct based on "MBIA's and U.S. Bank's *execution* of a commercially unreasonable sham purported auction of Zohar I's assets" (emphasis added)). And even if it were, the complaint's allegations, when viewed alongside Judge Rakoff's opinion on the matter, are insufficient to support the assertion that MBIA and U.S. Bank (a non-insider) acted inequitably toward Plaintiffs with respect to the Zohar I auction.[4]

\* \* \*

The Bankruptcy Court rightly concluded that Plaintiffs failed to state a plausible equitable subordination claim, and I therefore affirm its judgment dismissing the complaint with prejudice.[5] An appropriate order follows.

---

[4] Plaintiffs also take issue with the Bankruptcy Court's conclusion that their complaint did not plausibly allege MBIA acquired the Zohar I assets at a "windfall" price, as Tilton (a sophisticated investor) failed to exercise her right to purchase the assets at the same cost. The "reasoning and motivation behind Ms. Tilton's decision," they assert, are questions of fact that cannot be resolved on a motion to dismiss. Appellant Br. 49. Even if that were true, Plaintiffs' allegations of a "windfall" are undercut by their failure to allege any details concerning the assets' purported worth.

[5] The Court denied Plaintiffs leave to amend the complaint, and they do not challenge that determination on appeal (nor would I hold that the Court abused its discretion in denying the request).

12